**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION**

| | |
|---|---|
| JOSEPH BAYER and GWENDOLYN CULVERSON, <br><br> Plaintiffs, <br><br> v. <br><br> BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.; BOEHRINGER INGELHEIM CORPORATION; BOEHRINGER INGELHEIM USA CORPORATION; GLAXOSMITHKLINE, LLC; GLAXOSMITHKLINE HOLDINGS (AMERICAS) INC.; PFIZER INC.; SANOFI-AVENTIS U.S. LLC; SANOFI US SERVICES INC; PATHEON MANUFCTURING SERVICES LLC; CHATTEM INC; AURO HEALTH LLC; AUROBINDO PHARMA USA, INC.; DR. REDDY'S LABORATORIES, INC.; DR. REDDY'S LABORATORIES LOUISIANA, LLC; GRANULES USA, INC.; L. PERRIGO CO.; PERRIGO COMPANY; PERRIGO RESEARCH & DEVELOPMENT COMPANY; STRIDES PHARMA, INC.; RANBAXY INC.; SUN PHARMACEUTICALS INDUSTRIES INC., f/k/a RANBAXY PHARMACEUTICALS INC.; ACTAVIS MID ATLANTIC LLC; TEVA PHARMACEUTICALS U.S.A., INC.; WATSON LABORATORIES, INC.; WOCKHARDT USA LLC; WOCKHARDT AMERICAS, INC.; WALGREEN CO.; WALGREENS BOOTS ALLIANCE, INC.; BOND DRUG COMPANY OF ILLINOIS d/b/a/ WALGREENS, <br><br> Defendants. | Case No.  3:21-cv-01084 <br><br><br> **NOTICE OF REMOVAL OF ACTION PURSUANT TO 28 U.S.C. §§ 1332, 1441, AND 1446** <br><br> **DEMAND FOR JURY TRIAL** |

<u>**NOTICE OF REMOVAL**</u>

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Defendants Boehringer Ingelheim

Pharmaceuticals, Inc.; Boehringer Ingelheim Corporation; Boehringer Ingelheim USA

Corporation; GlaxoSmithKline LLC; GlaxoSmithKline Holdings (Americas) Inc.; Pfizer Inc.,

Sanofi-Aventis U.S. LLC; Sanofi US Services Inc.; and Chattem, Inc. (collectively, the

"Removing Defendants") hereby give notice of removal of this action, *Bayer v. Boehringer*

*Ingelheim Pharmaceuticals, Inc., et al.*, Case No. 2021L000915, from the Illinois Circuit Court

for Madison County to the United States District Court for the Southern District of Illinois.

## PRELIMINARY STATEMENT

1.      In September 2020, Plaintiffs in this action each voluntarily joined a "Census

Registry" in the multidistrict litigation ("MDL") pending in the United States District Court for

the Southern District of Florida before the Honorable Robin L. Rosenberg for actions alleging that

the medication Zantac (ranitidine) contains a chemical compound (NDMA) that can cause various

cancers.  By order of the MDL Court, in submitting "Census Plus Forms" regarding their claims

to the MDL "Census Registry" these Plaintiffs "commit[ted] to filing any action relating to Zantac

or any ranitidine products, if at all, before [the MDL] Court in MDL No. 2924."  *See* Pretrial Order

No. 15 ("PTO 15") at 11, *In re: Zantac (Ranitidine) Prods. Liab. Litig*. ("*Zantac* MDL"), No. 9:20-

md-2924 (Apr. 2, 2020), ECF No. 547 (attached as Exhibit A).  Nonetheless, Plaintiffs improperly

commenced this action in Illinois state court and fraudulently joined Illinois defendants in an

attempt to avoid federal court, the MDL proceeding, and adverse rulings of the MDL Court as to

these defendants.  Defendants will file a motion to stay this action pending transfer by the Judicial

Panel on Multidistrict Litigation ("JPML") to the Zantac MDL, so that the MDL Court can enforce

its orders entered there.

## INTRODUCTION

2.      This action is one of over a thousand related lawsuits filed against manufacturers

and sellers of Zantac (ranitidine), an antacid medication.  Zantac/ranitidine was sold in both

prescription and over-the-counter ("OTC") formulations, and since it first entered the market in 1983 it has been manufactured and sold by both branded pharmaceutical manufacturers (under the name Zantac) and generic manufacturers (under the active ingredient name ranitidine).

3.      On February 6, 2020, the JPML created an MDL in the Southern District of Florida for pretrial coordination of cases like this one "in which plaintiffs allege that they developed cancer as a result of NDMA formed from Zantac." *In re: Zantac (Ranitidine) Prods. Liab. Litig.*, 2020 WL 582134, at *2 (J.P.M.L. 2020).  To date, over 1,700 actions involving thousands of plaintiffs have been filed in or transferred to the Zantac MDL.

4.      On April 2, 2020, the MDL Court, with the agreement of leadership counsel for both the plaintiffs and the defendants, issued an order establishing a voluntary Census Registry, where individuals who did not yet wish to file a lawsuit could instead register their potential claims for personal injury and/or medical monitoring in connection with the use of any ranitidine product. *See* Ex. A (PTO 15).  Under the process outlined in PTO 15, individuals with potential claims were eligible for certain benefits, including tolling of the statute of limitations related to those claims, if they joined the Census Registry by completing and filing a Census Plus Form ("CPF").  In exchange for these benefits, claimants who chose to participate agreed to a forum selection clause if they ever decided to file a lawsuit:  they "commit[ted] to filing any action relating to Zantac or any ranitidine products, if at all, before [the MDL] Court in MDL No. 2924." *Id.* at 11.  The only exception to that binding commitment was for "actions as to which a federal court would lack diversity jurisdiction" based on claims against defendants that Registry Claimants "have a good faith belief marketed or manufactured Zantac or ranitidine products that such Claimants ingested or that they in good faith believe they may have a valid claim against for other reasons." *Id.* at 11–12.

5.     On June 22, 2020, plaintiffs' leadership counsel in the MDL filed three master complaints on behalf of all plaintiffs: a personal injury complaint, a consumer class action complaint, and a third-party payor class action complaint.  These three complaints each were signed by (among others) the Keller Lenkner law firm, which represents Plaintiffs in this case, and is one of the firms appointed by the MDL Court to litigate claims on behalf of plaintiffs in the MDL.  Specifically, Ashley Keller, of the Keller Lenkner firm, one of Plaintiffs' counsel here, was appointed Chair of the Law & Briefing Committee in the MDL.  *See* Pretrial Order No. 20 at 13 ("PTO 20"), *Zantac MDL*, (May 8, 2020), ECF No. 685 (attached as Exhibit B).

6.     On September 17, 2020, Joseph Bayer and Gwendolyn Culverson, Plaintiffs in this action, each voluntarily joined the MDL Census Registry by filing a completed CPF through the process outlined in PTO 15.  Plaintiff Bayer indicated he had taken only generic ranitidine products; Plaintiff Culverson indicated she had taken both generic and branded products.  For the next eleven months, these two Plaintiffs accepted the benefits of the MDL Registry, including tolling of the statute of limitations applicable to their claims and the ability to have some of their key medical records collected by a vendor appointed by the MDL Court, with defendants in the MDL paying half the cost of collection.  Plaintiffs' participation in the Registry bound them to the forum selection clause in PTO 15.

7.     General liability discovery in the MDL has been proceeding since June 2020, and fact discovery as to the defendants closes in December 2021.  To date, the defendants have produced tens of millions of pages of documents, and plaintiffs' leadership counsel have taken dozens of depositions.

8.     On December 31, 2020 and January 8, 2021, the MDL Court issued a series of orders on defendants' various motions to dismiss the original three master complaints.  Among

other things, the MDL Court held that all claims for design defect or failure to warn brought against generic manufacturer defendants and retailers—including claims brought against defendants Wockhardt and Walgreens—were preempted by federal law. *See* Order at 28–29, 52, *Zantac MDL*, (December 31, 2020), ECF No. 2512 (holding that certain claims against generic manufacturer defendants were preempted and dismissed with prejudice, including "claims based on allegations that ranitidine products were defectively designed because they break down into NDMA and claims based on failure to warn consumers that the products contained NDMA or could break down into NDMA when ingested") (attached as Exhibit C); *see* Order at 24–28, 45, *Zantac MDL*, (Dec. 31, 2020), ECF No. 2513 (holding that all claims against retailer defendants that were "predicated on design defect or an improper label" were preempted and dismissed with prejudice) (attached as Exhibit D).  These preemption motions in the MDL were argued for plaintiffs by Plaintiffs' counsel here.

9.     The MDL Court allowed the plaintiffs to replead the master complaints to assert new claims against generic manufacturers and retailers based on a limited set of theories that had not been properly pleaded previously. *See id.*  However, the MDL Court did *not* determine whether any such claims would survive federal preemption and permitted the defendants to file motions to dismiss the amended master complaints on preemption and other grounds.

10.     On February 8 and 22, 2021, plaintiffs' leadership counsel in the MDL, including Mr. Keller, filed three amended master complaints on behalf of all plaintiffs: a personal injury complaint, an economic loss consumer class action complaint, and a medical monitoring class action complaint.

11.     On June 30, 2021 and July 8, 2021, the MDL Court issued a series of orders on the defendants' various motions to dismiss the three amended master complaints, and held that all

claims asserted against generic manufacturer defendants (including Wockhardt) and retailers that sold store-brand generic ranitidine (including Walgreens) were preempted by federal law.  *See* Order at 44, *Zantac MDL*, (July 8, 2021), ECF No. 3750 (holding that all remaining claims against generic ranitidine manufacturers were preempted and dismissed with prejudice) (attached as Exhibit E); *id.* at 47 (explaining that retailer defendants like Walgreens had "no more authority under federal law to change their store-brand ranitidine products' design or labeling" than did generic manufacturers, and therefore claims against them were preempted and dismissed with prejudice).[1]  These preemption motions were once again argued for plaintiffs by Mr. Keller.  As to branded manufacturers, the MDL Court found that certain personal injury and medical monitoring claims could not survive Rule 12(b)(6), but others could proceed.

12.     Shortly thereafter, on August 2, 2021, Plaintiffs filed this Complaint in the Illinois Circuit Court for Madison County.  Plaintiffs bring claims of strict products liability, negligence, breach of warranty, unjust enrichment, and loss of consortium against the Removing Defendants, which manufactured or sold Zantac products over various time periods, as well as against certain manufacturers of generic ranitidine products.  The thrust of the allegations in the Complaint—as in the master personal injury complaint filed in the MDL by these same Plaintiffs' counsel—is that Plaintiffs ingested OTC generic ranitidine and/or brand name Zantac and, as a result, developed

---

[1] The MDL Court later noted that the only claim against a retailer that *might* survive a motion to dismiss is a negligence claim where a specific plaintiff could allege that the specific ranitidine product he or she took was subject to temperatures in excess of the conditions set forth on the product label, and as a result, NDMA was formed in the ranitidine product—for example, via "a negligently overheated lot/pallet of ranitidine or a store with inadequate air conditioning."  *See* Order at 2–3, *Zantac MDL.*, 9:20-md-2924 (Aug. 6, 2021), ECF No. 3913 (attached as Exhibit F).  The MDL Court held that "upon remand"—in other words, after a plaintiff's complaint had been filed in the MDL and then remanded to its home federal district—that plaintiff would be free to allege such a claim, if he or she had a factual basis to do so.  *Id.* at 3–4.  Plaintiffs here have not alleged such a claim against Walgreens.

cancer.  Compl. ¶¶ 15–26.  The Removing Defendants are not citizens of Illinois for diversity purposes.  *See id.* ¶¶ 28–42.  A copy of the Complaint is attached as Exhibit G.

13.     Despite the MDL Court's orders holding that the MDL master complaints' claims against generic manufacturer and retailer defendants are preempted by federal law, Plaintiffs' Complaint names a collection of generic ranitidine manufacturers, including Wockhardt USA LLC, a Delaware and Illinois citizen for diversity purposes.[2]  The Complaint also names Illinois-based "Retailer Defendants"—three Walgreens entities—ostensibly to destroy diversity jurisdiction and thus to escape Plaintiffs' binding commitment to file their cases in the federal MDL.

14.     As further explained below, Plaintiffs fraudulently joined the Retailer Defendants and Wockhardt USA LLC in this action to avoid the MDL Court's jurisdiction because the MDL Court—where Plaintiffs are obligated to file their claims—has held that claims like those alleged here against generic manufacturers and retailers of ranitidine products are preempted.  More specifically, the only non-derivative claims brought against Retailer Defendants in this action are for design defect and failure to warn, Compl. ¶¶ 324–60, claims that the MDL Court held are preempted and dismissed in its December 31, 2020 Order—more than seven months before this action was filed.  The MDL Court has likewise dismissed all claims against generic manufacturers with prejudice, including negligence, strict liability, and warranty claims based on failure to warn and design defect.  *See* Ex. C (Dec. 31, 2020 Order); Ex. E (July 8, 2021 Order).  As a result, the

---

[2] Defendant Wockhardt USA LLC is a limited liability company organized under the laws of Delaware.  In their Complaint, Plaintiffs inaccurately allege that Wockhardt USA LLC's sole member is Wockhardt Americas, Inc., a Delaware corporation with a principal place of business in New Jersey.  Compl. ¶ 80.  In fact, Wockhardt USA LLC's sole member is Morton Grove Pharmaceuticals, Inc., a Delaware corporation with a principal place of business in Illinois.  Wockhardt USA LLC is, therefore, a citizen of Delaware and Illinois.  As discussed below, however, because Wockhardt USA LLC is fraudulently joined, its Illinois citizenship should be disregarded for purposes of determining diversity.

Complaint cannot possibly state a viable claim against Retailer Defendants or against Wockhardt USA LLC, and because Plaintiffs filed these claims knowing that they are barred, their Illinois citizenship should be ignored for purposes of assessing whether diversity jurisdiction exists.

15.     Moreover, it was MDL Judge Rosenberg who oversaw the creation of the Census Registry and issued PTO 15 and other orders governing that Registry.  And, because all federal court claims alleging that ranitidine causes cancer have been consolidated into or directly filed in the Zantac MDL, the MDL Court is the only federal court that has considered in depth the issue of federal preemption for claims involving ranitidine medications.   Accordingly, Removing Defendants intend to tag this action to the MDL and to seek a stay of these proceedings pending transfer.

16.     Alternatively, even considering Plaintiffs' claims in a vacuum, without regard to their commitment to file them in the MDL, the Complaint fails to state any claim against Wockhardt USA LLC or the Retailer Defendants that is cognizable under Illinois law.

17.     First, as the MDL Court has held, Plaintiffs' design defect and failure to warn claims against Wockhardt USA LLC and the Retailer Defendants are preempted by federal law because both generic drug manufacturers and retailers lack the legal authority under U.S. Food and Drug Administration ("FDA") regulations to unilaterally alter Zantac's government approved labeling or to design the product differently.  *See, e.g.*, Ex. C (Dec. 31, 2020 Order) at 14 (under *Mensing* and *Bartlett*, both failure to warn and design defect claims brought against generic drug manufacturers are pre-empted "because the generic drug manufacturers [can]not independently change the labeling while remaining in compliance with federal law"); Ex. D (Dec. 31, 2020 Order) at 26 ("The [retailer and distributor] Defendants have no ability to alter a label or alter a drug's design; thus, claims against them premised on labeling and design are pre-empted."); *PLIVA, Inc.*

*v. Mensing*, 564 U.S. 604, 618 (2011) ("If the [generic] Manufacturers had independently changed their labels to satisfy their state-law duty [to attach a safer label], they would have violated federal law."); *Mut. Pharm. Co. v. Bartlett*, 570 U.S. at 475 ("[S]tate-law design-defect claims that turn on the adequacy of a drug's warnings are pre-empted by federal law under [*Mensing*].").

18.     Second, Plaintiffs' claims for Unjust Enrichment (Count IX) and Loss of Consortium (Count X) are derivative of their design defect and failure to warn claims, and therefore are not viable because those claims as against Wockhardt USA LLC and the Retailer Defendants are groundless for the reasons discussed herein. *See, e.g.*, *Allender v. Guardian Life Ins. Co. of Am.*, 592 F. Supp. 541, 544 (N.D. Ill. 1984).

19.     Third, Plaintiffs' strict liability claim against the Retailer Defendants (Count II) is also precluded by the Illinois "innocent seller statute," which bars claims against the sellers of products for strict liability claims. 735 Ill. Comp. Stat. 5/2-621. Because Plaintiffs cannot show that the Retailer Defendants "participated in the design or manufacture of the product," "had actual knowledge of [any] defect in the product," or "created the defect in the product," the Retailer Defendants cannot be liable under a strict liability theory. *Clay v. Philip Morris USA Inc.*, No. 18-cv-03549, 2018 WL 11198356, at *2 (N.D. Ill. Nov. 6, 2018).

20.     Finally, Plaintiffs' negligence claim against the Retailer Defendants for failure to warn (Count III) is groundless because the Complaint does not allege any facts from which the Court could infer that Retailer Defendants had knowledge of any alleged defect. *See Happel v. Wal-Mart Stores, Inc.*, 199 Ill. 2d 179, 186 (2002) ("A duty to warn exists where there is unequal knowledge, actual or constructive [of a dangerous condition], and the defendant[,] possessed of such knowledge, knows or should know that harm might or could occur if no warning is given."). To the extent Plaintiffs' negligence claim is premised on a duty to inspect ranitidine products to

discover any alleged defects, it is well settled under Illinois law that a seller has no such duty.  *Kirk v. Stineway Drug Store Co.*, 187 N.E.2d 307, 313 (Ill. App. Ct. 1963); *Rahn v. Gerdts*, 455 N.E.2d 807, 810–11 (Ill. App. Ct. 1983).

21.     Thus, Plaintiffs' substantive claims against Wockhardt USA LLC and the Retailer Defendants each fail for multiple independent reasons, and their remaining derivative claims cannot survive independently.   Because these Defendants are fraudulently joined, federal jurisdiction over this action is proper based on complete diversity between Plaintiffs and all properly joined Defendants.

## JURISDICTION

22.     The Removing Defendants remove this action on the basis of diversity jurisdiction pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 and the doctrine of fraudulent joinder.

23.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because: (1) there is complete diversity between Plaintiff and the properly joined Defendants; (2) the amount in controversy exceeds $75,000, exclusive of interest and costs; and (3) all other requirements for removal have been satisfied.

## BASIS FOR REMOVAL

### I.     THERE IS COMPLETE DIVERSITY BETWEEN PLAINTIFFS AND THE PROPERLY JOINED PARTIES.

24.     Plaintiffs Joseph Bayer and Gwendolyn Culverson are both citizens of Illinois. Compl. ¶¶ 15, 21.

25.     The properly joined Defendants[3] are all citizens of states other than Illinois.  *See id.* ¶¶ 28–82.

---

[3] As explained herein, Plaintiffs state no valid claim against any generic manufacturer.  But in any event, of the generic manufacturers named in the Complaint, only Wockhardt USA LLC is a citizen of Illinois for diversity purposes.

26.     Defendant Boehringer Ingelheim Pharmaceuticals, Inc. is a corporation organized under the laws of Delaware with its principal place of business in Ridgefield, Connecticut. *Id.* ¶ 28. Boehringer Ingelheim Pharmaceuticals, Inc. is, therefore, a citizen of Delaware and Connecticut.

27.     Defendant Boehringer Ingelheim Corporation is a corporation organized under the laws of Nevada with its principal place of business in Ridgefield, Connecticut. *Id.* ¶ 29. Boehringer Ingelheim Corporation is, therefore, a citizen of Nevada and Connecticut.

28.     Defendant Boehringer Ingelheim USA Corporation is a corporation organized under the laws of Delaware with its principal place of business in Ridgefield, Connecticut. *Id.* ¶ 30. Boehringer Ingelheim USA Corporation is, therefore, a citizen of Delaware and Connecticut.

29.     Defendant GlaxoSmithKline LLC is a limited liability company organized under the laws of Delaware. Its sole member is Defendant GlaxoSmithKline Holdings (America) Inc., a corporation organized under the laws of Delaware with its principal place of business in Wilmington, Delaware. *Id.* ¶¶ 32–33. GlaxoSmithKline LLC and GlaxoSmithKline Holdings (America) Inc. are, therefore, citizens of Delaware.

30.     Defendant Pfizer Inc. is a corporation organized under the laws of Delaware with its principal place of business in New York, New York. *Id.* ¶ 35. Pfizer Inc. is, therefore, a citizen of Delaware and New York.

31.     Defendant Sanofi-Aventis U.S. LLC is a limited liability company organized under the laws of Delaware. Its sole member is Defendant Sanofi US Services Inc., a corporation organized under the laws of Delaware with its principal place of business in Bridgewater, New Jersey. *Id.* ¶¶ 36–37. Sanofi-Aventis U.S. LLC and Sanofi US Services Inc. are, therefore, citizens of Delaware and New Jersey.

32.     Defendant Patheon Manufacturing Services LLC is a limited liability company organized under the laws of Delaware.  *Id.* ¶ 38.  DPI Newco LLC is the sole member of Patheon Manufacturing Services LLC. Thermo Fisher (CN) Luxembourg Holding S.a.r.l. is the sole member of DPI Newco LLC. Thermo CIDTEC Inc. and TFS Life Holding LLC are the two members of Thermo Fisher (CN) Luxembourg Holding S.a.r.l. Thermo CIDTEC Inc. is incorporated in New York and also maintains its principal place of business in New York. TFS Life Holding LLC has 5 members: (1) Thermo Fisher Scientific Life Technologies Investment UK I Limited, which is an English company; (2) Thermo Fisher Scientific Sweden Holdings LLC; (3) Thermo Fisher Scientific Investments (Sweden) S.a.r.l.; (4) Thermo Fisher Scientific Life Investments US Financing II LLC; and (5) TFS Group Holding II LLC. Thermo Fisher Scientific Sweden Holdings LLC has two members, Thermo Fisher Scientific Investments (Sweden) S.a.r.l. and TFS Group Holding II LLC. Thermo Fisher Scientific Investments (Sweden) S.a.r.l. has two members, CHK Holdings Inc., a Delaware corporation with its principal place of business in Massachusetts, and FSWH International Holdings LLC. Fisher Scientific Worldwide Holdings I C.V. is the sole member of FSWH International Holdings LLC. Fisher Scientific Worldwide Holdings I C.V. has two members, Fisher Scientific Worldwide Inc., a Delaware corporation with its principal place of business in Massachusetts, and FSIR Holdings (US) Inc., also a Delaware corporation with its principal place of business in Massachusetts. TFS Group Holding II LLC has two members, Thermo Fisher Scientific Life Investments C.V. and TFS Group Holding I LLC. Thermo Fisher Scientific Life Investments C.V. has two members, Thermo Fisher Scientific Life Investments GP LLC and Thermo Fisher Scientific Life Holdings II C.V. Thermo Fisher Scientific Life Holdings III C.V. is the sole member of Thermo Fisher Scientific Life Investments GP LLC. Thermo Fisher Scientific Life Holdings III C.V. has five members: (1) Thermo Fisher Scientific

AL-1 LLC; (2) TFLP LLC; (3) Thermo Fisher Scientific Inc., a Delaware corporation with its principal place of business in Massachusetts; (4) Thermo BioAnalysis LLC; and (5) Erie Scientific LLC. TFLP LLC is the sole member of Thermo Fisher Scientific AL-1 LLC. TFLP LLC has five members: (1) Thermo Electron Corporation, a Delaware corporation with its principal place of business in Massachusetts; (2) Erie Scientific LLC, whose sole member is Apogent Technologies Inc., a Wisconsin corporation with its principal place of business in Massachusetts; (3) Apogent Technologies Inc.; (4) Fisher Scientific Worldwide Inc., a Delaware corporation with its principal place of business in Massachusetts; and (5) Fisher WWD Holding L.L.C., whose sole member is Fisher Scientific Worldwide Inc., a Delaware corporation with its principal place of business in Massachusetts. Thermo BioAnalysis LLC has three members: (1) Thermo Fisher Scientific Inc.; (2) Life Sciences International Limited, an English company; and (3) Life Sciences International LLC, whose sole member is Helmet Securities Limited, an English company. TFS Group Holding I LLC has twelve members: (1) Thermo Fisher Scientific Inc., (2) Thermo Luxembourg Holding LLC (Thermo Luxembourg Holding S.a.r.l.), whose sole member is Thermo Fisher Scientific Germany BV & Co. KG, which is owned by Thermo Fisher Scientific Inc. and Thermo Fisher Scientific Germany B.V., a Dutch company; (3) Molecular Bioproducts Inc., a California corporation with its principal place of business also in California; (4) Thermo Fisher Scientific Investments (Sweden) S.a.r.l., which has two members, CHK Holdings Inc., a Delaware corporation with its principal place of business in Massachusetts, and FSWH International Holdings LLC, whose sole member is Fisher Scientific Worldwide Holdings I C.V., whose members are Fisher Scientific Worldwide Inc., a Delaware corporation with its principal place of business in Massachusetts, and FSIR Holdings (US) Inc., a Delaware corporation with its principal place of business in Massachusetts; (5) Fisher Scientific Worldwide Holdings I C.V.; (6) Thermo Fisher Scientific Life Investments US Financing I LLC, whose members are FSIR Holdings (US) Inc. and

FSWH International Holdings LLC; (7) Fisher Scientific Worldwide Inc.; (8) Fisher Clinical Services Inc., a Pennsylvania corporation with its principal place of business also in Pennsylvania; (9) Liberty Lane Investment LLC, whose sole member is FSIR Holdings (US) Inc.; (10) Fisher Scientific International LLC, whose sole member is Thermo Fisher Scientific Inc.; (11) Thermo Fisher Scientific Life Investments US Financing II LLC, whose members are Perbio Science Sweden Holdings AB, a Swedish Company, and Thermo Fisher Scientific Life Investments II S.a.r.l., which is owned by Perbio Science AB, a Swedish company; and (12) Erie LP Holding LLC, whose sole member is Erie UK Holding Company, a Delaware corporation with its principal place of business in Massachusetts. Consequently, Patheon Manufacturing Services LLC is not a citizen of Illinois.

33.     Defendant Chattem, Inc. is a corporation organized under the laws of Tennessee with its principal place of business in Bridgewater, New Jersey. *Id.* ¶ 39.  Chattem is, therefore, a citizen of Tennessee and New Jersey.

34.     Defendant Aurohealth LLC (incorrectly named as Auro Health LLC) is a limited liability company organized under the laws of New Jersey.  Its sole member is Defendant Aurobindo Pharma USA, Inc., a corporation organized under the laws of Delaware with its principal place of business in New Jersey. *Id.* ¶¶ 43, 45.  Aurohealth LLC and Aurobindo Pharma USA, Inc. are, therefore, citizens of Delaware and New Jersey.

35.     Defendant Dr. Reddy's Laboratories, Inc. is a corporation organized under the laws of New Jersey, with its principal place of business in Princeton, New Jersey. *Id.* ¶ 49.  Defendant Dr. Reddy's Laboratories Louisiana LLC is a limited liability company organized under the laws of Delaware. *Id.* ¶ 52.  Its sole member is Defendant Dr. Reddy's Laboratories, Inc.  Dr. Reddy's Laboratories, Inc. and Reddy's Laboratories Louisiana LLC are, therefore, citizens of New Jersey.

36.     Defendant Granules USA, Inc. is a corporation organized under the laws of Delaware with its principal place of business in New Jersey.  *Id.* ¶ 56.  Granules USA, Inc. is, therefore, a citizen of Delaware and New Jersey.

37.     Defendants L. Perrigo Co., Perrigo Company, and Perrigo Research & Development Company are corporations organized under the laws of Michigan with principal places of business in Michigan.  *Id.* ¶¶ 58, 60–61.  L. Perrigo Co., Perrigo Company, and Perrigo Research & Development Company are, therefore, citizens of Michigan.

38.     Defendant Strides Pharma, Inc. is a corporation organized under the laws of New Jersey with a principal place of business in New Jersey.  *Id.* ¶ 65.  Strides Pharma, Inc. is, therefore, a citizen of New Jersey.

39.      Defendant Ranbaxy Inc. is a corporation organized under the laws of Texas with a principal place of business in New Jersey.  *Id.* ¶ 68.  Ranbaxy Inc. is, therefore, a citizen of Texas and New Jersey.

40.     Defendant Sun Pharmaceutical Industries, Inc. is a corporation organized under the laws of Delaware with a principal place of business in New Jersey.  *Id.* ¶ 71.  Sun Pharmaceutical Industries, Inc. is, therefore, a citizen of Delaware and New Jersey.

41.     Defendant Actavis Mid Atlantic LLC is a limited liability company organized under the laws of Delaware.  Its membership interest is owned by Defendant Teva Pharmaceuticals U.S.A., Inc., a corporation organized under the laws of Delaware with its principal place of business in New Jersey (incorrectly alleged in the Complaint as Pennsylvania). *Id.* ¶¶ 73, 75.  Actavis Mid Atlantic LLC and Teva Pharmaceuticals U.S.A., Inc. are, therefore, citizens of Delaware and New Jersey.

42.     Defendant Watson Laboratories, Inc. is corporation organized under the laws of Nevada with a principal place of business in New Jersey.  *Id.* ¶ 77.  Watson Laboratories is, therefore, a citizen of Nevada and New Jersey.

43.     Defendant Wockhardt Americas, Inc. is a corporation organized under the laws of Delaware with a principal place of business in New Jersey.  *Id.* ¶ 82.  Wockhardt Americas, Inc. is, therefore, a citizen of Delaware and New Jersey.

44.     Because Plaintiffs are citizens of Illinois and the properly joined defendants are citizens of states other than Illinois, complete diversity exists between Plaintiffs and the properly joined defendants.  *See* 28 U.S.C. §§ 1332, 1441.

## II.   PLAINTIFFS MUST FILE THEIR CLAIMS IN THE ZANTAC MDL COURT, WHICH HAS HELD THAT THE CLAIMS PLAINTIFFS BRING AGAINST THE GENERIC MANUFACTURER AND RETAILER DEFENDANTS ARE PREEMPTED.

45.     Wockhardt USA LLC and the Retailer Defendants are fraudulently joined, and their Illinois citizenship should therefore be disregarded in determining whether the case is removable.

46.     A defendant is fraudulently joined and its presence in the lawsuit is ignored for purposes of determining diversity where "there exists no 'reasonable possibility' that a state court would rule against the [in-state] defendant."  *Schwartz v. State Farm Mut. Auto. Ins. Co.*, 174 F.3d 875, 878 (7th Cir. 1999) (quoting *Poulos v. Naas Foods, Inc.*, 959 F. 2d 69, 73 (7th Cir. 1992))*; see also Walton v. Bayer Corp.*, 643 F.3d 994, 999 (7th Cir. 2011) (finding that a case is removable if "the claim against the nondiverse defendant is utterly groundless"); *Clay*, 2018 WL 11198356, at *1 ("[T]the district court must ask whether there is any reasonable possibility that the plaintiff could prevail against the non-diverse defendant." (internal quotation marks omitted)).

47.     Here, Wockhardt USA LLC and the Retailer Defendants are fraudulently joined because there is no reasonable possibility that Plaintiffs could prevail on any claim against them.

By voluntarily joining the MDL Census Registry, and accepting its benefits, Plaintiffs bound themselves to the MDL Court's PTO 15, which generally requires Plaintiffs to bring suit, if at all, in the Zantac MDL.  And the MDL Court has ruled that claims against retailers and generic manufacturers of the type Plaintiffs assert in this Complaint are preempted by federal law.

48.     As discussed above, Plaintiffs voluntarily joined the MDL Census Registry outlined in PTO 15 almost a year prior to filing this case, and accepted the benefits of the Registry throughout that time.[4]  In creating the Registry, the MDL Court explained that it was the result of "good faith" negotiations between the parties and "concessions for the benefit of the litigation as a whole."  Ex. A (PTO 15) at 3; *see also id.* at 13 ("The parties have agreed to the creation of the Registry in contemplation of the mutual benefits to Plaintiffs and Defendants alike of robust participation in the Registry.").  Specifically, potential plaintiffs who entered into the Registry received tolling of the statute of limitations for their claims, *id.* at 11, and assistance in collecting documents needed to substantiate their claims, *id.* at 14.

49.     By filing CPFs in accordance with the MDL Court's directives in PTO 15, Plaintiffs opted to participate in the Registry.  Accordingly, they became subject to PTO 15's forum selection clause: they "commit[ted] to filing any action relating to Zantac or any ranitidine products, if at all, before [the MDL] Court in MDL No. 2924."  Ex. A (PTO 15) at 11.  This could be accomplished either by filing their complaints in any federal court and not opposing transfer to the MDL, or by filing their complaints directly in the MDL.  *See id.*

---

[4] The circumstances of this case are therefore entirely different than those at issue in *Hawkins v. Boehringer Ingelheim Pharmaceuticals, Inc. et al.*, No. 20-cv-6509 (N.D. Ill.).  In that case, the Northern District of Illinois granted a plaintiff's motion to remand a Zantac-related case to state court, concluding that she had shown that at least one of her claims against Retailer Defendants may be viable.  Opinion and Order, *Hawkins Boehringer Ingelheim Pharmaceuticals, Inc. et al.*, No. 20-cv-6509 (N.D. Ill. Jan. 19, 2021) (attached as Exhibit H).  The plaintiff in that case, however, who brought six claims against Retailer Defendants, had not submitted her claim to the MDL Registry and thus was not bound by the forum selection provisions of PTO 15.

50.     The only exception to PTO 15's forum selection requirement was for "actions as to which a federal court would lack diversity jurisdiction." *Id.* at 11–12.  That exception was designed for cases where there was a genuine lack of diversity jurisdiction.  Thus, the forum selection clause provided that persons who joined the Registry, if they ultimately filed a complaint, "commit[ted] . . . to name only those defendants that they have a good faith belief marketed or manufactured Zantac or ranitidine products that such Claimants ingested or that they in good faith believe they may have a valid claim against for other reasons." *Id.*

51.     After the Registry was created, Plaintiffs' leadership counsel in the MDL—including Plaintiffs' counsel in this action—filed a master personal injury complaint on June 22, 2020, which included claims for product liability design defect, negligent failure to warn, and loss of consortium.  The complaint alleged claims against "Retailer Defendants," including Walgreens, the sole retailer defendant in this action.  Ex. D (Dec. 31, 2020 Order) at 4–6.  The master complaints also included claims against generic manufacturers, including Wockhardt USA LLC, for strict liability failure to warn, strict liability design defect, negligent failure to warn, negligent product design, general negligence, negligent misrepresentation, breach of express and implied warranties, unjust enrichment, and loss of consortium.  Ex. C (Dec. 31, 2020 Order) at 5.

52.     On December 31, 2020, after extensive briefing and oral argument, the MDL Court dismissed all personal injury claims against all retailer defendants and generic manufacturer defendants as preempted.  Most claims were dismissed with prejudice—including claims for strict liability design defect and negligent failure to warn that are substantively identical to those brought against the Retailer Defendants here.  Ex. D (Dec. 31, 2020 Order) at 26.

53.     The MDL Court granted leave to replead only one substantive count against the retailer defendants, and even then only in part.  Specifically, the MDL Court permitted repleading

of a "general negligence" claim.  Ex. D (Dec. 31, 2020 Order) at 45.  The MDL Court also granted leave to replead (or plead for the first time) several limited claims against the generic manufacturer defendants, including claims relating to expiration dates, testing, storage and transportation conditions, and warning the FDA.  Ex. C (Dec. 31, 2020 Order) at 53.

54.     Plaintiffs' lead counsel—again including Plaintiffs' counsel here—filed amended complaints on February 8 and February 22, 2021.  Their amended personal injury complaint included a negligent storage and transportation claim against the retailer defendants and generic manufacturer defendants, and several claims against the generic manufacturer defendants, including claims for failure to warn through expiration dates, negligent product containers, and failure to warn consumers through the FDA.  Their amended class complaints included claims against generic manufacturer defendants and "Store Brand Defendants," including Walgreens, arising from their sale of generic ranitidine products under their store-brand names.

55.     Following a second round of motions to dismiss, the MDL Court held that all claims against generic manufacturer and Store Brand Defendants were preempted by federal law under *Mensing* and *Bartlett*.  Ex. E (July 8, 2021 Order) at 22–47.  The MDL Court also issued an Order dismissing the personal injury claims against retailer defendants, holding that Plaintiffs' storage and transportation "negligence claim [was] implausibly pled," and the derivative claims could not survive its dismissal.[5]  Order at 6, *Zantac MDL* (June 30, 2021), ECF No. 3716 (attached as Exhibit I).

---

[5] The MDL Court later noted that a plaintiff could, in theory, plausibly assert a claim against a retailer only by alleging that the specific ranitidine product that a specific plaintiff took had become overheated as a result of negligence of a specific retailer that sold the product, thereby causing NDMA to form in the product.  *See* Ex. F (Aug. 6, 2021 Order) at 2–3.  Plaintiffs here make no such allegation—rather, their Complaint makes the same design defect and failure to warn allegations that were contained in the MDL Plaintiffs' initial master complaints against the retailers, and which the MDL Court dismissed as preempted.

56.     The MDL Court's rulings evidently have caused Plaintiffs to change their minds about proceeding with their action in the MDL.  But it is too late for that.  Having voluntarily decided to join the MDL Registry and accepted the benefits of doing so, and knowing that PTO 15 required them to commit up front that they would file any action in the MDL, Plaintiffs cannot now simply ignore the MDL Court's order and their commitment.

57.     In an attempt to insulate their case from removal and transfer to the MDL, Plaintiffs added Retailer Defendants to destroy diversity jurisdiction, and also brought claims against Generic Manufacturer Defendants, including Wockhardt USA LLC.  PTO 15 does not allow them to do so.  The Order instead provides that, if Plaintiffs ultimately chose to file a complaint, they would be required to name only defendants that they "in good faith believe they may have a valid claim against."  Ex. A (PTO 15) at 11.  Here, Plaintiffs have no good faith basis to bring claims against the Retailer Defendants, since the MDL Court already held *before* Plaintiffs filed their action that claims substantively identical to those alleged here are preempted and not viable.  Ex. E (July 8, 2021 Order) at 43–47; Ex. D (Dec. 31, 2020 Order) at 4–6.  Likewise, Plaintiffs have no good faith basis to bring claims against generic manufacturer defendants that the MDL Court has already held are preempted and not viable. Ex. E (July 8, 2021 Order) at 22–45; Ex. C (Dec. 31, 2020 Order) at 7–8.

58.     This Court should not abide Plaintiffs' efforts to violate the MDL Court's orders and evade their obligations as MDL Registry participants by naming parties against whom they cannot possibly have viable claims—efforts that risk undermining the negotiated balance struck by the parties to the MDL and ordered by the MDL Court in PTO 15.  Plaintiffs have no viable claim against Wockhardt USA LLC or against the Retailer Defendants in the forum in which they have agreed to litigate, and those defendants are thus fraudulently joined.

III.   **WOCKHARDT USA LLC AND THE RETAILER DEFENDANTS ARE FRAUDULENTLY JOINED BECAUSE THE CLAIMS AGAINST THEM HAVE NO REASONABLE CHANCE OF SUCCESS.**

59.   Alternatively, even if Plaintiffs had not joined the MDL Registry and thus committed to a federal forum, none of the claims they bring against Wockhardt USA LLC or the Retailer Defendants have a "reasonable possibility" of succeeding; thus, defendants are fraudulently joined. *Schwartz*, 174 F.3d at 878; *Clay*, 2018 WL 11198356, at *1; *accord Walton*, 643 F.3d at 999.

**A.   Plaintiffs' Design Defect and Failure to Warn Claims Against Wockhardt USA LLC and the Retailer Defendants Are Preempted by Federal Law.**

60.   Plaintiffs allege a total of 10 counts in their Complaint: Strict Products Liability—Failure to Warn (Count I), Strict Products Liability—Design Defect (Count II), Negligence—Failure to Warn (Count III), Negligent Product Design (Count IV), General Negligence (Count V), Negligent Misrepresentation (Count VI), Breach of Express Warranties (Count VII), Breach of Implied Warranties (Count VIII), Unjust Enrichment (Count IX), and Loss of Consortium (Count X).  Each count is brought against the Brand-Name and Generic Manufacturer Defendants; three counts (Counts II, III, and X) are also alleged against Retailer Defendants.  Wockhardt USA LLC is alleged to be a Generic Manufacturer Defendant.

61.   All of Plaintiffs' claims, except for the derivative claims for unjust enrichment and loss of consortium, are, at their core, premised on alleged defects inherent to ranitidine's basic chemical design or on a failure to warn of the alleged defects and cancer risk in using ranitidine. The Supreme Court held in *Mensing* and *Bartlett* that such claims against generic drug manufacturers are pre-empted because they cannot remedy design defects or provide additional warnings while remaining in compliance with federal law.  *Mensing*, 564 U.S. at 623–24 ("[W]hen a party cannot satisfy its state duties without the Federal Government's special permission and

assistance, which in turn is dependent on the exercise of judgment by a federal agency, that party cannot ***independently*** satisfy those state duties for pre-emption purposes." (emphasis added)); *Bartlett*, 570 U.S. at 475 ("[S]tate-law design-defect claims that turn on the adequacy of a drug's warnings are pre-empted by federal law under [*Mensing*].").

62.     In *Mensing*, consumers of generic drugs brought state-law claims against generic drug manufacturers for failure to provide adequate warnings on the drugs' labeling.  564 U.S. at 610.    The generic manufacturers argued that, under federal drug regulations, they are "prevented . . . from independently changing their generic drugs' safety labels."   *Id*. at 617. Consequently, they asserted, holding them liable under state law for failure to "adequately and safely label their products," would directly conflict with labeling requirements under federal law. *Id*.  The Supreme Court agreed:  Because generic manufacturers are unable to comply with both state and federal law, state failure-to-warn claims against generic drug manufacturers must be preempted.  *Id*. at 618–620, 614 ("If the Manufacturers had independently changed their labels to satisfy their state-law duty [to attach a safer label], they would have violated federal law.").

63.     In *Bartlett*, the Supreme Court expanded this preemption principle to design defect claims and found that because generic manufacturers are "unable to change [a drug's] composition as a matter of both federal law and basic chemistry," state-law design-defect claims are preempted as well.  570 U.S. at 475.   The *Bartlett* Court also rejected the notion that a generic drug manufacturer could comply with both federal and state law by simply removing the drug from the market, as it found that adopting such "stop-selling rationale would render impossibility pre-emption a dead letter and work a revolution in [the Supreme] Court's pre-emption case law."  *Id*. at 475–79.

64.     Federal courts around the country have applied the *Mensing* and *Bartlett* preemption principle to numerous categories of claims against generic drug manufacturers and found them to be preempted, even where, as here, plaintiffs did not expressly label their claims as "design defect" or "failure to warn" claims.  For example, in Count V (General Negligence), Plaintiffs allege, among other things, that the generic manufacturers breached their duty of reasonable care when they failed to "conduct testing" or "proper post-market surveillance relating to the presence of NDMA in [their] ranitidine-containing products."  Compl. ¶ 389.  But courts have held such claims to be preempted.  *See, e.g.*, *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 476–77 (4th Cir. 2014) (concluding that a claim that a generic drug manufacturer was negligent in the "testing, inspection, and post-market surveillance" of its drug product was pre-empted because any duty to perform such acts fell within the "general duty to protect consumers from injury based on the negligent marketing and sale of a product," and the manufacturer "whose product is unreasonably dangerous as sold could not satisfy that [general] duty without changing its warnings, changing its formulation, exiting the market, or accepting tort liability").

65.     Courts also have found claims against generic drug manufacturers for misrepresentation, such as Plaintiffs' Count VI (Negligent Misrepresentation), to be preempted.  *See, e.g., In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 935–36 (6th Cir. 2014) (concluding that misrepresentation claims against generic manufacturers were pre-empted because the claims "all challenge[d] label content" and the generic manufacturers "could not have corrected any alleged misrepresentation without violating federal law because they were required to conform their labeling to that of the brand-name drugs"); *Drager*, 741 F.3d at 479 (negligent misrepresentation claim against generic drug manufacturer was pre-empted because

manufacturer had "no authority to add or remove information from its materials or to change the formulation of the product to make its representations complete or truthful.").

66.    Likewise, courts have held that claims against generic drug manufacturers for breaches of express and implied warranties, such as Counts VII & VIII (Breaches of Express and Implied Warranties), are preempted.  *See, e.g., Schrock v. Wyeth, Inc.,* 727 F.3d 1273, 1288 (10th Cir. 2013) (concluding that an express-warranty claim against a generic drug manufacturer was pre-empted because the plaintiffs did not identify a mechanism through which the manufacturer "could have modified or supplemented the warranties allegedly breached without running afoul of the duty of sameness" and that claims for breach of the implied warranties of merchantability and fitness for intended use were pre-empted because the manufacturer "could not have altered the composition of the [drug] it manufactured without violating federal law").

67.    On December 31, 2020, the MDL Court agreed with these federal courts and held, under *Mensing* and *Bartlett*, that all claims against the generic manufacturer defendants "based on alleged product and labeling defects that [the generic] Defendants could not independently change while remaining in compliance with federal law" were preempted.  *See* Ex. C (Dec. 31, 2020 Order) at 7, 27–30, 53 (holding that certain claims against generic manufacturer defendants were preempted and dismissed with prejudice, including "claims based on allegations that ranitidine products were defectively designed because they break down into NDMA and claims based on failure to warn consumers that the products contained NDMA or could break down into NDMA when ingested").

68.    The MDL Court, therefore, dismissed all claims against the generic manufacturer defendants because it found that all of the claims against the generic manufacturer defendants in the initial master complaints incorporated preempted allegations of design defect and failure to

warn.  Notably, the claims dismissed by the MDL Court from the initial master complaints were nearly word-for-word identical to the ten claims Plaintiffs plead here in their Complaint.

69.     At the same time, the MDL Court allowed the plaintiffs to re-plead new claims against the generic drug manufacturers based on a limited set of theories that had not been properly pled in the initial master complaints.

70.     On July 8, 2021, the MDL Court held that all of the repleaded claims in the amended master complaints against the generic manufacturer defendants were, again, preempted.  *See* Ex. E (July 8, 2021 Order) at 44 (holding that all remaining claims against generic ranitidine manufacturers were preempted and dismissed with prejudice).  Specifically, the MDL Court found that although the plaintiffs had repleaded their claims after the court's first dismissal, "the core of their pleadings remain[ed] virtually identical to the pleadings that the Court dismissed."  *Id*. at 40.

71.     The MDL Court explained: "[E]ven though the Plaintiffs' claims purport to be based on theories other than design defect, the Plaintiffs' design-defect theory remains at the center of this case, and, by extension, at the center of all of the Plaintiffs' claims . . . . Accepting the Plaintiffs' position and taking their allegations as true, ranitidine could not be made reasonably safe outside of a corrected design or labeling, but the Generic Manufacturer Defendants could correct neither the design nor the labeling under federal law."  *Id*. at 40–42.

*72*.     Thus, the MDL Court held that "Plaintiffs' claims against the Generic Manufacturer Defendants, rooted in design defect and the properties of the ranitidine molecule, are pre-empted under *Mensing* and *Bartlett*" and dismissed all claims against the generic manufacturers with prejudice.  *Id*. at 43.

73.     The Supreme Court's rulings apply with equal force to Plaintiffs' design defect (Count II) and failure to warn (Count III) claims against the Retailer Defendants.  As the MDL

Court has held, the same preemption analysis that the Supreme Court articulated in *Mensing* and *Bartlett* bars claims against distributors or retailers of pharmaceutical products that stand even further removed than generic manufacturers from the ability to change drug labeling or alter drug chemistry that FDA has approved.  *See* Ex. D (Dec. 31, 2020 Order).  Federal law requires that a generic drug have the same active ingredients, route of administration, dosage form, strength, and labeling as the brand-name drug.  21 U.S.C. §§ 355(j)(2)(A)(ii)–(v).  Thus, only the brand-name manufacturer who submits the New Drug Application (the "NDA") can alter the design or labeling of the drug—not the Retailer Defendants who are not, and never were, the holders of the Zantac NDA.  The MDL Court dismissed all claims against retailer defendants "based upon ranitidine's allegedly defective design and inadequate labels/warnings" on this basis.  Ex. D (Dec. 31, 2020 Order) at 26.

74.     The MDL Court's December 31, 2020 Order nonetheless allowed the plaintiffs an opportunity to replead a claim against the retailer defendants.  *See id.*  Thus, when the court in *Hawkins*, discussed *supra* footnote 4, considered the plaintiff's remand motion in that case, the MDL Court had still left open the possibility that the MDL plaintiffs could plead a negligence claim that *could* survive preemption (though not one based on design defect or failure to warn).

75.     This case is nothing like *Hawkins*.  Here, Plaintiffs have pleaded *only* design defect and failure to warn claims against the Retailer Defendants that the MDL Court has *already* held are preempted and dismissed with prejudice.  Moreover, Plaintiffs here are well aware of the MDL Court's rulings; as noted, Plaintiffs' counsel here is the same counsel who argued all preemption motions before the MDL Court.[6]

---

[6] In addition, the court in *Hawkins* did not reach the question of whether the plaintiff's products liability claims were preempted, finding that removal could not be based on an affirmative defense such as preemption.  *See* Ex. H at 7 (citing *Bennett v. Southwest Airlines Co.*, 493 F.3d 762, 763

76.     As a result, under the settled preemption principles articulated in *Mensing* and *Bartlett*, "there exists no 'reasonable possibility that a state court would rule against" the Retailer Defendants and hold them liable under either of the theories advanced by Plaintiffs. *Schwartz*, 174 F.3d at 878 (internal quotation marks omitted).

**B.     Plaintiffs' Derivative Claims for Unjust Enrichment and Loss of Consortium Are Not Standalone Claims.**

77.     Plaintiffs' claims for unjust enrichment (Count IX) and loss of consortium (Count X) are "derivative in nature and require that the defendant be liable for the injuries" to Plaintiffs. *Allender*, 592 F. Supp. at 544.  Because none of Plaintiffs' underlying claims of design defect and failure to warn has any chance of success, their derivative claims for unjust enrichment and loss of consortium are not viable.

**C.     Plaintiffs' Strict Liability Claims Against the Retailer Defendants Are Additionally Barred by the Illinois "Innocent Seller Statute."**

78.     In addition, Plaintiffs' strict products liability claims against the Retailer Defendants under a design defect theory are barred by Illinois law—specifically Section 5/2-621 of the Illinois Distributor Statute (known as the "innocent seller statute").[7]  This statute can be the basis for a finding of fraudulent joinder.  *See Clay*, 2018 WL 11198356, at *2 (rejecting plaintiff's

---

(7th Cir. 2007)).  But *Bennett* concerned removal based on 'arising under' jurisdiction, i.e., federal question jurisdiction, which indeed "depends on the claim for relief rather than potential defenses." 493 F.3d at 763.  Removal is proper on ***diversity*** grounds where there is no reasonable possibility that Plaintiffs can succeed on their claims against the only named non-diverse Defendants.  *See Schwartz*, 174 F.3d at 878.  This is the case here, where Plaintiffs' claims against the Wockhardt USA LLC and the Retailer Defendants are entirely preempted.

[7] Of course, the innocent seller statute is only a defense to claims sounding in strict liability, and therefore does not alone preclude all claims against the Retailer Defendants.  *See Cadagin v. Johnson & Johnson*, 18-cv-1821, 2018 WL 5004716, at *2–3 (S.D. Ill. Oct. 16, 2018) (remanding case to state court where removing defendants' fraudulent joinder argument failed to address claims against a non-diverse defendant to which 735 ILCS 5/2-621 was inapplicable); *Lewis v. Johnson & Johnson*, No. 15-cv-565, 2015 WL 5121417, at *3 (S.D. Ill. Aug. 31, 2015) (same).  In this case, however, all claims against the Retailer Defendants are preempted and, additionally, Plaintiffs' negligence claim against Retailer Defendants is groundless for the reasons discussed *infra*.

argument that the innocent seller statute cannot be the basis for a finding of fraudulent joinder as contrary to the fraudulent joinder test adopted in *Poulos v. Naas Foods*, 959 F.2d 69 (7th Cir. 1992)).

79.     The "purpose" of the innocent reseller statute "is to allow a defendant whose sole liability results from its role as a member in the chain of distribution of an allegedly defective product, who has not been shown to have created or contributed to the alleged defect or had knowledge of the defect, to get out of a product liability action at an early stage." *Murphy v. Mancari's Chrysler Plymouth, Inc.*, 887 N.E.2d 569, 576 (Ill. App. 2008).

80.     Thus, under the innocent seller statute, a plaintiff is precluded from bringing a claim under a theory of strict liability unless the plaintiff can show that the defendant "(1) participated in the design or manufacture of the product, (2) had actual knowledge of the defect in the product, or (3) created the defect in the product." *Clay*, 2018 WL 11198356, at *2; *accord Xiaofa Shi v. Am. Honda Motor Co.*, 2011 WL 5403618, at *2 (N.D. Ill. Nov. 8, 2011) (denying remand where reseller did not "exercise[] any control over the design or manufacture" of the product, "[have] actual knowledge of the defect," or "create[] the defect"); *Inman v. Daimler-Chrysler Corp.*, 2000 WL 283016, at *4 (N.D. Ill. Mar. 9, 2000) (same).  Plaintiffs cannot show that any of these exceptions apply here.

81.     First, although the Complaint includes boilerplate allegations that all Defendants, including Retailer Defendants "designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine-containing products," Compl. ¶ 325, the Retailer Defendants were not involved in the design or manufacture of ranitidine whatsoever.  *See* Aff. of Michael Wolf (Ex. J) ¶¶ 6; 9–10 (affirming that Walgreen Co. did not play any role in the design or manufacture of Zantac); Aff. of Carissa Castonzo (Ex. K) ¶¶ 5; 16–17 (affirming that

Walgreen Co. did not play any role in the design or manufacture of generic ranitidine product Wal-Zan).[8]  This is consistent with Walgreens-specific allegations in the Complaint, which label Walgreens "Retailer Defendants" and allege that they "derived substantial revenue from marketing, handling, distributing, storing, and selling ranitidine-containing products"—not designing or manufacturing such products.  Compl. ¶ 87.

82.    Second, Plaintiffs' Complaint does not allege specific facts indicating that the Retailer Defendants had actual knowledge of the purported defect in the ranitidine products they sold.  Plaintiffs' mere allegations that all Defendants "knew or should have known" about the alleged defects do not "support[] the claim that [the Retailer Defendants] had actual knowledge." *Clay*, 2018 WL 11198356, at *2.  That Defendants "should have known" of an alleged defect is "insufficient under [Illinois] law" to demonstrate that a reseller had "actual knowledge of a defect in order to be held liable."  *Ungaro v. Rosalco, Inc.*, 948 F. Supp. 783, 786 (N.D. Ill. 1996).  Thus, Plaintiffs' conclusory allegations are insufficient to "establish[] that there is a reasonable probability that [Retailer Defendants] would be held strictly liable."  *Clay*, 2018 WL 11198356, at *2.; *see also Int'l Bd. of Teamsters Local 734 Health & Welfare Tr. Fund v. Philip Morris, Inc.*, 1998 WL 242130, at *5 (N.D. Ill. May 8, 1998), *aff'd*, 196 F.3d 818 (7th Cir. 1999) ("Because the references to the distributor defendants are so sketchy, it is unnecessary to analyze the elements of

---

[8] In "determining whether fraudulent joinder has occurred," a court "is not limited by the allegations of the parties' pleadings but may pierce the pleadings and consider summary judgment-type evidence such as affidavits and deposition testimony."  *Veugeler v. General Motors Corp.*, 1997 WL 160749, at *2 (N.D. Ill. Apr. 2, 1997) (internal quotation marks omitted); *Gross v. FCA US LLC*, 2017 WL 6065234, at *5 (N.D. Ill. Dec. 7, 2017); *see also Badon v. R J R Nabisco Inc.*, 224 F.3d 382, 393 (5th Cir. 2000) (holding that a court may pierce the pleadings to examine affidavits and other summary judgment-type evidence even if the petition facially states a claim against an in-state defendant); *Clay*, 2018 WL 11198356, at *2 (considering similar affidavits submitted by the retailer defendants and finding that the retailer defendants had no involvement in the design, manufacture, labeling, or packaging of the cigarettes at issue).

each of the plaintiffs' ten counts and conclude the plaintiffs have no reasonable chance of success . . . because the only allegations directed at the distributor defendants are wholly conclusory . . . .").

83.     Third, Plaintiffs cannot demonstrate that the Retailer Defendants "created the defect in the product."  *Clay*, 2018 WL 11198356, at *2.  In their strict liability design defect claim, Plaintiffs allege that "the medication ingested by Plaintiffs was expected to and did reach Plaintiffs without a substantial change in their anticipated or expected design," Compl. ¶ 328, and that the medication in question was "defective in design and formulation," *id.* ¶ 329.  Thus, on the terms of the Plaintiffs' own Complaint, any alleged defect was inherent in the product's design.  The Retailer Defendants, regardless of whether they simply resold products manufactured by others or "used their own brand names on relabeled ranitidine-containing products," Compl. ¶ 87, could not possibly have controlled the design or formulation of the products in question.   As previously discussed, federal law requires that generic versions of a drug have the same active ingredients, route of administration, dosage form, strength, and labeling as the brand-name drug, and therefore only the Zantac NDA holders—not the Retailer Defendants—could have altered the design of the ranitidine products that the Retailer Defendants relabeled.  21 U.S.C. §§ 355(j)(2)(A)(ii)-(v).

84.     Thus, Plaintiffs' strict liability claims are barred by Section 5/2-621(a).

**D.     Plaintiffs' Negligence Claim Against the Retailer Defendants Is Not Viable.**

85.     There is likewise no possibility that Plaintiffs could prevail on their negligence claim against the Retailer Defendants because, under Illinois law, a seller of a product has no duty to warn of a particular hazard in a product unless the defendant "knows or should know that injury may occur if no warning is given."  *Carrizales v. Rheem Mfg. Co., Inc.*, 589 N.E. 2d 569, 574 (Ill. Ct. App. 1991); *see also Happel*, 199 Ill. 2d at 186.

86.     In Count II of the Complaint, Plaintiffs state in conclusory fashion, without distinguishing among Defendants, that "[t]he dangerous propensities of their products and the carcinogenic characteristics of NDMA as produced within the human body as a result of ingesting ranitidine . . . were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing . . . ."  Compl. ¶ 349.  But there are no factual allegations to support the conclusion that the Retailer Defendants, specifically, knew about any alleged defect in ranitidine products.  *See* Compl. ¶¶ 227–230 (section entitled "***Manufacturer*** Defendants Knew or Should Have Known of the NDMA Risk" (emphasis added)).

87.     To the extent that Plaintiffs' failure to warn claim against the Retailer Defendants rests on the existence of a duty to discover any alleged defect "through appropriate research and testing," such a duty is not recognized under Illinois law.  Compl. ¶ 349.

88.     Illinois law is clear that a seller is under no duty "to inspect every article he sells" and cannot be "compelled to look for defects" in products that it does not manufacture by performing "special tests."  *Kirk v. Stineway Drug Store Co.*, 187 N.E.2d 307, 313 (Ill. App. Ct. 1963); *Rahn v. Gerdts*, 455 N.E.2d 807, 810-11 (Ill. App. Ct. 1983) (holding that retailer is not under "any duty to generally inspect and discovery defects").  *Cf. Burgess v. Montgomery Ward & Co.*, 264 F.2d 495, 497 (10th Cir. 1959) (holding that it would be "completely unreasonable to expect the shopkeeper to perform the inspection or test which would have revealed to an expert the defect in the ladder rail"); *Ziglar v. E. I. Du Pont De Nemours & Co.*, 152, 280 S.E.2d 510, 514 (N.C. App. 1981) (holding that retailer of inherently dangerous toxic substance was under no duty to detect or remedy hidden defect); *Odum v. Gulf Tire & Supply Co.*, 196 F. Supp. 35, 36 (N.D. Fla. 1961) ("a retailer or wholesaler is not under a duty to inspect manufactured articles of a complex nature for defects which are latent"); *Meyer v. Rich's Inc.*, 12 S.E.2d 123, 123 (Ga.

App. 1940) (a seller of men's suits had no duty to analyze the suit chemically and was therefore not liable for buyer's injuries caused by poisonous dye and chemicals in suit).

89.     The Complaint therefore states no cognizable negligence claim against the Retailer Defendants under Illinois law.

## IV.     THE AMOUNT-IN-CONTROVERSY REQUIREMENT IS SATISFIED

90.     Plaintiffs' claims satisfy the amount in controversy requirement set forth in 28 U.S.C. § 1332(a).

91.     "[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 554 (2014).  "[T]he defendant's amount-in-controversy allegation should be accepted when not contested by the plaintiff or questioned by the court," and "[e]vidence establishing the amount is required by § 1446(c)(2)(B) only when the plaintiff contests, or the court questions, the defendant's allegation." *Id.* at 553–54.

92.     Plaintiffs seek several categories of damages, including compensatory damages, and punitive damages for every count. *See* Compl. ¶¶ 323, 341, 360, 374, 395, 408, 425, 439, 448, 456.

93.     The Complaint includes 10 causes of action, and alleges that Plaintiffs' use of ranitidine caused each to develop cancer and suffer "significant bodily injury, pain and suffering, mental anguish, disfigurement, embarrassment, inconvenience, loss of earnings and earning capacity," as well as "past and future medical expenses. *Id.* ¶¶ 18, 24.

94.     Courts have routinely found that allegations of serious injury in products liability actions, such as those Plaintiffs make here, support an inference that the amount-in-controversy requirement has been met. *See Mullaney v. Endogastric Sols. Inc.*, No. 11-62056-CIV, 2011 WL 4975904, at *2 (S.D. Fla. Oct. 19, 2011) (inferring that amount in controversy requirement was

met where plaintiff alleged that he underwent "surgical intervention that required additional life saving medical treatment" and suffered "serious, permanent and disabling injuries"); *see also In re Yasmin & Yaz (Drospirenone) Mktg. Sales Practices & Prod. Liab. Litig.*, 692 F. Supp. 2d 1025, 1040 (S.D. Ill. 2010) ("Given the severe and ongoing nature of the injuries alleged, the Court finds that it is plausible and supported by the evidence that the amount in controversy has been established."); *McCoy by Webb v. General Motors Corp.*, 226 F. Supp. 2d 939, 941 (N.D. Ill. 2002) ("In the parlance of product liability suits . . . [c]ourts have routinely held that when plaintiffs allege serious, permanent injuries and significant medical expenses, it is obvious from the face of the complaint that the plaintiffs' damages exceed the jurisdictional amount . . . .").[9]

95.     Based on Plaintiffs' allegations, the amount in controversy exceeds $75,000, exclusive of interest and costs.

## V.     PROCEDURAL REQUIREMENTS OF REMOVAL ARE SATISFIED

96.     This Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b).  Defendant GlaxoSmithKline LLC was served with the Complaint on August 2, 2021.  Defendant Sun Pharmaceuticals Industries, Inc. was served with the Complaint on August 4, 2021.  Defendants GlaxoSmithKline Holdings (Americas) Inc., Pfizer Inc., Boehringer Ingelheim Pharmaceuticals, Inc., and Dr. Reddy's Laboratories, Inc. were served with the Complaint on August 6, 2021.  Defendants Boehringer Ingelheim USA Corporation, Watson Laboratories, Inc., and Patheon Manufacturing Services LLC were served with the Complaint on August 9, 2021.  Defendants Dr.

---

[9] Indeed, in another Zantac-related case in which a state-court plaintiff similarly claimed cancer as an injury, a federal court in the District of Nevada denied a motion to remand where the amount in controversy was not alleged, finding that the requirement was satisfied on the face of the complaint by the nature of the injury. *See Brooks v. Sanofi, S.A.*, 2020 WL 1847682, at *4 (D. Nev. Apr. 13, 2020); *see also Gates v. 84 Lumber Co.*, 2015 WL 2345427, at *1 (S.D. Ala. May 14, 2015) (inferring that amount in controversy requirement was met when alleged injury included cancer).

Reddy's Laboratories Louisiana LLC, Perrigo Company, L. Perrigo Co., and Perrigo Research & Development Company were served with the Complaint on August 10, 2021.  Defendants Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., Chattem, Inc., Aurobindo Pharma USA, Inc., Aurohealth LLC, Strides Pharma, Inc., Teva Pharmaceuticals USA, Inc., Actavis Mid Atlantic LLC, and Ranbaxy Inc. were served with the Complaint on August 11, 2021.  Defendant Granules USA, Inc. was served with the Complaint on August 16, 2021.  Defendant Boehringer Ingelheim Corporation was served with the Complaint on August 18, 2021.  Defendant Wockhardt Americas, Inc. has not been served.

97.     The Southern District of Illinois is the federal judicial district encompassing the Illinois Circuit Court for Madison County, where this suit was originally filed.  Venue is therefore proper in this district under 28 U.S.C. §§ 84(a) and 1441(a).

98.     Removal pursuant to 28 U.S.C. § 1441(a) requires that "all defendants who have been properly joined and served must join in or consent to the removal of the action."  28 U.S.C. § 1446(b)(2)(A).

99.     All Defendants required to consent to this removal have so consented.  *See* Notices of Consent to Removal, attached as Exhibits. L–T.  Wockhardt USA LLC and the Retailer Defendants are fraudulently joined and therefore are not required to consent to the removal.  *See Darras v. Trans World Airlines, Inc.*, 617 F. Supp. 1068, 1069 (N.D. Ill. 1985) (exceptions to consent for removal include "a plaintiff's joinder of a defendant simply to keep the case out of the federal courts").

100.     The Removing Defendants are providing Plaintiffs with written notice of the filing of this Notice of Removal as required by 28 U.S.C. § 1446(d).

101.    Pursuant to 28 U.S.C. § 1446(d), the Removing Defendants are filing a copy of this Notice of Removal with the Clerk of the Illinois Circuit Court for Madison County.

102.    Pursuant to 28 U.S.C. § 1446(a), copies of all process, pleadings, orders and other papers filed in the state court action—as available from the state court docket or otherwise made available to the Removing Defendants at the time of filing this Notice—are attached hereto as Exhibit U.

103.    If any question arises regarding the propriety of the removal of this action, the Removing Defendants respectfully request the opportunity to present a brief and be heard at oral argument in support of removal.[10]

104.    No previous application has been made for the relief requested herein.

105.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this is a civil action in which the amount in controversy exceeds $75,000, exclusive of interest and costs, and is an action (when counting properly joined defendants) between citizens of different states.

## VI.   DEMAND FOR JURY TRIAL

106.    The Removing Defendants hereby demand a separate jury trial on all claims and issues so triable.

WHEREFORE, the Removing Defendants give notice that the matter bearing Case No. 2021L000915 pending in the Illinois Circuit Court for Madison County is removed to the United

---

[10] This is not a case in which other courts in the Southern District of Illinois have considered and rejected the same fraudulent joinder arguments raised here.  See *Cadagin*, 2018 WL 5004716, at *3 (S.D. Ill. Oct. 16, 2018) (ordering remand of a case before full briefing of a remand motion where removal was premised on fraudulent joinder of a retailer defendant when multiple courts had issued "well-reasoned decisions" that "routinely rejected the identical fraudulent joinder arguments").  Accordingly, the Removing Defendants respectfully submit that remand sua sponte or without the benefit of full briefing would be inappropriate here.

States District Court for the Southern District of Illinois, and request that this Court retain jurisdiction for all further proceedings in this matter.

Dated:  September 1, 2021                    Respectfully submitted,

**HEPLERBROOM LLC**

By: /s/ W. Jason Rankin
    W. Jason Rankin, #6237927
    130 N. Main Street
    P.O. Box 510
    Edwardsville, IL 62025
    (618) 656-0184 Telephone
    (618) 656-1364 Facsimile
    wjr@heplerbroom.com

***Attorneys for Defendants Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., and Chattem, Inc.***

By: /s/ Stephanie A. Scharf (with consent)
    Stephanie A. Scharf
    George Sax
    Scharf Banks Marmor LLC
    333 West Wacker Drive, Suite 450
    Chicago, IL 60606
    (312) 726-6000
    Email: sscharf@scharfbanks.com

***Attorneys for Defendant Pfizer Inc.***

By: /s/ Erik Snapp (with consent)
    Erik Snapp
    DECHERT LLP
    35 West Wacker Drive, Suite 3400
    Chicago, IL 60601
    (312) 646-5828
    Email: erik.snapp@dechert.com

***Attorneys for Defendant GlaxoSmithKline LLC and GlaxoSmithKline Holdings (Americas) Inc.***

By: /s/ Julia Zousmer  (with consent)
    Julia Zousmer
    KING & SPALDING LLP
    110 N. Wacker Drive, Suite 3800

Chicago, IL 60606
(312) 764-6920
Email: jzousmer@kslaw.com

***Attorneys for Defendants Boehringer Ingelheim Pharmaceuticals, Inc., Boehringer Ingelheim Corporation, and Boehringer Ingelheim USA Corporation***

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a copy of the foregoing was served upon the following attorneys on this 1st day of September 2021, via email:

R. Seth Crompton
Eric D. Holland
Greg Jones
**HOLLAND LAW FIRM, LLC**
211 N. Broadway, Ste. 2625
St. Louis, MO 63102
(314) 241-8111 Telephone
scrompton@hollandtriallawyers.com
eholland@hollandtriallawyers.com
gjones@hollandtriallawyers.com

Ann E. Callis
Erika Stassi
**HOLLAND LAW FIRM, LLC**
1324 Niedringhaus Ave.
Granite city, IL 62040
(618) 452-1323 Telephone
acallis@hollandtriallawyers.com
estassi@hollandtriallawyers.com

Ashley Keller
Nicole Berg
**KELLER LENKNER LLC**
150 N. Riverside Plaza, Suite 4270
Chicago, IL 60606
(312) 741-5220 Telephone
ack@kellerlenkner.com
ncb@kellerlenkner.com

***Attorneys for Plaintiffs***

/s/ W. Jason Rankin