# EXHIBIT G

***EFILED***
Case Number 2021L 000915
Date: 8/2/2021 11:32 AM
Thomas McRae
Clerk of Circuit Court
Third Judicial Circuit, Madison County Illinois

# IN THE CIRCUIT COURT
## OF THE THIRD JUDICIAL CIRCUIT
## MADISON COUNTY, ILLINOIS

JOSEPH BAYER and GWENDOLYN CULVERSON,

    Plaintiffs,

        -vs-

BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.; BOEHRINGER INGELHEIM CORPORATION; BOEHRINGER INGELHEIM USA CORPORATION; GLAXOSMITHKLINE LLC; GLAXOSMITHKLINE HOLDINGS (AMERICAS) INC.; PFIZER INC.; SANOFI-AVENTIS U.S. LLC; SANOFI US SERVICES INC.; PATHEON MANUFACTURING SERVICES LLC; CHATTEM, INC.; AURO HEALTH LLC; AUROBINDO PHARMA USA, INC.; DR. REDDY'S LABORATORIES, INC.; DR. REDDY'S LABORATORIES LOUISIANA, LLC; GRANULES USA, INC.; L. PERRIGO CO.; PERRIGO COMPANY; PERRIGO RESEARCH & DEVELOPMENT COMPANY; STRIDES PHARMA, INC.; RANBAXY INC.; SUN PHARMACEUTICALS INDUSTRIES, INC., f/k/a RANBAXY PHARMACEUTICALS INC.; ACTAVIS MID ATLANTIC LLC; TEVA PHARMACEUTICALS U.S.A., INC.; WATSON LABORATORIES, INC.; WOCKHARDT USA LLC; WOCKHARDT AMERICAS, INC.; WALGREEN CO.; WALGREENS BOOTS ALLIANCE, INC.; BOND DRUG COMPANY OF ILLINOIS, LLC d/b/a WALGREENS,

    Defendants.

Case No.: **2021L 000915**

**JURY TRIAL DEMAND**

## COMPLAINT

Plaintiffs Joseph Bayer and Gwendolyn Culverson, through their undersigned counsel, bring this action for personal injuries against the makers and retailers of Zantac and its generic, ranitidine, and allege as follows:

## INTRODUCTION

1.      Zantac is the branded name for ranitidine, a "blockbuster" drug that was sold as a safe and effective antacid. But ranitidine transforms over time and under particular conditions into high levels of N-Nitrosodimethylamine ("NDMA"), a carcinogen that is as potent as it is dangerous. After almost four decades and billions of dollars of sales, ranitidine consumption has caused scores of consumers to develop cancer. Plaintiffs brings this action for personal injuries resulting from Defendants' design, testing, marketing, labeling, packaging, handling, distribution, storage and sale of brand-name and generic ranitidine-containing products.

2.      Until its 2020 recall by the FDA, ranitidine was a popular heartburn drug consumed by millions of people every day. Recent scientific studies, however, confirm what drug companies knew or should have known decades earlier: ingesting ranitidine exposes the consumer to unsafe and excessive amounts of NDMA.

3.      NDMA is a well-known potent carcinogen. It was first discovered in the early 1900s as a byproduct of manufacturing rocket fuel. Today, its only use is to induce cancerous tumors in animals as part of laboratory experiments. Its only function is to cause cancer. It has no medicinal purpose whatsoever.

4.      NDMA is not akin to other compounds that have a salutary effect at low levels and a negative effect with greater exposure. There is no recommended daily dose of NDMA. The ideal level of exposure is zero. Nonetheless, the FDA previously set an allowable daily limit of NDMA of 96 nanograms (ng) to minimize the risks posed by this dangerous molecule. Yet a single pill of ranitidine can contain quantities of NDMA that are hundreds, if not thousands, of times higher than the allowable limit.

5.      Those recent revelations by the scientific community have caused widespread recalls of ranitidine both domestically and internationally.  In fact, after numerous voluntary recalls, on April 1, 2020, the FDA ordered the immediate withdrawal of all ranitidine-containing products sold in the United States, citing unacceptable levels of NDMA accumulation.

6.      The high levels of NDMA observed in ranitidine-containing products are a function of various factors.  The ranitidine molecule internally degrades to form NDMA.  The degradation of ranitidine into NDMA can increase over time under normal storage conditions, but more so with exposure to heat and/or humidity.  Once in the body, ranitidine continues to degrade and can yield increasing levels of NDMA in the human digestive system.

7.      Zantac wreaked such widespread harm in large part because GlaxoSmithKline— the inventor of ranitidine through its predecessors—succumbed to a temptation that is all too familiar to pharmaceutical innovators: maximizing the profits of an incredibly lucrative, government-conferred monopoly.

8.      To encourage pharmaceutical companies to invest in research and development ("R&D"), the U.S. legal and regulatory system offers drug companies who invent "new chemical entities" two powerful inducements.  First, innovators obtain patent protection for their pharmaceutical compounds.  Second, approved new drugs enjoy FDA exclusivity, irrespective of whether the molecule is protected by one or more issued patents.  Taken together, these policies assure that a pharmaceutical innovator will receive the exclusive right, for a limited period of time, to sell its drug to the American public.

9.      As a result, branded drug manufacturers have a strong—and too often perverse— incentive to sell as much product as they can during their exclusivity window.  That is why brand-name manufacturers spend billions of dollars per year in sales and marketing efforts to push

incremental sales of a brand-name drug. Where every $1 in new sales can produce upwards of $.90 in gross profit, staggering sales and marketing budgets are a very profitable investment. But while it makes sense for brand-name manufacturers to spend vast sums of money to develop and promote FDA approved drugs, they have no economic or regulatory incentive to uncover and investigate developing risks posed by their products.

10.     That problem is especially acute for bestselling, blockbuster drugs. And Zantac is the brand that gave meaning to a blockbuster pharmaceutical product, becoming the first drug ever to generate over $1 billion in annual sales. Zantac's success catapulted Glaxo ahead of its previously larger rivals, fueling the market capitalization and corporate combinations that gave the company its current name: GlaxoSmithKline. It is little wonder Glaxo spared no expense to both get Zantac to market and to aggressively promote it to millions of consumers. Yet Glaxo did not part with a comparative pittance to investigate the obvious cancer risk posed by ranitidine. Turning a blind eye was far more profitable.

11.     Generic ranitidine manufacturers share culpability for Plaintiffs' cancers, but for different and equally perverse reasons. To reduce the costs of medicine, Congress sought to ensure extensive competition once the exclusivity period for a brand-name drug expires. At that point, generic manufacturers may rapidly enter the market. They undergo a streamlined FDA approval process—through an Abbreviated New Drug Application ("ANDA")—without the need to replicate the expensive clinical trials to prove that the drug is safe and effective.

12.     With a drug as popular as Zantac, generic competition is extensive and fierce. Without the benefit of a lawful monopoly or a strong brand name, generics are forced to compete on price, which dramatically undercuts the lucrative margins enjoyed by brand-name manufacturers. The FDA estimates that when a single generic enters the market, the average price

of the drug falls by 39% compared to the branded-only monopoly. Once four generics enter the market, the average price falls by 79%. It takes only six generic competitors to reduce the price by more than 95%. But over the years, there were 75 FDA-approved ANDAs for generic ranitidine held by a multitude of generic manufacturers.

13.     With razor thin margins and robust competition, a generic manufacturer faces its own economic temptation to cut corners, source ingredients as inexpensively as possible, and underinvest in quality control. And having already enjoyed a free ride on the brand's development of the drug, generic manufacturers also hope to free ride on some other company's investment in monitoring and analyzing emerging dangers posed by the products they are selling into the marketplace. But generic manufacturers are responsible for their own products. Thin margins and robust competition are not legally valid excuses for selling drugs that cause cancer.

14.     Ultimately, the law holds every corporate entity in the supply chain of ranitidine responsible for the personal injuries caused by such an unsafe product. And the civil justice system is the first, last, and only line of defense against the unchecked avarice that is a byproduct of a regulatory regime with the well-intentioned aim of bringing safe and effective medicines to market. Plaintiffs seek redress both to compensate them for the horrific losses they have suffered in the past and to strongly deter future misconduct.

## PARTIES

### PLAINTIFFS

**A. Joseph Bayer**

15.     Plaintiff Joseph Bayer resides in Alton, Illinois and is a citizen of Illinois.

16.     Plaintiff Bayer began using over-the-counter generic ranitidine in 2005 and continued to use it through 2010.

17.     Plaintiff Bayer purchased generic ranitidine at Walgreens from 2005 to 2010. During this time, Plaintiff Bayer was not aware that ingesting ranitidine led to exposure to NDMA, or that ranitidine caused cancer.

18.     In August 2010, Plaintiff Bayer was diagnosed with esophageal cancer. As a result of his cancer and subsequent treatment, he has suffered significant bodily injury, pain and suffering, mental anguish, disfigurement, embarrassment, inconvenience, loss of earnings and earning capacity, and has and will incur past and future medical expenses.

19.     Based on prevailing scientific evidence, exposure to NDMA caused by consuming Defendants' ranitidine can cause esophageal cancer in humans.

20.     Plaintiff Bayer's esophageal cancer was caused by ingesting Zantac/ranitidine.

**B. Gwendolyn Culverson**

21.     Plaintiff Gwendolyn McKee Culverson resides in Chicago, Illinois and is a citizen of Illinois.

22.     Plaintiff Culverson began using over-the-counter brand name Zantac and generic ranitidine in 2014 and continued to use it through 2020.

23.     Plaintiff Culverson purchased generic ranitidine at Walgreens from 2014 to 2020. During this time, Plaintiff Culverson was not aware that ingesting ranitidine led to exposure to NDMA, or that ranitidine caused cancer.

24.     In January 2017, Plaintiff Culverson was diagnosed with bladder cancer and kidney cancer. As a result of her cancer and subsequent treatment, she has suffered significant bodily injury, pain and suffering, mental anguish, disfigurement, embarrassment, inconvenience, loss of earnings and earning capacity, and has and will incur past and future medical expenses.

25. Based on prevailing scientific evidence, exposure to NDMA caused by consuming Defendants' ranitidine can cause bladder cancer and kidney cancer in humans.

26. Plaintiff Culverson's bladder cancer and kidney cancer were caused by ingesting Zantac/ranitidine.

## DEFENDANTS

27. Defendants are entities that designed, manufactured, marketed, distributed, labeled, packaged, handled, stored, and/or sold ranitidine.

### C. Brand-Name Manufacturer Defendants

### Boehringer Ingelheim (BI)[1]

28. Defendant Boehringer Ingelheim Pharmaceuticals, Inc., is a Delaware corporation with its principal place of business located at 900 Ridgebury Road, Ridgefield, Connecticut 06877. Defendant Boehringer Ingelheim Pharmaceuticals, Inc., is a citizen of Delaware and Connecticut.

29. Defendant Boehringer Ingelheim Corporation is a Nevada corporation with its principal place of business located at 900 Ridgebury Road, Ridgefield, Connecticut 06877. Defendant Boehringer Ingelheim Corporation is a citizen of Nevada and Connecticut.

30. Defendant Boehringer Ingelheim USA Corporation is a Delaware corporation with its principal place of business located at 900 Ridgebury Rd., Ridgebury, Connecticut 06877. Defendant Boehringer Ingelheim USA Corporation is a citizen of Delaware and Connecticut.

31. Defendant Boehringer Ingelheim Pharmaceuticals, Inc. is a direct or indirect subsidiary of Defendants Boehringer Ingelheim Corporation and Boehringer Ingelheim USA Corporation, which are themselves wholly owned, directly or indirectly, by Boehringer Ingelheim

---

[1] Defendant Boehringer Ingelheim also manufactured generic ranitidine under ANDA 074662, as well as through its former subsidiary Ben Venue Laboratories Inc. d/b/a Bedford Laboratories (ANDA 074764). Ben Venue Laboratories Inc. is no longer in operation.

International GmbH. Collectively, these entities shall be referred to as "Boehringer Ingelheim" or "BI."

## GlaxoSmithKline (GSK)

32.     Defendant GlaxoSmithKline LLC is a Delaware limited liability company with its principal place of business located at Five Crescent Drive, Philadelphia, Pennsylvania, 19112. Defendant GlaxoSmithKline LLC's sole member is Defendant GlaxoSmithKline Holdings (Americas) Inc., a Delaware corporation with its principal place of business in that state. Defendant GlaxoSmithKline LLC is a citizen of Delaware.

33.     Defendant GlaxoSmithKline Holdings (Americas) Inc. is a Delaware corporation with its principal place of business located at 1105 N. Market Street, Suite 622, Wilmington, Delaware 19801.  Defendant GlaxoSmithKline Holdings (Americas) Inc. is a citizen of Delaware.

34.     Defendants GlaxoSmithKline LLC and GlaxoSmithKline Holdings (Americas) Inc. are subsidiaries of GlaxoSmithKline plc. Collectively, these entities shall be referred to as "GSK."

## Pfizer

35.     Defendant Pfizer Inc.  ("Pfizer") is a Delaware corporation with its principal place of business located at 235 East 42nd Street, New York, New York 10017.  Defendant Pfizer is a citizen of Delaware and New York.

## Sanofi

36.     Defendant Sanofi-Aventis U.S. LLC is a Delaware limited liability company with its principal place of business located at 55 Corporate Drive, Bridgewater, New Jersey 08807. Defendant Sanofi-Aventis U.S. LLC's sole member is Defendant Sanofi U.S. Services, Inc., a Delaware corporation with its principal place of business in New Jersey.  Defendant Sanofi-

Aventis U.S. LLC is a citizen of Delaware and New Jersey.

37.     Defendant Sanofi US Services Inc. is a Delaware corporation with its principal place of business located at 55 Corporate Drive, Bridgewater, New Jersey 08807. Defendant Sanofi US Services Inc. is a citizen of Delaware and New Jersey.

38.     Defendant Patheon Manufacturing Services LLC is a Delaware limited liability company with its principal place of business located at 5900 Martin Luther King Jr. Hwy, Greenville, North Carolina 27834. Thermo Fisher Scientific, Inc. is the sole member of Defendant Patheon Manufacturing Services LLC. Thermo Fisher Scientific, Inc. is a Delaware corporation with its principal place of business in Massachusetts. Defendant Patheon Manufacturing Services LLC is a citizen of Delaware and Massachusetts.

39.     Defendant Chattem, Inc. ("Chattem") is a Tennessee corporation with its principal place of business located at 55 Corporate Drive, Bridgewater, New Jersey 08807. Defendant Chattem is a citizen of Tennessee and New Jersey. Defendant Chattem is a wholly owned subsidiary of Defendant Sanofi SA.

40.     Defendant Chattem purchased ranitidine and repackaged and/or relabeled it under its own brand.

41.     Defendant Patheon Manufacturing Services LLC packaged and manufactured the finished Zantac product for Sanofi. Collectively, these entities shall be referred to as "Sanofi."

42.     Defendants BI, GSK, Pfizer, and Sanofi shall be referred to collectively as the "Brand-Name Manufacturer Defendants."

**D. Generic Manufacturer Defendants**

**Aurobindo**

43.     Defendant Auro Health LLC is a New Jersey limited liability company with is principal place of business located at 2572 U.S. Highway 1, Lawrenceville, New Jersey 08648. The sole member of Defendant Auro Health LLC is Defendant Aurobindo Pharma USA, Inc., a Delaware corporation with its principal place of business located in New Jersey.  Auro Health LLC is a citizen of Delaware and New Jersey.

44.     Defendant Auro Health LLC applied to the FDA for the power and privilege of listing and labeling ranitidine-containing products for sale in all states and territories within the United States.

45.     Defendant Aurobindo Pharma USA, Inc. is a Delaware corporation with its principal place of business located at 279 Princeton Highstown Road, East Windsor, New Jersey 08520.  Defendant Aurobindo Pharma USA, Inc. is a citizen of Delaware and New Jersey.

46.     Defendant Aurobindo Pharma USA, Inc. is Aurobindo Pharma Ltd.'s (a citizen of India's) appointed agent in the United States for the very purpose of lawfully selling and distributing drugs including ranitidine-containing products. Defendant Aurobindo Pharma USA, Inc. as a regulatory agent also fulfills a regulatory compliance role for Aurobindo Pharma Ltd. by regularly filing materials the FDA requires ANDA holders to provide to maintain their right to manufacture drugs.

47.     Defendant Auro Health LLC and Aurobindo Pharma USA, Inc. are subsidiaries of Aurobindo Pharma, Ltd.  Collectively, these entities shall be referred to as "Aurobindo."

48.     Defendant Aurobindo purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.

**Dr. Reddy's**

49.     Defendant Dr. Reddy's Laboratories, Inc. is a New Jersey corporation with its principal place of business located at 107 College Rd. E, Princeton, New Jersey 08540. Defendant Dr. Reddy's Laboratories, Inc. is a citizen of New Jersey.

50.     Defendant Dr. Reddy's Laboratories, Inc. applied to the FDA for the right to manufacture and sell a generic form of ranitidine and subsequently received that approval as discussed herein. Defendant Dr. Reddy's Laboratories, Inc. also applied to the FDA for the power and privilege of listing and labeling ranitidine-containing products for sale in all states and territories within the United States.

51.     Defendant Dr. Reddy's Laboratories, Inc. is also the appointed agent in the United States for the very purpose of lawfully selling and distributing drugs including ranitidine-containing products manufactured by Dr. Reddy's Laboratories, Ltd. (a citizen of India). Defendant Dr. Reddy's Laboratories, Inc. as a regulatory agent also fulfills a regulatory compliance role for other Dr. Reddy's entities by regularly filing materials the FDA requires ANDA holders to provide to maintain their right to manufacture drugs.

52.     Defendant Dr. Reddy's Laboratories Louisiana LLC is a Delaware limited liability company with its principal place of business located at 8800 Line Avenue, Shreveport, Louisiana (LA) 71106.

53.     Defendant Dr. Reddy's Laboratories Louisiana LLC registered an establishment with the FDA, allowing it to manufacture, repack, or relabel drug products within the United States.

54. Dr. Reddy's Laboratories, Inc., Dr. Reddy's Laboratories, Ltd., and Dr. Reddy's Laboratories Louisiana LLC are subsidiaries of Dr. Reddy's Laboratories SA. Collectively, these entities shall be referred to as "Dr. Reddy's."

55. Defendant Dr. Reddy's purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.

### Granules

56. Defendant Granules USA, Inc. ("Granules") is a Delaware corporation with its principal place of business located at 35 Waterview Blvd., Parsippany, New Jersey 07054. Defendant Granules is a citizen of Delaware and New Jersey.

57. Defendant Granules purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.

### Perrigo

58. Defendant L. Perrigo Co. is a Michigan corporation with its principal place of business located at 515 Eastern Avenue, Allegan, Michigan 49010. Defendant L. Perrigo Co. is a citizen of Michigan.

59. Defendant L. Perrigo Co. applied to the FDA for the right to manufacture and sell a generic form of ranitidine and subsequently received that approval as discussed herein. Defendant L. Perrigo Co. also applied to the FDA for the power and privilege of listing and labeling ranitidine-containing products for sale in all states and territories within the United States. Defendant L. Perrigo Co. further registered an establishment with the FDA, allowing it to manufacture, repack, or relabel drug products within the United States.

60.     Defendant Perrigo Company is a Michigan corporation with its principal place of business located at 515 Eastern Avenue, Allegan, Michigan 49010.  Defendant Perrigo Company is a citizen of Michigan.

61.     Defendant Perrigo Research & Development Company is a Michigan corporation with its principal place of business located at 515 Eastern Avenue, Allegan, Michigan 49010. Defendant Perrigo Research & Development Company is a citizen of Michigan.

62.     Defendant Perrigo Research & Development Company applied to the FDA for the right to manufacture and sell a generic form of ranitidine and subsequently received that approval as discussed herein.

63.     L. Perrigo Co., Perrigo Company, and Perrigo Research & Development Company are subsidiaries of non-party Perrigo Company, plc., a corporation organized and existing under the laws of Ireland with its principal place of business in Ireland.  Collectively, these entities shall be referred to as "Perrigo."

64.     Defendant Perrigo purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.

**Strides**

65.     Defendant Strides Pharma, Inc. ("Strides") is a New Jersey corporation with its principal place of business located at 2 Tower Center Blvd., Suite 1102, East Brunswick, New Jersey 08816.  Defendant Strides is a citizen of New Jersey.

66.     Defendant Strides registered an establishment with the FDA, allowing it to manufacture, repack, or relabel drug products within the United States.

67.     Defendant Strides purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.

**Sun Pharmaceutical**

68.     Defendant Ranbaxy Inc. is a Texas corporation with its principal place of business located at 2 Independence Way, Princeton, New Jersey 08540.  Defendant Ranbaxy Inc. is a citizen of Texas and New Jersey.

69.     Defendant Ranbaxy Inc. applied to the FDA for the right to manufacture and sell a generic form of ranitidine and subsequently received that approval as discussed herein.

70.     Defendant Sun Pharmaceutical Industries, Inc., f/k/a Ranbaxy Pharmaceuticals Inc., is a Delaware corporation with is principal place of business located at 2 Independence Way, Princeton, New Jersey 08540.  Defendant Sun Pharmaceutical Industries, Inc. is a citizen of Delaware and New Jersey.

71.     Defendant Sun Pharmaceutical Industries, Inc. applied to the FDA for the right to manufacture and sell a generic form of ranitidine and subsequently received that approval as discussed herein.

72.     Defendant Ranbaxy Inc., Defendant Sun Pharmaceutical Industries, Inc. (f/k/a Ranbaxy Pharmaceuticals Inc.), and Sun Pharmaceutical Industries Ltd. are subsidiaries of non-party Taro Pharmaceutical Industries Ltd., a corporation organized and existing under the laws of Israel with its principal place of business located in Israel.  Collectively, these entities shall be referred to as "Sun Pharmaceutical."

**Teva**

73.     Defendant Actavis Mid Atlantic LLC is a Delaware limited liability company with its principal place of business located at 400 Interpace Parkway, Bldg. A, Parsippany, NJ 07054. The membership interest of Defendant Actavis Mid Atlantic LLC is owned by Teva Pharmaceuticals U.S.A., Inc., either directly or through an intervening limited liability company.

Defendant Teva Pharmaceuticals U.S.A., Inc. is a Delaware corporation with its principal place of business in Pennsylvania. Actavis Mid Atlantic LLC is a citizen of Delaware and Pennsylvania.

74.     Defendant Actavis Mid Atlantic LLC applied to the FDA for the right to manufacture and sell a generic form of ranitidine and subsequently received that approval as discussed herein.

75.     Defendant Teva Pharmaceuticals U.S.A., Inc. is a Delaware corporation with its principal place of business located at 1090 Horsham Road North Wales, Pennsylvania 19454. Teva Pharmaceuticals U.S.A., Inc. is a citizen of Delaware and Pennsylvania.

76.     Defendant Teva Pharmaceuticals U.S.A., Inc. applied to the FDA for the right to manufacture and sell a generic form of ranitidine and subsequently received that approval as discussed herein.

77.     Defendant Watson Laboratories, Inc. is a Nevada corporation with its principal place of business located at 400 Interpace Parkway, Bldg. A., Parsippany, New Jersey, 07054. Watson Laboratories, Inc. is a citizen of Nevada and New Jersey.

78.     Defendant Watson Laboratories, Inc. applied to the FDA for the right to manufacture and sell a generic form of ranitidine and subsequently received that approval as discussed herein.

79.     Defendants Actavis Mid Atlantic LLC, Teva Pharmaceuticals U.S.A., Inc., and Watson Laboratories, Inc. are subsidiaries of non-party Teva Pharmaceutical Industries Ltd., a corporation organized and existing under the laws of Israel with its principal place of business located in Israel. Collectively, these entities shall be referred to as "Teva."

**Wockhardt**

80.     Defendant Wockhardt USA LLC is a Delaware limited liability company with its principal place of business located at 20 Waterview Blvd., Parsippany, New Jersey 07054.  Upon information and belief, the sole member of Defendant Wockhardt USA LLC is Defendant Wockhardt Americas, Inc., a Delaware corporation with its principal place of business in New Jersey.  Defendant Wockhardt USA LLC is a citizen of Delaware and New Jersey.

81.     Defendant Wockhardt USA LLC applied to the FDA for the power and privilege of listing and labeling ranitidine-containing products for sale in all states and territories within the United States.

82.     Defendant Wockhardt Americas, Inc. is a Delaware corporation with its principal place of business located at 135 Route 202/206, Bedminster, New Jersey 07921.  Wockhardt Americas, Inc. is a citizen of Delaware and New Jersey.

83.     Defendant Wockhardt Americas, Inc. is Wockhardt Ltd.'s appointed agent in the United States for the very purpose of lawfully selling and distributing drugs including ranitidine-containing products. Defendant Wockhardt Americas, Inc. as a regulatory agent also fulfills a regulatory compliance role for Wockhardt Ltd. by regularly filing materials the FDA requires ANDA holders to provide to maintain their right to manufacture drugs.

84.     Defendants Wockhardt USA LLC and Wockhardt Americas, Inc. are subsidiaries of Wockhardt Ltd., a corporation organized and existing under the laws of India with its principal place of business in India.  Collectively, these entities shall be referred to as "Wockhardt."

85.     Defendant Wockhardt purchased ranitidine and repackaged and/or relabeled it under Defendant's own brand.

86. Defendants identified in paragraphs 43 to 85 above shall be referred to collectively as the "Generic Manufacturer Defendants." The "Brand-Name Manufacturer Defendants" and "Generic Manufacturer Defendants" shall also be referred to collectively herein as the "Manufacturer Defendants."

**E. Retailer Defendants – Walgreens**

87. Retailers derived substantial revenue from marketing, handling, distributing, storing, and selling ranitidine-containing products within each of the States and Territories of the United States, including Illinois. As described below, many retailers also used their own brand names on relabeled ranitidine-containing products.

88. Defendant Walgreen Co. is an Illinois corporation with its principal place of business located at 108 Wilmot Road, Deerfield, Illinois 60015. Walgreen Co. is a citizen of Illinois.

89. Defendant Walgreens Boots Alliance, Inc. is a Delaware corporation with its principal place of business located at 108 Wilmot Road, Deerfield, Illinois 60015. Walgreens Boots Alliance, Inc. is a citizen of Delaware and Illinois.

90. Defendant Bond Drug Company of Illinois, LLC d/b/a Walgreens is an Illinois limited liability company with its principal place of business located at 200 Wilmot Road, Deerfield, Illinois 60015. Bond Drug Company of Illinois LLC is a citizen of Illinois.

91. Walgreen Co. and Bond Drug Company of Illinois, LLC d/b/a Walgreens are subsidiaries of Walgreens Boots Alliance, Inc. Collectively, these entities shall be referred to as "Walgreens" or "Retailer Defendants."

## JURISDICTION & VENUE

92. This Court has subject matter jurisdiction pursuant to 735 ILCS 5/2-209 (b)(3-4).

93. This Court has personal jurisdiction over Defendants insofar as Defendants are authorized and licensed to conduct business in Illinois, maintain and carry on systematic and continuous contacts in Illinois, and regularly transacts business within Illinois.

94. Additionally, the Defendants caused injury by acts and omissions in Illinois and caused injury in Illinois by acts and omissions outside Illinois while regularly doing and soliciting business, engaging in a persistent course of conduct, and receiving financial benefit and profits from goods used or consumed in Illinois.

95. At all relevant times, Defendants were present and doing business in Illinois, and should have expected that their acts would have consequences within the state of Illinois

96. Venue is proper in Madison County because a substantial part of the events, actions, or omissions giving rise to Plaintiff Bayer's causes of action occurred in Madison County, including the purchase and use of Zantac/ranitidine. 735 ILCS 5/2-101. Further, venue is proper in Madison County because Defendants conduct business there. 735 ILCS 5/2-101.

## FACTUAL ALLEGATIONS

## I. THE CREATION OF RANITIDINE-CONTAINING PRODUCTS AND THEIR INTRODUCTION TO THE MARKET

97. Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine under the brand name Zantac or a generic equivalent by either prescription or over the counter ("OTC").

### A. GSK Develops Zantac Through a Flurry of Aggressive Marketing Maneuvers

98. Ranitidine belongs to a class of medications called histamine $H_2$-receptor antagonists (or $H_2$ blockers), which decrease the amount of acid produced by cells in the lining of the stomach. Other drugs within this class include cimetidine (branded Tagamet), famotidine (Pepcid), and nizatidine (Axid).

99.    GSK-predecessor Smith, Kline & French discovered and developed Tagamet, the first $H_2$ blocker and the prototypical histamine $H_2$ receptor antagonist from which the later members of the class were developed.

100.    GSK[2] developed Zantac specifically in response to the success of cimetidine. Recognizing the extraordinary potential of having its own $H_2$ blocker in the burgeoning anti-ulcer market, GSK was all too willing to ensure its drug succeeded at all costs.

101.    Allen & Hanburys Ltd., a then-subsidiary of Glaxo Laboratories Ltd., is credited with developing ranitidine and was awarded Patent No. 4,128,658 by the U.S. Patent and Trademark Office in December 1978, which covered the ranitidine molecule.

102.    In 1983, the FDA granted approval to Glaxo to sell Zantac, pursuant to the New Drug Application ("NDA") No. 18-703, and it quickly became GSK's most successful product— a "blockbuster." Indeed, Zantac became the first prescription drug in history to reach $1 billion in sales.

103.    To accomplish this feat, GSK entered into a joint promotion agreement with Hoffmann-LaRoche, Inc. More salespersons drove more sales and blockbuster profits for GSK.

104.    In June of 1986, the FDA approved Zantac for maintenance therapy of duodenal ulcers and for treatment of patients with gastroesophageal reflux disease (GERD).

105.    In December 1993, GSK (through Glaxo Wellcome plc) entered into a partnership agreement with Pfizer-predecessor company Warner-Lambert Co. to develop and market an OTC version of Zantac. In 1995, the FDA approved OTC Zantac 75 mg tablets through NDA 20-520.

_____

[2] GSK, as it's known today, was created through a series of mergers and acquisitions: In 1989, Smith, Kline & French merged with the Beecham Group to form SmithKline Beecham plc. In 1995, Glaxo merged with the Wellcome Foundation to become Glaxo Wellcome plc. In 2000, Glaxo Wellcome plc merged with SmithKline Beecham plc to form GlaxoSmithKline plc and GlaxoSmithKline LLC.

In 1998, the FDA approved OTC Zantac 75 mg effervescent tablets through NDA 20-745.

106.    In 1998, GSK (Glaxo Wellcome plc) and Warner-Lambert Co. ended their partnership.  As part of the separation, Warner-Lambert Co. retained control over the OTC NDA for Zantac and the Zantac trademark in the United States and Canada but was required to obtain approval from GSK prior to making any product or trademark improvements or changes.  GSK retained rights to sell OTC Zantac outside of the United States and Canada, and retained control over the Zantac trademark internationally.

107.    In 2000, Pfizer acquired Warner-Lambert Co.  Pfizer controlled the Zantac OTC NDAs until December 2006.

108.    In October 2000, GSK sold to Pfizer the full rights to OTC Zantac in the United States and Canada pursuant to a divestiture and transfer agreement.  As part of that agreement, GSK divested all domestic Zantac OTC assets to Pfizer, including all trademark rights.  The agreement removed the restrictions on Pfizer's ability to seek product line extensions or the approval for higher doses of OTC Zantac.  GSK retained the right to exclusive use of the Zantac name for any prescription ranitidine-containing product in the United States.

109.    In October 2003, Pfizer submitted NDA 21-698 for approval to market OTC Zantac 150 mg.  The FDA approved NDA 21-698 on August 31, 2004.

110.    During the time that Pfizer owned the rights to OTC Zantac, GSK continued to manufacture the product.

111.    In 2006, pursuant to a Stock and Asset Purchase Agreement, Pfizer sold and divested its entire consumer health division (including employees and documents) to Johnson & Johnson ("J&J").  Because of antitrust issues, however, Zantac was transferred to Boehringer Ingelheim.

112.    Pfizer, through a divestiture agreement, transferred all assets pertaining to its Zantac OTC line of products, including the rights to sell and market all formulations of OTC Zantac in the United States and Canada, as well as all intellectual property, R&D, and customer and supply contracts to Boehringer Ingelheim.  As part of that deal, Boehringer Ingelheim obtained control and responsibility over all Zantac OTC NDAs.

113.    GSK continued marketing prescription Zantac in the United States until 2017 and still holds the NDAs for several prescription formulations of Zantac.  GSK continued to maintain manufacturing and supply agreements relating to various formulations of both prescription and OTC Zantac.  According to its recent annual report, GSK claims to have "discontinued making and selling prescription Zantac tablets in 2017 . . . in the U.S."[3]

114.    Boehringer Ingelheim owned and controlled the NDA for OTC Zantac between December 2006 and January 2017, and manufactured, marketed, and distributed the drug in the United States during that period.[4]

115.    In 2017, Boehringer Ingelheim sold the rights of OTC Zantac to Sanofi pursuant to an asset swap agreement.  As part of that deal, Sanofi obtained control and responsibility over Boehringer Ingelheim's entire consumer healthcare business, including the OTC Zantac NDAs.  As part of this agreement, Boehringer Ingelheim and Sanofi entered into a manufacturing agreement wherein Boehringer continued to manufacture OTC Zantac for Sanofi.

116.    Sanofi has controlled the OTC Zantac NDAs and marketed, sold, and distributed Zantac in the United States from January 2017 until 2019 when it issued a global recall and ceased marketing, selling, and distributing OTC Zantac.  In addition, Sanofi has marketed, sold, and

---

[3] GlaxoSmithKline, plc, *Annual Report* 37 (2019), https://www.gsk.com/media/5894/annual-report.pdf.
[4] Boehringer Ingelheim also owned and controlled ANDA 074662.

distributed ranitidine globally since 1983.

117. Throughout the time that Sanofi controlled the OTC Zantac NDAs, Boehringer Ingelheim Promeco, S.A. de C.V. and Patheon Manufacturing Services LLC manufactured the finished drug product.

118. Sanofi voluntarily recalled all brand-name OTC Zantac and ranitidine on October 18, 2019.

119. Pfizer and Boehringer Ingelheim have made demands for indemnification per the Stock and Asset Purchase Agreement against J&J for legal claims related to OTC Zantac products.

120. Sanofi has made a demand for indemnification against J&J pursuant to a 2016 Asset Purchase Agreement between J&J and Sanofi.

121. The times during which each Brand-Name Manufacturer Defendant manufactured and sold branded Zantac are alleged below:

| Manufacturer/ Repackager | Product | Prescription or Over the Counter | Sale Start Date Year | Sale End Date Year |
|---|---|---|---|---|
| GlaxoSmithKline | Pills, Syrup, and Injection | Prescription | 1983 | 2019 |
| | Pills | OTC | 1995 | 1998 |
| Pfizer | Pills | OTC | 1998 | 2006 |
| Boehringer Ingelheim | Pills | OTC | 2007 | 2016 |
| Sanofi | Pills | OTC | 2017 | 2019 |

**B. Patents Expire, Allowing Generics to Enter the Market**

122. In 1997, GSK's patent on the original prescription Zantac product expired, allowing generic manufacturers to sell prescription ranitidine.

123. When GSK and Pfizer's patent on the original OTC Zantac product expired, generic manufacturers were allowed to sell OTC ranitidine.

124. The FDA approved numerous generic manufacturers for the sale of prescription

and OTC ranitidine through the ANDA process.

125. "An abbreviated new drug application (ANDA) contains data which is submitted to FDA for the review and potential approval of a generic drug product. Once approved, an applicant may manufacture and market the generic drug product to provide a safe, effective, lower cost alternative to the brand-name drug it references."[5]

126. Generic drugs must be comparable to the branded drug in dosage form, strength, route of administration, quality, performance characteristics, and intended use.[6]

127. ANDA applicants generally do not need to establish safety and effectiveness. Instead, generic applicants must scientifically demonstrate that their product performs in the same manner as the innovator drug, known as "bioequivalence."

128. Once a manufacturer's ANDA is approved, that manufacturer is subject to post-market obligations. These obligations include submitting annual reports to the FDA, tracking and reporting adverse events, and tracking and reporting relevant medical literature, among other things.

129. These ANDA approvals allowed the Generic Defendants to sell their ranitidine products throughout the country. And the Generic Defendants did so.

130. All Defendants who have the power of labeling and listing drugs within the United States must obtain a National Drug Code ("NDC"). All NDC holders are required to register all drugs and list them with the FDA.

131. All Defendants who have registered establishments with the FDA must provide "[c]omplete, accurate and up-to-date establishment registration and drug listing information

---

[5] https://www.fda.gov/drugs/types-applications/abbreviated-new-drug-application-anda.
[6] https://www.fda.gov/drugs/types-applications/abbreviated-new-drug-application-anda.

[which] is essential to promote patient safety. FDA relies on establishment registration and drug listing information for several key programs, including:

- Drug establishment inspections
- Post market surveillance
- Counterterrorism
- Recalls
- Drug quality reports
- Adverse event reports
- Monitoring of drug shortages and availability
- Supply chain security
- Drug import and export
- Identification of products that are marketed without an approved application[7]"

132. In registering with the FDA to manufacture, label, distribute, and sell ranitidine-containing products within all U.S. states and territories, all defendants holding an ANDA or NDC Code, or which registered an establishment had an obligation to comply with federal law.

133. Plaintiffs assert claims against these Generic Defendants as to the time during which each sold ranitidine to Plaintiffs.

134. Based upon the information released by Defendants, the following generic defendants manufactured Ranitidine-Containing Products during the following date ranges. Upon information and belief, each Defendant began researching Ranitidine-Containing Products at least one year prior to the date they commenced selling the product and therefore knew or should have known of all risks associated with Ranitidine-Containing Products discussed herein from that date onward:

| Manufacturer/ Repackager (by Corporate Family) | Product | Prescription or Over the Counter | Sale Start Date Year | Sale End Date Year |
|---|---|---|---|---|
| Ranbaxy | Pills and Syrup | Both | 1998 | 2014 |
| Teva | Pills and Syrup | Both | 1998 | 2016 |

---

[7] U.S. Food & Drug Admin., *Electronic Drug Registration and Listing System (eDRLS)* (Dec. 18, 2020) https://www.fda.gov/drugs/guidance-compliance-regulatory-information/electronic-drug-registration-and-listing-system-edrls.

| Perrigo | Pills | OTC | 2000 | 2019 |
|---|---|---|---|---|
| Sun Pharmaceutical | Pills | Both | 2000 | 2017 |
| Wockhardt | Pills and Syrup | Both | 2003 | 2015 |
| Dr. Reddy's | Pills | Both | 2005 | 2019 |
| Aurobindo | Pills and Syrup | Both | 2010 | 2020 |
| Strides | Pills | Both | 2012 | 2020 |
| Granules | Pills | OTC | 2018 | 2019 |

135.    Despite generic entry, Brand-Name Manufacturer Defendants continued to sell prescription and OTC Zantac.  Although sales of Zantac declined as a result of generic competition, ranitidine sales remained strong over time.  As recently as 2018, Zantac was one of the top 10 antacid tablets in the United States, with sales of OTC Zantac 150 totaling $128.9 million—a 3.1% increase from the previous year.

## II.  NDMA IS A CARCINOGEN WHOSE DANGEROUS PROPERTIES ARE WELL ESTABLISHED.

136.    According to the Environmental Protection Agency ("EPA"), "NDMA is a semivolatile organic chemical that forms in both industrial and natural processes."[8]  It is one of the simplest members of a class of N-nitrosamines, a family of potent carcinogens.  Scientists have long recognized the dangers that NDMA poses to human health.  A 1979 news article noted that "NDMA has caused cancer in nearly every laboratory animal tested so far."[9]  NDMA is no longer

---

[8] U.S. Environmental Protection Agency, *Technical Fact Sheet – N-Nitroso-dimethylamine (NDMA)* (Nov. 2017), https://www.epa.gov/sites/production/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf.

[9] Jane Brody, *Bottoms Up: Alcohol in Moderation Can Extend Life*, The Globe & Mail (CANADA) (Oct. 11, 1979); *see* Rudy Platiel, *Anger Grows as Officials Unable to Trace Poison in Reserve's Water*, The Globe & Mail (CANADA) (Jan. 6, 1990) (reporting that residents of Six Nations Indian Reserve "have been advised not to drink, cook or wash in the water because testing has found high levels of N-nitrosodimethylamine (NDMA), an industrial byproduct chemical that has been linked to cancer"); Kyrtopoulos et al, *DNA Adducts in Humans After Exposure to Methylating Agents*, 405 Mut. Res. 135 (1998) (noting that "chronic exposure of rats to very low doses of NDMA gives rise predominantly to liver tumors, including tumors of the liver cells (hepatocellular carcinomas), bile ducts, blood vessels and Kupffer cells").

produced or commercially used in the United States except for research. Its only use today is to cause cancer in laboratory animals.

137. Both the EPA and the International Agency for Research on Cancer ("IARC") classify NDMA as a probable human carcinogen.[10]

138. The American Conference of Governmental Industrial Hygienists classifies NDMA as a confirmed animal carcinogen.[11]

139. The Department of Health and Human Services ("DHHS") states that NDMA is reasonably anticipated to be a human carcinogen.[12] This classification is based upon DHHS's findings that NDMA caused tumors in numerous species of experimental animals, at several different tissue sites, and by several routes of exposure, with tumors occurring primarily in the liver, respiratory tract, kidney, and blood vessels.[13]

140. The FDA considers NDMA a carcinogenic impurity and chemical that "could cause cancer" in humans.[14] The FDA recognizes that NDMA is "known to be toxic."[15]

141. The World Health Organization states that there is "conclusive evidence that NDMA is a potent carcinogen" and that there is "clear evidence of carcinogenicity."[16] NDMA

---

[10] *See* EPA Technical Fact Sheet, *supra* note 8; Int'l Agency for Research on Cancer (IARC), *Summaries & Evaluations, N-NITROSODIMETHYLAMINE* (1978), http://www.inchem.org/documents/iarc/vol17/n-nitrosodimethylamine.html.

[11] *See* EPA Technical Fact Sheet, *supra* note 8.

[12] *Id.* at 3.

[13] *Id.*

[14] FDA Statement, Janet Woodcock, Director – Ctr. for Drug Evaluation & Research, *Statement Alerting Patients and Health Care Professionals of NDMA Found in Samples of Ranitidine* (Sept. 13, 2019), https://www.fda.gov/news-events/press-announcements/statement-alerting-patients-and-health-care-professionals-ndma-found-samples-ranitidine.

[15] Amneal_prod 1 _ 0000002938.

[16] World Health Org., *Guidelines for Drinking Water Quality, N-Nitrosodimethylamine (NDMA)* (3d ed. 2008), https://www.who.int/water_sanitation_health/dwq/chemicals/ndmasummary_2ndadd.pdf.

belongs to the so-called "cohort of concern" which is a group of highly potent mutagenic carcinogens that have been classified as probable human carcinogens.[17]

142. The EMA has referred to NDMA as "highly carcinogenic." It recommended that "primary attention with respect to risk for patients should be on these highly carcinogenic N-nitrosamines" (including NDMA), and categorized NDMA as "of highest concern with respect to mutagenic and carcinogenic potential."[18]

143. In 1989, the Agency for Toxic Substances and Disease Registry (ATSDR) stated that it is "reasonable to expect that exposure to NDMA by eating, drinking or breathing could cause cancer in humans" and that the "carcinogenicity of orally-administered NDMA has been demonstrated unequivocally in acute, intermediate and chronic durations studies" in animals and "it is important to recognize that this evidence also indicates that oral exposures of acute and intermediate duration are sufficient to induce cancer." Moreover, "hepatoxicity has been demonstrated in all animal species that have been tested and has been observed in humans who were exposed to NDMA by ingestion or inhalation."[19]

144. As early as 1980, consumer products containing unsafe levels of NDMA and other nitrosamines have been recalled by manufacturers, either voluntarily or at the direction of the FDA.

145. Most recently, beginning in the summer of 2018, there have been recalls of several generic drugs used to treat high blood pressure and heart failure—Valsartan, Losartan, and

---

[17] International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH), Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals to Limit Potential Carcinogenic Risk, M7(R1), March 2017; https://database.ich.org/sites/default/files/M7_R1_Guideline.pdf.

[18] Nitrosamines EMEA-H-A5(3)-1490 - Assessment Report (europa.eu) (June 25, 2020), https://www.ema.europa.eu/en/documents/referral/nitrosamines-emea-h-a53-1490-assessment-report_en.pdf.

[19] ATSDR Toxicological Profile For N-Nitrosodimethylamine (December 1989), http://www.atsdr.cdc.gov/toxprofiles/tp141.pdf.

Irbesartan—because the medications contained nitrosamine impurities that do not meet the FDA's safety standards. Some of the manufacturers of those contaminated medications also are parties to this case. They include Aurobindo and Teva.

146. This continued in 2020 when the FDA required recalls of numerous generic manufacturers' metformin, including metformin made by Granules, Sun Pharmaceuticals and Teva.[20]

147. NDMA is a genotoxin which interacts with DNA and may subsequently induce mutations. Genotoxins are not considered to have a safe threshold or dose due to their ability to alter DNA.

148. The FDA has set an acceptable daily intake ("ADI") level for NDMA at 96 ng. That means that consumption of 96 ng of NDMA a day would increase the risk of developing cancer by 0.001% over the course of a lifetime. That risk increases as the level of NDMA exposure increases. However, any level above 96 ng is considered unacceptable.[21]

149. In studies examining carcinogenicity through oral administration, mice exposed to NDMA developed cancer in the kidney, bladder, liver, and lung. In comparable rat studies, cancers were observed in the liver, kidney, pancreas, and lung.

150. In other long-term animal studies in mice and rats utilizing different routes of exposures—inhalation, subcutaneous injection, and intraperitoneal (abdomen injection)—cancer was observed in the lung, liver, kidney, nasal cavity, and stomach.

---

[20] https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-metformin.

[21] U.S. Food & Drug Admin., *FDA Updates and Press Announcements on Angiotensin II Receptor Blocker (ARB) Recalls (Valsartan, Losartan, and Irbesartan)* (Feb. 28, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan.

151.    Numerous *in vitro* studies confirm that NDMA is a mutagen—causing genetic mutations in human and animal cells.

152.    Overall, the animal data demonstrates that NDMA is carcinogenic in all animal species tested: mice; rats; Syrian golden, Chinese and European hamsters; guinea pigs; rabbits; ducks; mastomys; fish; newts; and frogs.

153.    The EPA classified NDMA as a probable human carcinogen "based on the induction of tumors at multiple sites in different mammal species exposed to NDMA by various routes."[22]

154.    Pursuant to EPA cancer guidelines, "tumors observed in animals are generally assumed to indicate that an agent may produce tumors in humans."[23]

155.    In addition to the overwhelming animal data linking NDMA to cancer, there are numerous human epidemiological studies exploring the effects of dietary exposure to various cancers.  These studies consistently show increased risks of various cancers.

156.    In a 2000 epidemiological cohort study looking at occupational exposure of workers in the rubber industry, researchers observed significant increased risks for NDMA exposure for esophagus, oral cavity, and pharynx cancer.[24]

157.    In a 2011 epidemiological cohort study looking at NDMA dietary exposure with 3,268 cases and a follow up of 11.4 years, researchers concluded that "[d]ietary NDMA intake was

---

[22] *Id.*

[23] *See* U.S. Envtl. Protection Agency, Risk Assessment Forum, *Guidelines for Carcinogen Risk Assessment* (Mar. 2005), https://www3.epa.gov/airtoxics/cancer_guidelines_final_3-25-05.pdf.

[24] Straif et al., *Exposure to High Concentrations of Nitrosamines and Cancer Mortality Among a Cohort of Rubber Workers*, 57 Occup. Envtl. Med 180–87 (2000).

significantly associated with increased cancer risk in men and women" for all cancers.[25]

158.    NDMA is also known to be genotoxic—meaning, it can cause DNA damage in human cells.  Indeed, multiple studies demonstrate that NDMA is genotoxic both *in vivo* and *in vitro.*  However, recent studies have shown that the ability of NDMA to cause mutations in cells is affected by the presence of enzymes typically found in living humans, suggesting that "humans may be especially sensitive to the carcinogenicity of NDMA."[26]

159.    In addition to studies demonstrating that NDMA directly causes cancer, research shows that exposure to NDMA (1) can exacerbate existing but dormant (*i.e.* not malignant) tumor cells; (2) promote otherwise "initiated cancer cells" to develop into cancerous tumors; and (3) reduce the ability of the body to combat cancer as NDMA is immunosuppressive.  Thus, in addition to NDMA being a direct cause of cancer itself, NDMA can also be a contributing factor to a cancer injury caused by some other source.

### III.  NDMA IS DISCOVERED IN RANITIDINE-CONTAINING PRODUCTS, LEADING TO MARKET WITHDRAWL

160.    On September 9, 2019, pharmacy and testing laboratory Valisure LLC and ValisureRX LLC (collectively, "Valisure") filed a Citizen Petition calling for the recall of all ranitidine-containing products due to detecting exceedingly high levels of NDMA when testing ranitidine pills using gas chromatography-mass spectrometry.  FDA and European regulators started reviewing the safety of ranitidine with specific focus on the presence of NDMA.[27]  This set

---

[25]  Loh et al., *N-nitroso Compounds and Cancer Incidence: The European Prospective Investigation into Cancer and Nutrition (EPIC)–Norfolk Study*, 93 Am. J. Clinical Nutrition 1053–61 (2011).

[26]  World Health Org., *supra* note 16.

[27]  FDA Statement, Woodcock, *supra* note 14; Press Release, European Medicines Agency, *EMA to Review Ranitidine Medicines Following Detection of NDMA* (Sept. 13, 2019), https://www.ema.europa.eu/en/news/ema-review-ranitidine-medicines-following-detection-ndma.

off a cascade of recalls by the Brand-Name Manufacturer, Generic Manufacturer, and Retailer Defendants.

161.    On September 13, 2019, the FDA's Director for Drug Evaluation and Research, Dr. Janet Woodcock, issued a statement warning that some ranitidine medicines may contain NDMA.[28]

162.    On September 26, 2019, Retailer Defendant Walgreens voluntarily recalled all ranitidine products and removed them from shelves.[29]

163.    On October 2, 2019, the FDA ordered manufacturers of ranitidine to test their products and recommended using a liquid chromatography with high resolution mass spectrometer ("LC-HRMS") testing protocol, which "does not use elevated temperatures."[30]

164.    On October 8, 2019, Brand-Name Manufacturer Defendant GSK voluntarily recalled all ranitidine-containing products internationally.[31]  As part of the recall, GSK publicly acknowledged that unacceptable levels of NDMA were discovered in Zantac and noted that "GSK is continuing with investigations into the potential source of the NDMA."[32]

165.    On October 18 and 23, 2019, Brand-Name Manufacturer Defendant Sanofi and Generic Manufacturer Defendant Dr. Reddy's voluntarily recalled all of their ranitidine-containing

---

[28] FDA Statement, Woodcock, *supra* note 14.

[29] U.S. Food & Drug Admin., *FDA Updates and Press Announcements on NDMA in Zantac (ranitidine)* (Sept. 26, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine.

[30] U.S. Food & Drug Admin., *FDA Updates and Press Announcements on NDMA in Zantac (ranitidine)* (Oct. 2, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine.

[31] Press Release, Gov. UK, *Zantac – MHRA Drug Alert Issued as GlaxoSmithKline Recalls All Unexpired Stock* (Oct. 8, 2019), https://www.gov.uk/government/news/zantac-mhra-drug-alert-issued-as-glaxosmithkline-recalls-all-unexpired-stock.

[32] Justin George Varghese, *GSK Recalls Popular Heartburn Drug Zantac Globally After Cancer Scare*, Reuters (Oct. 8, 2019), https://www.reuters.com/article/us-gsk-heartburn-zantac/gsk-recalls-popular-heartburn-drug-zantac-globally-after-cancer-scare-idUSKBN1WN1SL.

products.[33]

166.    On November 1, 2019, the FDA announced the results of recent testing, finding unacceptable levels of NDMA in ranitidine-containing products, and requested that drug makers begin to voluntarily recall their ranitidine-containing products if the FDA or manufacturers discovered NDMA levels above the acceptable limits.[34]

167.    On December 4, 2019, the FDA issued a statement notifying consumers who wished to continue taking ranitidine to consider limiting their intake of nitrite-containing foods, *e.g.*, processed meats and preservatives like sodium nitrite.[35]  This advice **mirrored** an admonition issued by Italian scientists in 1981 after finding that ranitidine reacted with nitrites *in vitro* to form toxic and mutagenic effects in bacteria.  The prudent advice of Dr. de Flora published in October 1981 in *The Lancet* was to "avoid nitrosation as far as possible by, for example, suggesting a diet low in nitrates and nitrites, by asking patients not to take these at times close to (or with) meals or by giving inhibitors of nitrosation such as ascorbic acid."[36]  If GSK had only heeded Dr. de Flora's advice in 1981, millions of people might have avoided exposure to NDMA formed as a result of ranitidine's interaction with the human digestive system.

168.    On November 8, 2019 Generic Manufacturer Defendant Aurobindo recalled their

---

[33] U.S. Food & Drug Admin., *FDA Updates and Press Announcements on NDMA in Zantac (ranitidine)* (Oct. 23, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine.

[34] U.S. Food & Drug Admin., Laboratory Tests | Ranitidine, https://www.fda.gov/drugs/drug-safety-and-availability/laboratory-tests-ranitidine (content current as of Nov. 1, 2019).

[35] U.S. Food & Drug Admin., *FDA Updates and Press Announcements on NDMA in Zantac (ranitidine)* (Dec. 4, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine.

[36] Silvio de Flora, *Cimetidine, Ranitidine and Their Mutagenic Nitroso Derivatives*, The Lancet, Oct. 31, 1981, at 993–94.

products.[37]

169. On January 2, 2020, research laboratory, Emery Pharma, submitted a Citizen Petition to the FDA, showing that the ranitidine molecule is heat-liable and under certain temperatures progressively accumulates NDMA.

170. Emery's Citizen Petition outlined its substantial concern that ranitidine is a time- and temperature-sensitive pharmaceutical product that develops NDMA when exposed to heat, a common occurrence during shipping, handling, and storage. Emery requested that the FDA issue a directive to manufacturers to clearly label ranitidine with a warning that "by-products that are probable carcinogens can be generated if exposed to heat." In addition to warning about this condition, Emery requested agency directives to manufacturers and distributors to ship ranitidine products in temperature-controlled vehicles.[38]

171. In response,[39] on April 1, 2020, the FDA recounted that a recall is an "effective methods [sic.] of removing or correcting defective FDA-regulated products . . . particularly when those products present a danger to health."[40] The FDA sought the voluntary consent of manufacturers to accept the recall "to protect the public health from products that present a risk of injury."[41] The FDA found that the recall of all ranitidine-containing products and a public warning of the recall was necessary because the "product being recalled presents a serious health risk."[42]

_____

[37] U.S. Food & Drug Admin., *FDA Updates and Press Announcements on NDMA in Zantac (ranitidine)* https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine (content current as of Apr. 16, 2020).

[38] Emery Pharma FDA Citizen Petition (Jan. 2, 2020) https://emerypharma.com/news/emery-pharma-ranitidine-fda-citizen-petition/.

[39] Letter of Janet Woodcock, U.S. Food & Drug Admin., Docket No. FDA-2020-P-0042 (Apr. 1, 2020), *available at* https://emerypharma.com/wp-content/uploads/2020/04/FDA-2020-P-0042-CP-Response-4-1-2020.pdf.

[40] *Id.* at 5 (*citing* 21 CFR 7.40(a)).

[41] *Id.*

[42] *Id.* at 7.

The FDA therefore sent Information Requests to all applicants and pending applicants of ranitidine-containing products "requesting a market withdrawal."[43]

172.    The FDA found its stability testing raised concerns that NDMA levels in some ranitidine-containing products stored at room temperature can increase with time to unacceptable levels.  In the same vein, FDA testing revealed that higher NDMA levels were found as the products approached their expiration dates.  The FDA's testing eroded the agency's confidence that any ranitidine-containing product would remain stable through its labeled expiration date. Consequently, the FDA requested a market withdrawal of all ranitidine products.  The FDA also announced to the public that the Agency's laboratory tests indicate that temperature and time contribute to an increase in NDMA levels in some ranitidine products.  The FDA's decision to withdraw the drug rendered moot Emery's request for temperature-controlled shipping conditions.

173.    The FDA's reaction was consistent with comparable regulatory action throughout the world.  Before the FDA acted, over 43 different countries and jurisdictions restricted or banned ranitidine-containing products.[44]

174.    The European Medicines Agency ("EMA"), the European Union's equivalent to the FDA, through an Article 31 Referral, determined the sale of all ranitidine-containing products should be suspended on September 19, 2019.  On April 30, 2020, the Human Medicines Committee of the EMA "has recommended the suspension of all ranitidine medicines in the EU due to the presence of low levels of an impurity called N-nitrosodimethylamine (NDMA)."  The EMA recognizes NDMA as a probable human carcinogen and issued a "precautionary suspension of

---

[43] *Id.* at 10 n.43.
[44] Margaret Newkirk & Susan Berfield, *FDA Recalls Are Always Voluntary and Sometimes Haphazard—and The Agency Doesn't Want More Authority to Protect Consumers*, Bloomberg Businessweek (Dec. 3, 2019), https://www.bloomberg.com/graphics/2019-voluntary-drug-recalls-zantac/.

these medicines in the EU" because "NDMA has been found in several ranitidine medicines above levels considered acceptable, and there are unresolved questions about the source of the impurities."[45]

175.     On September 17, 2020, after a ranitidine manufacturer requested that the EMA re-examine its decision and permit ranitidine to be marketed again in the EU, the EMA confirmed its prior recommendation to suspend all ranitidine medicines in the EU due to the presence of NDMA noting that it is a probable human carcinogen and that there is evidence that NDMA forms from the degradation of ranitidine itself with increasing levels seen over shelf life.[46]

## IV. HOW RANITIDINE TRANSFORMS INTO NDMA

176.     The ranitidine molecule itself contains the constituent molecules to form NDMA. *See* Figure 1.



**Figure 1 – Diagram of Ranitidine & NDMA Molecules**

177.     The degradation occurs independently in two parts of the ranitidine molecule, with

[45] Eur. Med. Agency, *Suspension of Ranitidine Medicines in the EU* (Apr. 30, 2020), https://www.ema.europa.eu/en/documents/referral/ranitidine-article-31-referral-suspension-ranitidine-medicines-eu_en.pdf.

[46] Eur. Med. Agency, EMA Confirms Recommendation to Suspend All Ranitidine Medicines in the EU (Nov. 24, 2020), https://www.ema.europa.eu/en/documents/referral/ranitidine-article-31-referral-ema-confirms-recommendation-suspend-all-ranitidine-medicines-eu_en.pdf.

the products of the degradation combining to produce NDMA.

178.    The formation of NDMA by the reaction of DMA and a nitroso source (such as a nitrite) is well characterized in the scientific literature and has been identified as a concern for contamination of the U.S. water supply.[47]    Indeed, in 2003, alarming levels of NDMA in drinking water processed by wastewater-treatment plants were specifically linked to the presence of ranitidine.[48]

179.    The high levels of NDMA observed in ranitidine-containing products are a function of various factors.    The ranitidine molecule internally degrades to form NDMA.    The degradation of ranitidine can increase over time under normal storage conditions, but more so with exposure to heat and/or humidity.    Once in the body, ranitidine continues to degrade and can yield increasing levels of NDMA in the human digestive system, and when it interacts with nitrogenous products.

**A.  Formation of NDMA in the Environment of the Human Stomach**

180.    When the ranitidine molecule is exposed to the acidic environment of the stomach, particularly when accompanied by nitrites (a chemical commonly found in heartburn-inducing foods), the Nitroso molecule (0=N) and the DMA molecule ($H_3C-N-CH_3$) break off and reform as NDMA.

181.    In 1981, Dr. Silvio de Flora, an Italian researcher from the University of Genoa, published the results of experiments he conducted on ranitidine in the well-known journal, *The Lancet*.    When ranitidine was exposed to human gastric fluid in combination with nitrites, his experiment showed "toxic and mutagenic effects."[49]    Dr. de Flora hypothesized that these

---

[47]  Ogawa et al., *Purification and Properties of a New Enzyme, NG, NG-dimethylarginine Dimethylaminohydrolase, from Rat Kidney*, 264 J. Bio. Chem. 17, 10205–209 (1989).
[48]  Mitch et al., *N-Nitrosodimethylamine (NDMA) as a Drinking Water Contaminant: A Review*, 20 Env. Eng. Sci. 5, 389–404 (2003).
[49]  De Flora, *supra* note 36.

mutagenic effects could have been caused by the "formation of more than one nitroso derivative [which includes NDMA] under our experimental conditions." *Id.* Dr. de Flora cautioned that, in the context of ranitidine ingestion, "it would seem prudent to … suggest[] a diet low in nitrates and nitrites, by asking patients not to take these at times close to (or with) meals."[50] *Id.*

182. GSK knew of Dr. de Flora's publication because, two weeks later, GSK responded in *The Lancet*, claiming that the levels of nitrite needed to induce the production of nitroso derivatives (*i.e.*, NDMA) were not likely to be experienced by people in the real world.[51]

183. This response reflects GSK's reputation for "adopting the most combative, scorched-earth positions in defense of its brands."[52] The company has no compunctions against distorting objective science to maintain its lucrative monopoly franchises, and its egregious conduct surrounding Zantac is not some isolated incident.

184. GSK endangered patient health while reaping billions of dollars in profits from Paxil, Wellbutrin, and Avandia. As we now know, the company was involved in covering up scientific data, offering illegal kickbacks to prescribing physicians, intimidating witnesses, and defrauding Medicare to profit from these medicines. In the wake of Congressional hearings into the company's outrageous misbehavior,[53] GSK's actions resulted in a criminal investigation and

---

[50] This admonition came two years before the FDA approved Zantac in 1983. Notwithstanding, in 1998 GSK applied for and obtained an indication for OTC Zantac "[f]or the prevention of meal-induced heartburn at a dose of 75 mg taken 30 to 60 minutes prior to a meal." *See* Ctr. for Drug Eval. & Research, *Approval Package* (June 8, 1998), *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/98/20520s1_Zantac.pdf. So GSK specifically invited patients to take Zantac shortly before eating heartburn-inducing food.

[51] R. T., Brittain et al., *Safety of Ranitidine*, The Lancet 1119 (Nov. 14, 1981).

[52] Jim Edwards, *GSK's Alleged Coverup of Bad Avandia Data: A Snapshot of Its Poisonous Corporate Culture*, Moneywatch (July 13, 2010) https://www.cbsnews.com/news/gsks-alleged-coverup-of-bad-avandia-data-a-snapshot-of-its-poisonous-corporate-culture/.

[53] *Staff Report on GlaxoSmithKline and the Diabetes Drug Avandia*, Senate Comm. on Finance, 111th Cong.2d Sess. 1 (Comm. Print Jan. 2010).

the then-largest guilty plea by a pharmaceutical company for fraud and failure to report safety data in the country's history.[54] There is currently an open investigation of GSK and Sanofi being conducted by the Department of Justice relating to the failure to disclose to the federal government information about the potential presence of NDMA in Zantac.[55]

185. GSK attended an FDA Advisory Committee in May 1982 where its representative testified and presented evidence relating to the safety of Zantac, including the potential for ranitidine to form nitrosamines. However, GSK failed to disclose its new evidence relating to ranitidine and the formation of a nitrosamine, specifically the formation of NDMA.

186. One month later, in June 1982, GSK submitted its draft Summary Basis of Approval and labeling for Zantac. Again, GSK failed to submit or otherwise disclose its new evidence relating to ranitidine and the formation of NMDA.

187. In its submission to the FDA, GSK discussed its findings from internal studies performed in 1980 that ranitidine formed a different nitrosamine, n-nitroso-nitrolic acid, a potent mutagen, but explained that these results had no "practical clinical significance"[56]:

---

[54] U.S. Dep't of Justice, *GlaxoSmithKline to Please Guilty and Pay $3 Billion to Resolve Fraud Allegations and Failure to Report Safety Data* (July 2, 2012), https://www.justice.gov/opa/pr/glaxosmithkline-plead-guilty-and-pay-3-billion-resolve-fraud-allegations-and-failure-report.

[55] https://www.sanofi.com/-/media/Project/One-Sanofi-Web/Websites/Global/SanofiCOM/Home/en/investors/docs/2020_07_29_HY_financial_report_EN.pdf;

[56] Excerpted from the Summary Basis of Approval submitted to the FDA to obtain approval of Zantac in the early 1980s. This document was obtained through a Freedom of Information Act request to the FDA.

```
Although N-nitroso-nitrolic acid was a potent mutagen, it is
not likely to be formed in the stomach of a patient ingesting
ranitidine, as an unrealistically large amount of nitrite
needs to be present to form and maintain the nitrosamine.  For
this reason, and also because ranitidine was not carcinogenic
in life-span studies in rodents, the in vitro nitrosation of
ranitidine to a mutagenic nitrosamine does not seem to have
practical clinical significance.
```

188.    In 1980—before Zantac was approved by the FDA—GSK conducted another study

to examine, among other things, how long-term use of ranitidine could affect the levels of nitrite

in the human stomach.[57]  Remarkably, GSK admitted that ranitidine use caused the proliferation

of bacteria in the human stomach that are known to convert nitrates to nitrites, which leads to

elevated levels of nitrite in the stomach environment.  GSK acknowledged this could increase the

risk of forming nitrosamines and, in turn, cancer, but then dismissed this risk because people were

allegedly only expected to use ranitidine-containing products for a short-term period:

```
The importance of this finding is not clear.  High levels of
nitrite could react with certain organic compounds to form
nitrosamines, which are known carcinogens.  To date, however,
neither ranitidine nor cimetidine have been carcinogenic in
rodents, so the level of human risk cannot be estimated from
animal studies.  Ranitidine is recommended only for short-term
use and carcinogenic risk, if any, should thus be minimized.
```

189.    GSK knew—and indeed specifically admitted—that ranitidine could react with

nitrite in the human stomach to form nitrosamines and, at the same time, that long-term use of

ranitidine could lead to elevated levels of nitrite in the human stomach.  GSK also knew but did

not disclose that it had new evidence showing that NDMA was generated by ranitidine under

certain conditions.

---

[57] The results of this study are discussed in the Summary Basis of Approval, obtained from the
FDA.

190.    In response to Dr. de Flora's findings, in 1982, GSK conducted a clinical study specifically investigating gastric contents in human patients.[58]    The study, in part, specifically measured the levels of N-Nitroso compounds in human gastric fluid.  GSK indicated that there were no elevated levels, and even published the results of this study five years later, in 1987.  The study, however, was flawed.  It did not use gold-standard mass spectrometry to test for NDMA, but instead, used a process that could not measure N-nitrosamines efficiently.  And worse, in the testing it did do, GSK refused to test gastric samples that contained ranitidine in them out of concern that samples with ranitidine would contain "high concentrations of N-nitroso compounds being recorded."[59]    In other words, GSK intentionally engineered the study to exclude the very samples most likely to contain a dangerous carcinogen.

191.    Given the above information that was disclosed relating to the nitrosation potential and formation of nitrosamines, it is shocking that GSK conducted an internal study to assess the formation of NDMA and found that ranitidine, when exposed to sodium nitrite, formed hundreds of thousands of nanograms of NDMA.  The GSK study was never published or disclosed to the public.

192.    In 1983, the same year GSK started marketing Zantac in the United States, seven researchers from the University of Genoa published a study discussing ranitidine and its genotoxic effects (ability to harm DNA).[60]    The researchers concluded "it appears that reaction of ranitidine with excess sodium nitrite under acid conditions gives rise to a nitroso-derivative (or derivatives) [like NDMA] capable of inducing DNA damage in mammalian cells."  *Id.*

---

[58] Thomas et al., *Effects of One Year's Treatment with Ranitidine and of Truncal Vagotomy on Gastric Contents*, 6 Gut. Vol. 28, 726–38 (1987).

[59] *Id.*

[60] Maura et al., *DNA Damage Induced by Nitrosated Ranitidine in Cultured Mammalian Cells*, 18 Tox. Lttrs. 97–102 (1983).

193.    Then, again in 1983, Dr. de Flora, along with four other researchers, published their complete findings.[61]  The results "confirm our preliminary findings on the formation of genotoxic derivatives from nitrite and ranitidine."  Again, the authors noted that, "the widespread clinical use [of ranitidine] and the possibility of a long-term maintenance therapy suggest the prudent adoption of some simple measures, such as a diet low in nitrates and nitrites or the prescription of these anti-ulcer drugs at a suitable interval from meals."  This admonition carries weight considering GSK's studies indicate that long-term ranitidine consumption, itself, leads to elevated levels of nitrites in the human gut.

194.    The high instability of the ranitidine molecule was elucidated in scientific studies investigating ranitidine as a source of NDMA in drinking water and specific mechanisms for the breakdown of ranitidine were proposed.[62]  These studies underscore the instability of the NDMA group on the ranitidine molecule and its ability to form NDMA in the environment of water-treatment plants that supply many U.S. cities with water.

195.    In 2016, researchers at Stanford University conducted an experiment on healthy adult volunteers.[63]  They measured the NDMA in urine of healthy individuals over the course of 24 hours, administered one dose of ranitidine, and then measured the NDMA in the urine of the same individuals for another 24 hours.  The study reported that on average, the level of NDMA increased by 400 times, to approximately 47,000 ng.  The only change during that 24-hour period was the consumption of ranitidine.  In the study, the scientists further explained that previous studies have indicated a high metabolic conversion rate of NDMA, meaning it will be processed

---

[61] De Flora et al., *Genotoxicity of Nitrosated Ranitidine*, 4 Carcinogenesis 3, 255–60 (1983).
[62] Le Roux et al., *NDMA Formation by Chloramination of Ranitidine: Kinetics and Mechanism*, 46 Envtl. Sci. Tech. 20, 11095–103 (2012).
[63] Zeng et al., *Oral intake of Ranitidine Increases Urinary Excretion of N-nitrosodimethylamine*, 37 Carcinogenesis 625–34 (2016).

by the human body.  This study showed that ranitidine generates NDMA in the human body.

196.    Valisure is an online pharmacy that also runs an analytical laboratory that is ISO 17025 accredited by the International Organization for Standardization ("ISO")—an accreditation recognizing the laboratories technical competence for regulatory purposes.  Valisure's mission is to help ensure the safety, quality, and consistency of medications and supplements in the market. In response to rising concerns about counterfeit medications, generics, and overseas manufacturing, Valisure developed proprietary analytical technologies that it uses in addition to FDA standard assays to test every batch of every medication it dispenses.

197.    In its September 9, 2019 Citizen's Petition to the FDA, [64] Valisure disclosed as part of its testing of ranitidine-containing products that in every lot tested there were exceedingly high levels of NDMA.  Valisure's ISO 17025 accredited laboratory used FDA recommended GC/MS headspace analysis method FY19-005-DPA for the determination of NDMA levels.  As per the FDA protocol, this method was validated to a lower limit of detection of 25 ng.[65]  The results of Valisure's testing show levels of NDMA well above 2 million ng per 150 mg Zantac tablet, shown below in Table 1.

| Table 1 – Ranitidine Samples Tested by Valisure Laboratory Using GC/MS Protocol | | |
|---|---|---|
| **150 mg Tablets or equivalent** | **Lot #** | **NDMA per tablet (ng)** |
| Reference Powder | 125619 | 2,472,531 |
| Zantac, Brand OTC | 18M498M | 2,511,469 |
| Zantac (mint), Brand OTC | 18H546 | 2,834,798 |
| Wal-Zan, Walgreens | 79L800819A | 2,444,046 |

---

[64] Valisure, *Citizen Petition on Ranitidine* (Sept. 9, 2019), *available at* https://www.valisure.com/wp-content/uploads/Valisure-Ranitidine-FDA-Citizen-Petition-v4.12.pdf
[65] U.S. Food & Drug Admin., *Combined N-Nitrosodimethlyamine (NDMA) and N-Nitrosodiethylamine (NDEA) Impurity Assay, FY19-005-DPA-S* (Jan. 28, 2019).

| Wal-Zan (mint), Walgreens | 8ME2640 | 2,635,006 |
| Ranitidine, Strides | 77024060A | 2,951,649 |

198.    This testing by GC-MS demonstrates the instability of the ranitidine molecule and its propensity to break down under higher temperatures.

199.    Valisure was concerned that the extremely high levels of NDMA observed in its testing were a product of the modest oven heating parameter of 130 °C in the FDA recommended GC/MS protocol.  So Valisure developed a low temperature GC/MS method that could still detect NDMA but would only subject samples to 37 °C, the average temperature of the human body. This method was validated to a lower limit of detection of 100 ng.

200.    Valisure tested ranitidine tablets by themselves and in conditions simulating the human stomach.  Industry standard "Simulated Gastric Fluid" ("SGF": 50 mM potassium chloride, 85 mM hydrochloric acid adjusted to pH 1.2 with 1.25 g pepsin per liter) and "Simulated Intestinal Fluid" ("SIF": 50 mM potassium chloride, 50 mM potassium phosphate monobasic adjusted to pH 6.8 with hydrochloric acid and sodium hydroxide) were used alone and in combination with various concentrations of nitrite, which is commonly ingested in foods like processed meats and is elevated in the stomach by antacid drugs.  The inclusion of nitrite in gastric fluid testing is commonplace and helps simulate the environment of a human stomach.

201.    Indeed, ranitidine-containing products were specifically advertised to be used when consuming foods containing high levels of nitrates, such as tacos or pizza.[66]

202.    The results of Valisure's tests on ranitidine tablets in biologically relevant

---

[66] *See, e.g.*, Zantac television commercial, *Family Taco Night*, https://www.ispot.tv/ad/dY7n/zantac-family-taco-night; Zantac television commercial, *Spicy*, https://youtu.be/jzS2kuB5_wg; Zantac television commercial, *Heartburn*, https://youtu.be/Z3QMwkSUlEg; Zantac television commercial, *Zantac Heartburn Challenge*, https://youtu.be/qvh9gyWqQns.

conditions demonstrate significant NDMA formation under simulated gastric conditions with nitrite present (*see* Table 2).

| Table 2 – Valisure Biologically Relevant Tests for NDMA Formation | | |
|---|---|---|
| **Ranitidine Tablet Studies** | **NDMA (ng/mL)** | **NDMA per tablet (ng)** |
| Tablet without Solvent | Not Detected | Not Detected |
| Tablet | Not Detected | Not Detected |
| Simulated Gastric Fluid ("SGF") | Not Detected | Not Detected |
| Simulated Intestinal Fluid ("SIF") | Not Detected | Not Detected |
| SGF with 10 mM Sodium Nitrite | Not Detected | Not Detected |
| SGF with 25 mM Sodium Nitrite | 236 | 23,600 |
| SGF with 50 mM Sodium Nitrite | 3,045 | 304,500 |

203.    Under biologically relevant conditions, when nitrites are present, high levels of NDMA are found in one dose of 150 mg ranitidine, ranging between 245 and 3,100 times above the FDA-allowable limit.  One would need to smoke over 500 cigarettes to achieve the same levels of NDMA found in one dose of 150 mg ranitidine at the 25 nanogram level (over 7,000 for the 50 nanogram level).

204.    Following the release of Valisure Citizen's Petition, the FDA conducted additional laboratory tests, which showed NDMA levels in all ranitidine samples it tested, including API and the finished drug, both tablets and syrup.  The FDA developed simulated gastric fluid ("SGF") and simulated intestinal fluid ("SIF") models to use with the LC-MS testing method to estimate the biological significance of *in vitro* findings.  These models are intended to detect the formation of NDMA in systems that approximate the stomach and intestine.

205.    When the scientific data is assessed overall, the literature demonstrates that the ingestion of ranitidine already containing NDMA combined with the presence of human-relevant levels of nitrite in the stomach—a substance that is commonly found in foods that induce heartburn

and that is known to be elevated in people taking ranitidine for longer than a month—the ranitidine molecule transforms into more NDMA which would dramatically increase a person's risk of developing cancer.

**B. Formation of NDMA in Other Organs of the Human Body**

206.     In addition to the gastric fluid mechanisms investigated in the scientific literature, Valisure identified a possible enzymatic mechanism for the liberation of ranitidine's DMA group via the human enzyme dimethylarginine dimethylaminohydrolase ("DDAH"), which can occur in other tissues and organs separate from the stomach.

207.     Valisure explained that liberated DMA can lead to the formation of NDMA when exposed to nitrite present on the ranitidine molecule, nitrite freely circulating in the body, or other potential pathways, particularly in weak acidic conditions such as that in the kidney or bladder. The original scientific paper detailing the discovery of the DDAH enzyme in 1989 specifically comments on the propensity of DMA to form NDMA: "This report also provides a useful knowledge for an understanding of the endogenous source of dimethylamine as a precursor of a potent carcinogen, dimethylnitrosamine [NDMA]."[67]

---

[67] Ogawa, *et al.*, *supra* note 47.

208.    Valisure reported as illustrated in Figure 2, below, computational modelling demonstrates that ranitidine (shown in green) can readily bind to the DDAH-1 enzyme (shown as a cross-section in grey) in a manner similar to the natural substrate of DDAH-1 known as asymmetric dimethylarginine ("ADMA," shown in blue).



**Figure 2 – Computational Modelling of Ranitidine Binding to DDAH-1 Enzyme**

|  | Predicted Affinity (kcal/mol) |
|---|---|
| ADMA | -5.9 ± 0.2 |
| Ranitidine | -6.1 ± 0.1 |

209.    Valisure reported that these results suggest that the enzyme DDAH-1 increases formation of NDMA in the human body when ranitidine is present; therefore, the expression of the DDAH-1 gene is useful for identifying organs most susceptible to this action.

210.     Figure 3 below, derived from the National Center for Biotechnology Information, illustrates the expression of the DDAH-1 gene in various tissues in the human body.



Figure 3 – Expression levels of DDAH-1 enzyme by Organ

211.     DDAH-1 is most strongly expressed in the kidneys but also broadly distributed throughout the body, such as in the brain, colon, liver, small intestine, stomach, bladder, and prostate.  Valisure noted that this offers both a general mechanism for NDMA formation in the human body from ranitidine and specifically raises concern for the effects of NDMA on numerous organs.

212.     The possible enzymatic reaction of ranitidine to DDAH-1, or other enzymes, suggests that high levels of NDMA can form throughout the human body.  Indeed, ranitidine metabolizes and circulates throughout the human body, crossing the placental and blood-brain barrier, within 1-2 hours.  When ranitidine interacts with the DDAH-1 enzyme in various organs throughout the body, it breaks down into NDMA.  This observation is validated by the Stanford study, discussed above.

### C. Formation of NDMA by Exposure to Heat, Moisture, and/or Time

213. The risk of creating NDMA by exposing ranitidine to heat has been well-known and documented. Early studies, including the one conducted by GSK in the early 1980s, demonstrated that nitrosamines were formed when ranitidine was exposed to heat. This point was underscored in the Valisure petition, which initially used a high-heat testing method.

214. In response to Valisure, on October 2, 2019, the FDA recommended that researchers use the LC-HRMS protocol for detecting NDMA in ranitidine because the "testing method does not use elevated temperatures" and has been proven capable of detecting NDMA.

215. On January 2, 2020, Emery Pharma, an FDA-certified pharmaceutical testing laboratory, conducted a series of tests on ranitidine. The researchers exposed ranitidine to 70 °C for varying periods of time. The results showed that increasing levels of NDMA formed based on exposure to heat. As reported by Emery Pharma, the following diagram reveals how NDMA accumulates over time when exposed to 70 °C:



**Figure 4 – Rate of Development of NDMA when Exposed to Heat**

216.    The researchers cautioned:

NDMA accumulates in ranitidine-containing drug products on exposure to elevated temperatures, which would be routinely reached during shipment and during storage.  More importantly, these conditions occur post-lot release by the manufacturer.  Hence, while NDMA levels in ranitidine may be acceptable at the source, they may not be so when the drug is purchased and subsequently at the time of consumption by the consumer.[68]

217.    The results of this data demonstrate that in normal transport and storage, and especially when exposed to heat or humidity, the ranitidine molecule systematically breaks down into NDMA, accumulating over time in the finished product.  Considering ranitidine-containing products have an approved shelf life of 36 months, the possibility of the drug accumulating dangerously high levels of NDMA prior to consumption is very real—a point underscored by the FDA's swift removal of the product from the market.

218.    In fact, the FDA acknowledged that testing revealed that NDMA levels in ranitidine products stored at room temperature can increase with time to unacceptable levels.

219.    In 2019, the findings by Valisure unleashed an avalanche of regulatory authorities throughout the world demanding that the manufacturers of Zantac and/or ranitidine conduct testing of their products for the presence of NDMA as well as investigate the root cause as to how NDMA was being generated.  In April 2020, the FDA requested that manufacturers immediately remove all ranitidine-containing products from the market.

220.    In the interim between the Valisure findings being released to the public and the FDA announcement requesting recall of all ranitidine products in April 2020, the manufacturers were investigating the root cause of NDMA in their products.

221.    After undertaking an investigation, GSK concluded that "the presence of NDMA

---

[68] Emery Pharma, *Emery Pharma Ranitidine: FDA Citizen Petition* (Jan. 2, 2020), *available at* https://emerypharma.com/news/emery-pharma-ranitidine-fda-citizen-petition/.

in ranitidine drug substance is due to a slow degradation reaction occurring primarily in the solid state. The two constituent parts of NDMA, the nitroso group and the dimethylamino group, are both derived from internal degradation reactions which occur at slow rates with the ranitidine molecule."

222.     Both Brand-Name and Generic Manufacturer Defendants could dictate the conditions under which API was transported to them. The labeling requirements do not apply to transporting API, in part because the finished product and API are packaged differently and may degrade under different conditions.

223.     Based upon the documents produced by Defendants and based upon further information and belief, both the Brand-Name and Generic Manufacturer Defendants failed to ensure that their Ranitidine-Containing Products (in both API and finished dose form) were kept safely from excessive heat and humidity.

## V.  EVIDENCE DIRECTLY LINKS RANITIDINE EXPOSURE TO PLAINTIFFS' CANCERS

224.     In addition to numerous epidemiology studies examining how NDMA causes cancer in humans, researchers have also specifically looked at ranitidine and found an association with bladder, esophageal, and kidney cancer.

225.     In one epidemiological study looking at various cancer risks and histamine $H_2$-receptor antagonists (or $H_2$ blockers), including ranitidine, the data showed that ranitidine consumption increased the risk of prostate, lung, esophageal, pancreatic, and kidney cancer.[69]

226.     A number of studies have been published over the years showing an increased risk

---

[69] Laurel A Habel et al., *Cimetidine Use and Risk of Breast, Prostate, and Other Cancers*, 9 Pharmacoepidemiology & Drug Safety 149–55 (2000).

of various cancers associated with use of ranitidine and/or H$_2$ blockers.[70]  Research reports have shown that ranitidine use was associated with a significant increase in the risk of bladder, breast, colorectal/intestinal, esophageal, gastric, kidney, liver, lung, pancreatic, and prostate cancer.[71]

## VI. MANUFACTURER DEFENDANTS KNEW OR SHOULD HAVE KNOWN OF THE NDMA RISK

227.    As early as 1981, two years before Zantac entered the market, research showed elevated rates of NDMA, when properly tested.[72]  This was known or should have been known by the Brand-Name Manufacturer and Generic Manufacturer Defendants as the information was available in medical literature.

228.    In 1981, GSK, the originator of the ranitidine molecule, published a study focusing on the metabolites of ranitidine in urine using liquid chromatography.[73]  Many metabolites were listed, though there is no indication that the study looked for NDMA.

229.    Indeed, in that same year, Dr. de Flora published a note discussing the results of his experiments showing that ranitidine was turning into mutagenic N-nitroso compounds, of which NDMA is one, in human gastric fluid when accompanied by nitrites—a substance commonly

---

[70] Robert W. Mathes et al., *Relationship Between Histamine2-receptor Antagonist Medications and Risk of Invasive Breast Cancer*, 17 Cancer Epi. Biomarkers & Prevention 1, 67–72 (2008); *see also* Jeong Soo Ahn et al., *Acid Suppressive Drugs and Gastric Cancer: A Meta-analysis of Observational Studies*, 19 World J. Gastroenterology 16, 2560 (2013); Shih-Wei Lai et al., *Use of Proton Pump Inhibitors Correlates with Increased Risk of Pancreatic Cancer: A Case-control Study in Taiwan*, 46 Kuwait Med J. 1, 44–48 (2014); Poulsen et al., *Proton Pump Inhibitors and Risk of Gastric Cancer – A Population Based Cohort Study*, 100 Brit. J. Cancer 1503–07 (2009); E Wennerström, *Acid-suppressing Therapies and Subsite-specific Risk of Stomach Cancer*, 116 Brit. J. Cancer 9, 1234–38 (2017).

[71] Richard H. Adamson & Bruce A. Chabne, *The Finding of N-Nitrosodimethylamine in Common Medicines,* The Oncologist, June 2020; 25(6): 460–62, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7288647/.

[72] *See supra* ¶ 181 (discussing de Flora research).

[73] Carey et al., *Determination of Ranitidine and Its Metabolites in Human Urine by Reversed-phase Ion-pair High-performance Liquid Chromatography*, 255 J. Chromatography B: Biomedical Sci. & Appl. 1, 161–68 (1981).

found in food and in the body.[74] GSK was aware of this study because GSK specifically responded to the note and attempted to discredit it. Manufacturer Defendants knew or should have known about this scientific exchange as it was published in a popular scientific journal. Manufacturer Defendants were obligated to investigate this issue properly. None did.

230. By 1987, after numerous studies raised concerns over ranitidine and cancerous nitroso compounds, GSK published a clinical study specifically investigating gastric contents in human patients and N-nitroso compounds.[75] That study specifically indicated that there were no elevated levels of N-nitroso compounds (of which NDMA is one). But the study was flawed. It used an analytical system called a "nitrogen oxide assay" for the determination of N-nitrosamines, which was developed for analyzing food and is a detection method that indirectly and non-specifically measures N-nitrosamines. Not only is that approach not accurate, but GSK also removed all gastric samples that contained ranitidine out of concern that samples with ranitidine would contain "high concentrations of N-nitroso compounds being recorded." Without the chemical being present in any sample, any degradation into NDMA could not, by design, be observed. The inadequacy of that test was knowable in light of its scientific publication in 1987. All Manufacturer Defendants either knew or should have known about the inadequacy of that study and should have investigated the issue properly and/or took action to protect consumers from the NDMA risks in their products. None did.

---

[74] De Flora, *supra* note 36.
[75] Thomas et al., *supra* note 58.

## THE FEDERAL REGULATORY LANDSCAPE

231. Plaintiffs' reference federal law herein not in any attempt to enforce it, but only to demonstrate that their Illinois tort claims do not impose any additional obligations on Defendants, beyond what is already required of them under federal law.

### I. BRAND-NAME AND GENERIC MANUFACTURER DEFENDANTS MADE FALSE STATEMENTS IN THE LABELING OF RANITIDINE-CONTAINING PRODUCTS

232. A manufacturer is required to give adequate directions for the use of a pharmaceutical drug such that a "layman can use a drug safely and for the purposes for which it is intended,"[76] and conform to requirements governing the appearance of the label.[77]

233. "Labeling" encompasses all written, printed or graphic material accompanying the drug or device,[78] and therefore broadly encompasses nearly every form of promotional activity, including not only "package inserts" but also advertising.

234. "Most, if not all, labeling is advertising. The term 'labeling' is defined in the FDCA as including all printed matter accompanying any article. Congress did not, and we cannot, exclude from the definition printed matter which constitutes advertising."[79]

235. All drug manufacturers (brand and generic) are also responsible for conducting stability testing, which must be "designed to assess the stability characteristics of drug products."[80] Manufacturers must adopt a written testing program that includes: "(1) Sample size and test intervals based on statistical criteria for each attribute examined to assure valid estimates of stability; (2) Storage conditions for samples retained for testing; (3) Reliable, meaningful, and

---

[76] 21 C.F.R. § 201.5.
[77] *Id.* § 201.15.
[78] *Id.*; 65 Fed. Reg. 14286 (Mar. 16, 2000).
[79] *United States v. Research Labs.*, 126 F.2d 42, 45 (9th Cir. 1942).
[80] 21 C.F.R. § 211.166(a).

specific test methods; (4) Testing of the drug product in the same container-closure system as that in which the drug product is marketed; (5) Testing of drug products for reconstitution at the time of dispensing (as directed in the labeling) as well as after they are reconstituted."[81]

236. The purpose of stability testing is, in part, to determine the "appropriate storage conditions and expiration dates."[82]  And expiration dates, in turn, must be set to "assure that a drug product meets applicable standards of identity, strength, quality, and purity at the time of use."[83]  An expiration date is "related to any storage conditions stated on the labeling, as determined by stability studies listed in § 211.166."[84]

237. Notably, while generic medications must have the same active ingredients as their branded counterparts, the inactive ingredients, or excipients, may not necessarily be identical.  For this reason, the stability of each generic drug may differ from manufacturer to manufacturer, or even from manufacturing process to manufacturing process.

238. Each manufacturer, whether brand or generic, must therefore conduct its own tests to determine and set accurate retest or expiration dates.

239. The FDA made clear when it first adopted the expiration-date provision that the regulation means what it says.  The purpose of the expiration date is not merely to consider the "stability of a specific active ingredient."  Instead, a compliant expiration date must account for multiple factors, including "the stability of the inactive ingredients, the interaction of active and inactive ingredients, the manufacturing process, the dosage form, the container closure system, the conditions under which the drug product is shipped, stored, and handled by wholesalers and

---

[81] *Id.*
[82] *Id.*
[83] *Id.* § 211.137(a).
[84] *Id.* § 211.137(b).

retailers, and the length of time between initial manufacture and final use."[85]

240.     The FDA expressly recognizes that an initial expiration date may not be the final expiration date: "Where data from accelerated studies are used to project a tentative expiration date that is beyond a date supported by actual shelf life studies, there must be stability studies conducted . . . until the tentative expiration date is verified or the appropriate expiration date determined."[86]

241.     After a drug is approved, a manufacturer (brand or generic) can make changes to its drug application.  To do so, manufacturers must comply with the requirements of §§ 314.70 and 314.71.[87]

242.     Some of the requirements in those regulations require a brand or generic manufacturer of an approved drug to obtain FDA approval before implementing a label change.[88]

243.     But the FDA has long recognized a "changes being effected" ("CBE") supplement that permits a manufacturer to make immediate changes, subject to FDA's post-change review.[89]

244.     A manufacturer of an approved drug can use the CBE supplement to immediately make an "[a]ddition to a specification or changes in the methods or controls to provide increased assurance that the drug substance or drug product will have the characteristics of identity, strength quality, purity, or potency that it purports or is represented to possess."[90]  "A specification is defined as a list of tests, references to analytical procedures, and appropriate acceptance criteria that are numerical limits, ranges, or other criteria for the tests described."[91]

---

[85] 43 Fed. Reg. 45059 (Sept. 29, 1978).
[86] 21 C.F.R. § 211.166(b).
[87] *See id.* § 314.97(a) (requiring generics to comply with §§ 314.70, 314.71).
[88] *Id.* § 314.70(b).
[89] *Id.* § 314.70(c)(3), (c)(6).
[90] *Id.* § 314.70(c)(6)(i).
[91] 65 Fed. Reg. 83042 (Dec. 29, 2000).

245.    A manufacturer, therefore, need not seek FDA pre-approval to make changes to its stability studies to identify the appropriate expiration date—which must "assure that a drug product meets applicable standards of identity, strength, quality, and purity at the time of use"[92]—or to ensure that the drug is shipped and stored under appropriate conditions.

246.    A manufacturer of an approved drug can also use the CBE supplement to make changes "in the labeling to reflect newly acquired information" in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction for which the evidence of a causal association satisfies the standard for inclusion in the labeling under § 201.57(c) of this chapter"; "add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product"; and "delete false, misleading, or unsupported indications for use or claims for effectiveness."[93]

247.    A manufacturer of an approved drug may make minor changes to a label with no approval or notice, so long as that change is described in an annual report.  The illustrative but non-exhaustive list of minor changes includes "[a] change in the labeling concerning the description of the drug product or in the information about how the drug product is supplied, that does not involve a change in the dosage strength or dosage form."[94]

248.    A "minor change" further includes "[a]n extension of an expiration dating period based upon full shelf life data on production batches obtained from a protocol approved in the NDA."[95]

---

[92] 21 C.F.R. § 211.137(a).
[93] *Id.* § 314.70(c)(6)(iii)(A), (C), (D).
[94] *Id.* § 314.70 (d)(2)(ix).
[95] *Id.* § 314.70 (d)(2)(vi); *see also id.* § 314.70(d)(2)(vii), (x).

249.    At no time did any Brand-Name Manufacturer attempt to include a warning on the labels for ranitidine-containing products that consumers were at elevated risk of developing cancer if the products were: (i) exposed to excessive heat; (ii) exposed to excessive moisture/humidity; (iii) consumed with high-nitrite foods; (iv) consumed daily for a period of greater than a few months.  The FDA never rejected such cancer warnings.

250.    At no time did any Manufacturer Defendant attempt to change its label to delete a false or misleading expiration date, or to add a proper expiration date to ensure that ranitidine-containing products would not break down into NDMA prior to human consumption.

251.    Based on the public scientific information, the Manufacturer Defendants knew or should have known that NDMA could form in ranitidine by exposure to heat, humidity, nitrites, the conditions of the human stomach, and/or over time in storage.

252.    At no time did any Manufacturer Defendant change its label to shorten the expiration date.  Manufacturer Defendants had the ability to unilaterally make such label changes (for both prescription and OTC) without prior FDA approval pursuant to the CBE regulation.  Had any Manufacturer Defendant attempted such label changes, the FDA would not have rejected them.

253.    Because they failed to include appropriate expiration dates on their products, Manufacturer Defendants made false statements in the labeling of their products.

## II.  GENERIC MANUFACTURER REQUIREMENTS

254.    According to FDA, "[a] generic drug is a medication created to be the same as an already marketed brand-name drug in dosage form, safety, strength, route of administration, quality, performance characteristics, and intended use.  These similarities help to demonstrate bioequivalence, which means that a generic medicine works in the same way and provides the same clinical benefit as its brand-name version.  In other words, you can take a generic medicine

as an equal substitute for its brand-name counterpart."[96]

255.    While brand-name medications undergo a more rigorous review before being approved, generic manufacturers are permitted to submit an ANDA.  As the first "A" in ANDA denotes, the generic approval process is "abbreviated" to serve Congress's intent to expeditiously offer consumers lower-cost, previously approved medicines.  But the abbreviated NDA process does not absolve generic manufacturers of their obligations to ensure that their drugs are safe and effective.  To obtain FDA approval, an ANDA applicant must demonstrate that the generic medicine is the same as the brand-name version in the following ways:

    a.  The active ingredient in the generic medicine is the same as in the brand-name drug/innovator drug.
    b.  The generic medicine has the same strength, use indications, form (such as a tablet or an injectable), and route of administration (such as oral or topical).
    c.  The inactive ingredients of the generic medicine are acceptable.
    d.  The generic medicine is manufactured under the same strict standards as the brand-name medicine.
    e.  The container in which the medicine will be shipped and sold is appropriate.[97]

256.    Because the brand-name manufacturer previously demonstrated clinical safety and efficacy when the NDA was approved, an ANDA applicant does not need to do so if it can show bioequivalence to the branded, reference listed drug ("RLD").  Bioequivalence is the "absence of a significant difference" in the pharmacokinetic profiles of two pharmaceutical products.[98]

257.    Though an ANDA applicant's drug must be bioequivalent to the RLD, no two manufacturers' drugs will be exactly the same.  For that reason, generic manufacturers are responsible for conducting their *own, independent* stability testing, which must be "designed to

---

[96] U.S. Food & Drug Admin., *Generic Drugs: Questions & Answers U.S. Food and Drug Administration*, https://www.fda.gov/drugs/questions-answers/generic-drugs-questions-answers (current as of June 1, 2018)
[97] U.S. Food & Drug Admin., *Generic Drug Facts*, https://www.fda.gov/drugs/generic-drugs/generic-drug-facts (current as of June 1, 2018).
[98] 21 C.F.R. §§ 320.1(e) & 314.3(b).

assess the stability characteristics of drug products."[99]

258. Because a generic manufacturer's drug must be bioequivalent to the RLD, a compliant generic label should be "the same as the labeling of the reference listed drug" in many respects.[100] But because a generic drug may not be exactly the same as the RLD, the generic label "may include differences in expiration date, formulation, bioavailability, or pharmacokinetics, labeling revisions made to comply with current FDA labeling guidelines or other guidance."[101] This regulation by its terms does not apply to non-label elements of a generic drug, including the container and number of units.

259. Pursuant to this regulation, it is common for a generic drug's label to differ from the RLD by setting a different expiration date, requiring the drug to be shipped and stored under different temperature conditions, and/or requiring the drug to receive different (or no) exposure to light. Several of the Generic Manufacturer Defendants relied on 21 C.F.R. § 314.94(a)(8)(iv) and their independent stability studies to sell approved, generic ranitidine with labels that differed from the RLD label.

## III. FEDERAL LAW REQUIRED THE MANUFACTURER DEFENDANTS TO NOTIFY THE FDA ABOUT THE PRESENCE OF NDMA IN RANITIDINE-CONTAINING PRODUCTS

260. During the time that Manufacturer Defendants manufactured and sold ranitidine-containing products in the United States, the weight of scientific evidence showed that ranitidine exposed users to unsafe levels of NDMA. Manufacturer Defendants failed to report these risks to the FDA.

261. Manufacturer Defendants concealed the ranitidine–NDMA link from ordinary

---

[99] *Id.* § 211.166(a).
[100] *Id.* § 314.94(a)(8)(iii).
[101] *Id.* § 314.94(a)(8)(iv).

consumers in part by not reporting it to the FDA, which relies on drug manufacturers (or others, such as those who submit citizen petitions) to bring new information about an approved drug like ranitidine to the agency's attention.

262.    Manufacturers (brand and generic) of an approved drug are required by regulation to submit an annual report to the FDA containing, among other things, new information regarding the drug's safety pursuant to 21 C.F.R. § 314.81(b)(2):

> The report is required to contain . . . [a] brief summary of significant new information from the previous year that might affect the safety, effectiveness, or labeling of the drug product.  The report is also required to contain a brief description of actions the applicant has taken or intends to take as a result of this new information, for example, submit a labeling supplement, add a warning to the labeling, or initiate a new study.

263.    21 C.F.R. § 314.81(b)(2)(v) provides that the manufacturer's annual report must also contain:

> Copies of unpublished reports and summaries of published reports of new toxicological findings in animal studies and in vitro studies (*e.g.*, mutagenicity) conducted by, or otherwise obtained by, the [manufacturer] concerning the ingredients in the drug product.

264.    Manufacturer Defendants ignored these regulations and, disregarding the scientific evidence available to them regarding the presence of NDMA in their products and the risks associated with NDMA, did not report to the FDA significant new information affecting the safety or labeling of ranitidine-containing products.

265.    Knowledge regarding the risk of NDMA in ranitidine was sufficiently available in the publicly available scientific literature such that any manufacturer, consistent with its heightened obligations to ensure the safety of its products, also should have known about the potential NDMA risks associated with ranitidine consumption.

266.     Manufacturer Defendants never conducted or provided the relevant studies to the FDA, nor did they present the FDA with a proposed disclosure noting the various ways that ranitidine transforms into NDMA.  Accordingly, because Manufacturer Defendants never properly disclosed the risks to the FDA, they never proposed any labeling or storage / transportation guidelines that would have addressed this risk.  Thus, the FDA was never able to reject any proposed warning or proposal for transport / storage.

267.     When the FDA eventually learned about the NDMA risks posed by ranitidine-containing products, it ordered manufacturers to voluntarily remove the products from the market.  Thus, had any Manufacturer Defendant alerted the FDA to the risks of NDMA, the FDA would have required the manufacturers to remove ranitidine-containing products from the market.

## IV. GOOD MANUFACTURING PRACTICES

268.     Under federal law, a manufacturer must manufacture, store, warehouse, and distribute pharmaceutical drugs in accordance with "Current Good Manufacturing Practices" ("CGMPs") to ensure they meet safety, quality, purity, identity, and strength standards.[102]

269.     21 C.F.R. § 210.1(a) states that the CGMPs establish "minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess."  Entities at all phases of the design, manufacture, and distribution chain are bound by these requirements.

270.     Pursuant to 21 C.F.R. § 211.142(b), the warehousing of drug products shall provide for "[s]torage of drug products under appropriate conditions of temperature, humidity, and light

---

[102] 21 U.S.C. § 351(a)(2)(B).

so that the identity, strength, quality, and purity of the drug products are not affected." In other words, Defendants had a duty and were obligated to properly store, handle, and warehouse ranitidine.

271.    Testing conducted by the FDA confirms that under accelerated conditions the elevated temperatures can lead to the presence of NDMA in the drug product.[103] FDA has also concluded that NDMA can increase in ranitidine under storage conditions allowed by the labels, and NDMA has been found to increase significantly in samples stored at higher temperatures, including temperatures the product may be exposed to during normal distribution and handling. FDA's testing also showed that the level of NDMA in ranitidine-containing products increases with time. And while Emery's Citizen Petition sought to obtain a directive regarding temperature-controlled shipping of ranitidine, which was necessary given the time and temperature sensitivity of the drug, that request was deemed moot by the FDA because the agency sought to withdraw ranitidine-containing products altogether.

272.    Nothing prevented any Defendant from, on their own, taking actions to prevent accumulation of NDMA in ranitidine-containing products by ensuring that ranitidine was not exposed to heat or moisture over long periods.

## VII.    RANITIDINE-CONTAINING PRODUCTS ARE MISBRANDED AND ADULTERATED BECAUSE THEY CONTAIN DANGEROUS AND BIOLOGICALLY RELEVANT LEVELS OF NDMA

273.    The manufacture of any misbranded or adulterated drug is prohibited under federal law.[104]

274.    The introduction into commerce of any misbranded or adulterated drug is similarly

---

[103] Woodcock Letter, *supra* note 39.
[104] 21 U.S.C. § 331(g).

prohibited.[105]

275. Similarly, the receipt in interstate commerce of any adulterated or misbranded drug is also unlawful.[106]

276. Among the ways a drug may be adulterated and/or misbranded are:

a. "If it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice . . . as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess."[107]

b. "If it purports to be or is represented as a drug the name of which is recognized in an official compendium, and . . . its quality or purity falls below, the standard set forth in such compendium. . . ."[108]

c. "If it is a drug and any substance has been (1) mixed or packed therewith so as to reduce its quality or strength or (2) substituted wholly or in part therefor."[109]

277. A drug is misbranded:

a. "If its labeling is false or misleading in any particular."[110]

b. "If any word, statement, or other information required . . . to appear on the label or labeling is not prominently placed thereon . . . in such terms as to

---

[105] *Id.* § 331(a).
[106] *Id.* § 331(c).
[107] *Id.* § 351(a)(2)(B).
[108] *Id.* § 351(b).
[109] *Id.* § 351(d).
[110] *Id.* § 352(a)(1).

render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use."[111]

c. If the labeling does not contain, among other things, "the proportion of each active ingredient . . ."[112]

d. "Unless its labeling bears (1) adequate directions for use; and (2) such adequate warnings . . . against unsafe dosage or methods or duration of administration or application, in such manner and form, as are necessary for the protection of users . . . ."[113]

e. "If it purports to be a drug the name of which is recognized in an official compendium, unless it is packaged and labeled as prescribed therein."[114]

f. "If it is an imitation of another drug."[115]

g. "If it is offered for sale under the name of another drug."[116]

h. "If it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof."[117]

i. If the drug is advertised incorrectly in any manner.[118]

j. If the drug's "packaging or labeling is in violation of an applicable regulation."[119]

---

[111] *Id.* § 352(c).
[112] *Id.* § 352(e)(1)(A)(ii).
[113] *Id.* § 352(f).
[114] *Id.* § 352(g).
[115] 21 U.S.C. § 352(i)(2).
[116] *Id.* § 352(i)(3).
[117] *Id.* § 352(j).
[118] *Id.* § 352(n).
[119] *Id.* § 352(p).

278.   If a manufacturer labels a drug but omits ingredients, that renders the drug misbranded.[120]

279.   Because Defendants did not disclose NDMA as an ingredient in ranitidine-containing products ingested by Plaintiffs, the subject drugs were misbranded.

280.   Because Defendants did not disclose the proper directions for storage of the ranitidine-containing products ingested by Plaintiffs, the subject drugs were misbranded.

281.   Because Defendants did not disclose the proper directions for expiration of the ranitidine-containing products ingested by Plaintiffs, the subject drugs were misbranded

282.   It is unlawful to introduce a misbranded drug into interstate commerce.[121]  Thus, the ranitidine ingested by Plaintiffs was unlawfully distributed and sold.

## DEFENDANTS' WARRANTIES TO PLAINTIFFS

## I.   WARRANTIES COMMON TO MANUFACTURER DEFENDANTS.

283.   Each Manufacturer Defendant's ranitidine-containing product is accompanied by an FDA-approved label.  By presenting consumers with an FDA-approved label, Manufacturer Defendants made representations and express or implied warranties to consumers like Plaintiffs that their products were consistent with the safety, quality, purity, identity, and strength characteristics reflected in the FDA-approved labels and/or were not adulterated and/or misbranded.

284.   In addition, each Manufacturer Defendant affirmatively misrepresented and warranted to physicians and patients like Plaintiffs through their websites, brochures, and other marketing or informational materials that their ranitidine-containing products complied with CGMPs and did not contain (or were not likely to contain) any ingredients besides those identified

---

[120] *Id.* § 201.6, 201.10.
[121] *Id.* § 331(a).

on the products' FDA-approved labels.

285.   The presence of NDMA in Manufacturer Defendants' ranitidine-containing products resulted in Manufacturer Defendants' ranitidine-containing products containing an ingredient that is not also listed on each Defendant's FDA-approved label, breaching warranties listed on each Defendant's FDA-approved label and Defendants' express warranty of compliance. Each Manufacturer Defendant willfully, recklessly, or negligently failed to ensure their products' labels and other advertising or marketing statements accurately conveyed information about their products.

286.   At all relevant times, Manufacturer Defendants have also impliedly warranted that their ranitidine-containing products were merchantable and fit for their ordinary purposes.

287.   Due to its status as a probable human carcinogen as listed by both the IARC and the EPA, NDMA is not an FDA-approved ingredient.  The presence of NDMA in Manufacturer Defendants' ranitidine-containing products means that Manufacturer Defendants violated implied warranties to Plaintiffs.  The presence of NDMA in Manufacturer Defendants' products results in their being non-merchantable and not fit for their ordinary purposes, breaching Manufacturer Defendants' implied warranty of merchantability and/or fitness for ordinary purposes.

288.   For these and other reasons, Manufacturer Defendants' ranitidine-containing products are adulterated and/or misbranded, and it was illegal for Brand-Name Manufacturer and Generic Manufacturer Defendants to have introduced such ranitidine into commerce in the United States.[122]

---

[122] *See* 21 U.S.C. §§ 331(a), 351(a)(2)(B), 331(g).

## II. WARRANTIES COMMON TO ALL NON-MANUFACTURING DEFENDANTS

289.    By selling drugs in the stream of commerce, each Retailer Defendant warranted to consumers that the ranitidine-containing products they sold were safe and effective.

### TOLLING / FRAUDULENT CONCEALMENT

290.    Plaintiffs assert all applicable statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, delayed discovery, discovery rule and/or fraudulent concealment

291.    Plaintiff Bayer did not learn of the link between his cancer and ranitidine exposure until on or around July 2020.

292.    Plaintiff Culverson did not learn of the link between her cancer and ranitidine exposure until on or around February 2020.

293.    Plaintiffs would not have taken ranitidine had Plaintiffs known of or been fully and adequately informed by Defendants of the true increased risks and serious dangers of taking the drugs.

294.    Upon information and belief, Plaintiffs' physicians were unaware of the increased risk of multiple types of cancer associated with the use of ranitidine due to its transformation into NDMA and, if they had been informed, would have used and prescribed alternative therapies to Plaintiffs.

295.    Plaintiffs' prescribing physician would not have prescribed ranitidine to Plaintiffs, would have changed the way in which they treated Plaintiffs' relevant conditions, changed the way they warned Plaintiffs about the signs and symptoms of serious adverse effects of ranitidine, and discussed with Plaintiffs the true risks of cancer, had Manufacturer Defendants provided Plaintiffs' physicians with an appropriate and adequate warning regarding the risks associated with the use of ranitidine-containing products.

296.    The discovery rule applies to toll the running of the statute of limitations until Plaintiffs knew, or through the exercise of reasonable care and diligence should have known, of facts that Plaintiffs had been injured, the cause of the injury, and the tortious nature of the wrongdoing that caused the injury.

297.    Plaintiffs bring this action within the prescribed time limit following Plaintiffs' injuries and Plaintiffs' knowledge of the wrongful cause.  Prior to such time, Plaintiffs did not know and had no reason to know of their injuries and/or the wrongful cause of those injuries.

298.    The running of the statute of limitations is tolled due to equitable tolling. Defendants are estopped from relying on any statutes of limitation or repose by virtue of their acts of fraudulent concealment, through affirmative misrepresentations and omissions to Plaintiffs and defects associated with ranitidine-containing products as they transform into NDMA.  Defendants affirmatively withheld and/or misrepresented facts concerning the safety of ranitidine.  As a result of Defendants' misrepresentations and concealment, Plaintiffs and Plaintiffs' physicians were unaware and could not have known or have learned through reasonable diligence, of facts related to Defendants' misrepresentations or omissions, that Plaintiffs had been exposed to the risks alleged herein, or that those risks were the direct and proximate result of the wrongful acts and/or omissions of Defendants.

299.    Given Defendants' affirmative actions of concealment by failing to disclose this known but non-public information about the defects—information over which Defendants had exclusive control—and because Plaintiffs could not reasonably have known that Defendants' ranitidine-containing products were and are defective, Defendants are estopped from relying on any statutes of limitations or repose that might otherwise be applicable to the claims asserted herein.

## EXEMPLARY / PUNITIVE DAMAGES ALLEGATIONS

300.    Defendants' conduct as alleged herein was done with reckless disregard for human life, oppression, and malice.  Defendants were fully aware of the safety risks of ranitidine, particularly the carcinogenic potential of ranitidine as it transforms into NDMA within the chemical environment of the human body and/or during transport and/or storage.  Nonetheless, Defendants deliberately crafted their label and marketing to mislead consumers.

301.    This was not done by accident or through some justifiable negligence.  Rather, Defendants knew they could profit by convincing consumers that ranitidine was harmless to humans, and that full disclosure of the true risks of ranitidine would limit the amount of money Defendants would make selling the drugs.  Defendants' object was accomplished not only through a misleading label, but through a comprehensive scheme of selective misleading research and testing, false advertising, and deceptive omissions as more fully alleged throughout this pleading. Plaintiffs were denied the right to make an informed decision about whether to purchase and use ranitidine-containing products, knowing the full risks attendant to that use.  Such conduct was done with conscious disregard of Plaintiffs' rights.

302.    Accordingly, Plaintiffs request punitive damages against Defendants for the harms caused to Plaintiffs.

## CAUSES OF ACTION

### COUNT I:  STRICT PRODUCTS LIABILITY—FAILURE TO WARN
(Against Manufacturer Defendants)

303.    Plaintiffs incorporate paragraphs 1 through 302 as if fully stated herein.

304.    Under Illinois law, a manufacturer has a duty to adequately warn of the potential risks or hazards associated with a product where there is unequal knowledge, actual or constructive of a dangerous condition, and the defendant, possessed of such knowledge, knows or should know

that harm might or could occur if no warning is given.

305.    At all relevant times, Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine-containing products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of ranitidine and NDMA.  These actions were under the ultimate control and supervision of Defendants.

306.    Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, sold, and/or otherwise released into the stream of commerce their ranitidine-containing products, and in the course of same, directly marketed the products to consumers and end users, including Plaintiffs, and therefore had a duty to warn of the risks associated with the use of ranitidine.

307.    At all relevant times, Defendants had a duty to properly design, manufacture, test, market, label, package, handle, distribute, store, sell, provide proper warnings, and/or take such steps as necessary to ensure their ranitidine-containing products did not cause users and consumers to suffer from unreasonable and dangerous risks.  Defendants had a continuing duty to warn Plaintiffs of dangers associated with ranitidine.  Defendants, as a manufacturer or seller of pharmaceutical medication, are held to the knowledge of an expert in the field.

308.    Defendants had a continuing duty to provide appropriate and accurate instructions regarding the proper expiration and retest dates, as well as the packaging, storage, and handling of ranitidine.

309.    At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of ranitidine because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such

products.

310.    At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their products and to those who would foreseeably use or be harmed by Defendants' ranitidine-containing products.

311.    Even though Defendants knew or should have known that ranitidine posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to ranitidine-containing products.  The dangerous propensities of ranitidine-containing products and the carcinogenic characteristics of NDMA, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, and were not known to end users and consumers, such as Plaintiffs.

312.    Defendants knew or should have known that ranitidine-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn or instruct consumers, *i.e.*, the reasonably foreseeable users, and physicians of the risks of exposure to ranitidine-containing products.  Defendants failed to warn and have wrongfully concealed information concerning the dangerous level of NDMA in ranitidine-containing products, and further, have made false and/or misleading statements concerning the safety of ranitidine.

313.    At all relevant times, Defendants' ranitidine-containing products were expected to and did reach Plaintiffs without a substantial change in their anticipated or expected design as manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold by Defendants.

314. Plaintiffs were exposed to Defendants' ranitidine-containing products without knowledge of their dangerous characteristics.

315. At all relevant times, Plaintiffs used and/or were exposed to the use of Defendants' ranitidine-containing products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

316. Plaintiffs could not have reasonably discovered the defects and risks associated with ranitidine-containing products prior to or at the time Plaintiffs consumed the drugs. Plaintiffs and their physicians relied upon the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with using Defendants' products.

317. Defendants knew or should have known that the minimal warnings disseminated with their ranitidine-containing products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses.

318. The information that Defendants did provide or communicate failed to contain relevant warnings, expiration dates, hazards, and precautions that would have enabled consumers such as Plaintiffs to avoid using the drug. Instead, Defendants disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to ranitidine; continued to aggressively promote the efficacy of ranitidine-containing products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of ingesting ranitidine.

319.     This alleged failure to warn is not limited to the information contained on ranitidine-containing products' labeling.  Defendants were able, in accord with federal law, to comply with relevant state law by disclosing the known risks associated with ranitidine through other non-labeling mediums, *e.g.*, promotion, advertisements, public service announcements, and/or public information sources.  But Defendants did not disclose these known risks through any medium.

320.     Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their ranitidine-containing products, Plaintiffs could have avoided the risk of developing injuries and could have obtained or used alternative medication.  However, as a result of Defendants' concealment of the dangers posed by their ranitidine-containing products, Plaintiffs could not have averted their injuries.

321.     Defendants' conduct, as described above, was reckless.  Defendants risked the lives of consumers and users of their products, including Plaintiffs, with knowledge of the safety problems associated with ranitidine-containing products, and suppressed this knowledge from the general public.  Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public.  Defendants' reckless conduct warrants an award of punitive damages.

322.     Defendants' lack of adequate warnings and instructions accompanying their ranitidine-containing products were a substantial factor in causing Plaintiffs' injuries.

323.     As a direct and proximate result of Defendants' failure to provide an adequate warning of the risks of ranitidine-containing products, Plaintiffs were injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

**WHEREFORE**, Plaintiffs respectfully request this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT II: STRICT PRODUCTS LIABILITY—DESIGN DEFECT
### (Against All Defendants)

324.    Plaintiffs incorporate paragraphs 1 through 302 as if fully stated herein.

325.    At all relevant times, Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine-containing products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing ranitidine-containing products into the stream of commerce. These actions were under the ultimate control and supervision of these Defendants.

326.    At all relevant times, Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold the ranitidine-containing products used by Plaintiff, as described herein.

327.    At all relevant times, Defendants' ranitidine-containing products were designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public.

328.    At all relevant times, the medication ingested by Plaintiffs was expected to and did reach Plaintiffs without a substantial change in their anticipated or expected design as manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold by the Manufacturer Defendants.

329.    Defendants' ranitidine-containing products, as designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold by Defendants were

defective in design and formulation in that, when they left Defendants' control, they were unreasonably dangerous, and dangerous to an extent beyond that which an ordinary consumer would contemplate because of their inherent susceptibility to form NDMA.

330. Defendants' ranitidine-containing products, as designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold by Defendants were defective in design and formulation in that, when they left the hands of Defendants, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

331. At all relevant times, Defendants knew or had reason to know that ranitidine-containing products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

332. Therefore, at all relevant times, Defendants' ranitidine-containing products, as designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold by Defendants were defective in design and formulation, in one or more of the following ways:

    a. Defendants' ranitidine-containing products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer when used in a reasonably anticipated manner;

    b. Defendants' ranitidine-containing products were not reasonably safe when used in a reasonably anticipated or intended manner;

    c. Defendants did not sufficiently test, investigate, or study their ranitidine-containing products and, specifically, the ability for ranitidine to transform into the carcinogenic compound NDMA within the human body;

    d. Defendants did not sufficiently test, investigate, or study their ranitidine-containing products and, specifically, the stability of ranitidine and the ability for ranitidine-containing products to develop increasing levels of NDMA over time under anticipated and expected storage and handling conditions;

    e. Defendants failed to provide accurate expiration dates on the product label;

f. Defendants failed to package their ranitidine-containing products in a manner which would have preserved the safety, efficacy, quality, and purity of the product;

g. Defendants failed to provide accurate instructions concerning the stability of the drug, including failing to provide accurate information about proper temperature and light conditions for storage of the drug;

h. Defendants knew or should have known at the time of marketing ranitidine-containing products that exposure to ranitidine could result in cancer and other severe illnesses and injuries;

i. Defendants did not conduct adequate post-marketing surveillance of their ranitidine-containing products;

j. Defendants did not conduct adequate stability testing of their product to ascertain shelf life, expiration, and proper storage, heat, and light specifications; and

k. Defendants could have employed safer alternative designs and formulations.

333. Plaintiffs used and were exposed to Defendants' ranitidine-containing products without knowledge of ranitidine's dangerous characteristics.

334. At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendants' ranitidine-containing products in an intended or reasonably foreseeable manner without knowledge of ranitidine's dangerous characteristics.

335. Plaintiffs could not reasonably have discovered the defects and risks associated with ranitidine-containing products before or at the time of exposure due to Defendants' suppression or obfuscation of scientific information linking ranitidine to cancer.

336. Exposure to ranitidine presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the drug. The harm caused by Defendants' ranitidine-containing products far outweighed their benefit, rendering each Defendants' product dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' ranitidine-containing products were and are more dangerous than alternative products, and Defendants could have designed ranitidine-containing products to make them less dangerous. Indeed, at the time

Defendants designed ranitidine-containing products and their labels, the state of the industry's scientific knowledge was such that a safer, less risky design or formulation and label was attainable.

337. At the time ranitidine-containing products left Defendants' control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' ranitidine-containing products. For example, Defendants could have provided proper warnings, expiration dates, stability information, and associated information.

338. Defendants' defective design of ranitidine-containing products was willful, wanton, malicious, and conducted with reckless disregard for the health and safety of users of ranitidine-containing products, including Plaintiffs.

339. The defects in Defendants' ranitidine-containing products were substantial factors in causing Plaintiffs' injuries.

340. As a direct and proximate result of Defendants' defective design of ranitidine-containing products, Plaintiffs were injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

341. WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT III: NEGLIGENCE—FAILURE TO WARN
### (Against All Defendants)

342. Plaintiffs incorporate paragraphs 1 through 302 as if fully stated herein.

343. At all relevant times, Defendants designed, manufactured, tested, marketed,

labeled, packaged, handled, distributed, stored, and/or sold ranitidine-containing products. Defendants knew or by the exercise of reasonable care should have known that their ranitidine-containing products were not accompanied by adequate warnings or instructions concerning the dangerous characteristics of ranitidine and NDMA. These actions were under the ultimate control and supervision of Defendants.

344. Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold, and otherwise released into the stream of commerce their ranitidine-containing products, and in the course of same, directly marketed the products to consumers and end users, including Plaintiffs, and therefore had a duty to warn of the risks associated with the use of ranitidine-containing products.

345. At all relevant times, Defendants had a duty to properly design, manufacture, test, market, label, package, handle, distribute, store, and sell, provide proper warnings, and take such steps as necessary to ensure their ranitidine-containing products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn Plaintiffs of dangers associated with ranitidine. Defendants, as manufacturers and sellers of pharmaceutical medication, are held to the knowledge of an expert in the field.

346. Defendants had a continuing duty to provide appropriate and accurate warnings and instructions regarding the identity, strength, stability, expiry, quality and purity at the time of use of their products and how to properly store and handle their ranitidine-containing products.

347. At the time of manufacture, Defendants could have provided warnings or instructions regarding the full and complete risks of ranitidine because they knew or should have known use of ranitidine-containing products was dangerous, harmful and injurious when used by Plaintiffs in a reasonably foreseeable manner.

348.    At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their product and to those who would foreseeably use or be harmed by Defendants' ranitidine-containing products.

349.    Defendants knew or should have known that ranitidine-containing products posed a grave risk of harm but failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to the products.  The dangerous propensities of their products and the carcinogenic characteristics of NDMA as produced within the human body as a result of ingesting ranitidine, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold the product, and were not known to end users and consumers, such as Plaintiffs.

350.    Defendants further breached their duty by failing to use reasonable care to adequately warn or instruct consumers (*i.e.*, the reasonably foreseeable users), such as Plaintiffs, of the risks of exposure to their products.  Defendants failed to warn and have wrongfully concealed information concerning the dangerous level of NDMA in their ranitidine-containing products and the potential for ingested ranitidine to transform into the carcinogenic NDMA compound, and further, have made false and/or misleading statements concerning the safety of ranitidine-containing products.

351.    At all relevant times, Plaintiffs used and/or were exposed to excessive levels of nitrosamines through the use of Defendants' ranitidine-containing products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

352. Defendants knew or should have known that the minimal warnings disseminated with their ranitidine-containing products were inadequate, failed to communicate adequate information on the dangers and identity, strength, quality and purity at the time of use of their products, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses.

353. The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to avoid using the product. Instead, Defendants disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to ranitidine and ranitidine-containing products; continued to aggressively promote the efficacy of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of ingesting ranitidine-containing products.

354. A reasonable company under the same or similar circumstance would have warned and instructed of the dangers of ranitidine-containing products.

355. This alleged failure to warn is not limited to the information contained on ranitidine-containing products' labeling. Defendants were able, in accord with federal law, to comply with relevant state law by disclosing the known risks associated with ranitidine-containing products through other non-labeling mediums, *e.g.*, promotion, advertisements, public service announcements, and/or public information sources. But Defendants did not disclose these known risks through any medium.

356.     Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their ranitidine-containing products, Plaintiffs could have avoided the risk of developing injuries and could have obtained or used alternative medication.  However, as a result of Defendants' concealment of the dangers posed by their ranitidine-containing products, Plaintiffs could not have averted their injuries.

357.     Defendants' conduct, as described above, was reckless.  Defendants risked the lives of consumers and users of their products, including Plaintiffs, with knowledge of the safety problems associated with ranitidine-containing products, and suppressed this knowledge from the general public.  Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public.  Defendants' reckless conduct warrants an award of punitive damages.

358.     Defendants' lack of adequate warnings and instructions accompanying their ranitidine-containing products were a substantial factor in causing Plaintiffs' injuries.

359.     As a direct and proximate result of Defendants' failure to provide an adequate warning of the risks of ranitidine-containing products, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

360.     WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

### COUNT IV:  NEGLIGENT PRODUCT DESIGN
### (Against Manufacturer Defendants)

361.     Plaintiffs incorporate paragraphs 1 through 302 as if fully stated herein.

362.     Manufacturer Defendants knew or, by the exercise of reasonable care, should have

known, ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of ranitidine-containing products.

363.    Manufacturer Defendants owed a duty to all reasonably foreseeable users to design a safe product and to provide a label that rendered the product safe and effective.

364.    Manufacturer Defendants breached their duty by failing to use reasonable care in the design of ranitidine-containing products because the drug exposed users to unsafe levels of the carcinogen NDMA.

365.    Manufacturer Defendants breached their duty by failing to use reasonable care in the design of ranitidine-containing products by negligently designing the drug with an inherent susceptibility to form NDMA.

366.    Manufacturer Defendants breached their duty by failing to use reasonable care in the design of ranitidine-containing products in one or more of the following ways:

   a. When placed in the stream of commerce, Manufacturer Defendants' ranitidine-containing products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

   b. When placed in the stream of commerce, Manufacturer Defendants' ranitidine-containing products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

   c. When placed in the stream of commerce, Manufacturer Defendants' ranitidine-containing products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

   d. Manufacturer Defendants did not sufficiently test, investigate, or study their ranitidine-containing products and, specifically, the ability for ranitidine to transform into the carcinogenic compound NDMA within the human body;

   e. Manufacturer Defendants did not sufficiently test, investigate, or study their ranitidine-containing products identity, strength, quality and purity at the time of use of their products and, specifically, the ability for ranitidine-containing products

to develop increasing levels of NDMA under anticipated and expected packaging, storage, and handling conditions;

f.  Manufacturer Defendants did not sufficiently test, investigate, or study their ranitidine-containing products identity, strength, quality and purity at the time of use of their products and, specifically, the ability for ranitidine-containing products to develop increasing levels of NDMA over time;

g.  Manufacturer Defendants failed to conduct proper stability testing and/or to set accurate recall dates for the drugs, which resulted in the formation of excess amounts of NDMA in ranitidine-containing products;

h.  Manufacturer Defendants knew or should have known at the time of marketing ranitidine-containing products that exposure to ranitidine could result in cancer and other severe illnesses and injuries;

i.  Manufacturer Defendants did not conduct adequate post-marketing surveillance of their ranitidine-containing products; and

j.  Manufacturer Defendants could have employed safer alternative designs and formulations.

367.   Exposure to ranitidine presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the drug.

368.   Manufacturer Defendants breached their duty to exercise reasonable care by failing to use cost effective, reasonably feasible alternative designs.  There was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Manufacturer Defendants' ranitidine-containing products.

369.   A reasonable company under the same or similar circumstances would have designed a safer product.

370.   Plaintiffs were harmed directly and proximately by Manufacturer Defendants' failure to use reasonable care in the design of their ranitidine-containing products.  Such harm includes significant exposure to a known carcinogen, NDMA, which can cause or contribute the development of cancers.

371. Manufacturer Defendants' defective design of ranitidine-containing products was willful, wanton, malicious, and conducted with reckless disregard for the health and safety of users of ranitidine-containing products, including Plaintiffs.

372. The defects in Manufacturer Defendants' ranitidine-containing products were substantial factors in causing Plaintiffs' injuries.

373. As a direct and proximate result of Manufacturer Defendants' defective design of ranitidine-containing products, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

374. WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

### COUNT V:  GENERAL NEGLIGENCE
### (Against Manufacturer Defendants)

375. Plaintiffs incorporate paragraphs 1 through 302 as if fully stated herein.

376. Defendants, directly or indirectly, designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine-containing products that were used by Plaintiffs.

377. At all relevant times, Defendants had a duty to exercise reasonable care in the design, manufacture, testing, marketing, labeling, packaging, handling, distribution, storage, and/or sale of ranitidine-containing products, including the duty to take all reasonable steps necessary to design, manufacture, test, market, label, package, handle, distribute, store, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

378. At all relevant times, Defendants had a duty to exercise reasonable care in the

marketing and sale of ranitidine-containing products. Defendants owed to consumers and the general public a duty of care that included providing accurate, true, and correct information concerning the risks of using ranitidine-containing products and appropriate, complete, and accurate warnings concerning the potential adverse effects of ranitidine and, in particular, its ability to transform into the carcinogenic compound NDMA.

379. At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of ranitidine and, specifically, the carcinogenic properties of NDMA when ranitidine-containing products are ingested and/or the elevated levels of NDMA that occurs when ranitidine-containing products are transported and stored.

380. At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known that their ranitidine-containing products were highly unstable and that ranitidine-containing products were not safe for human consumption for as long as the labeling suggested.

381. At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known that their ranitidine-containing products were likely to break down in the absence of sufficient packaging which would have protected the pills from heat and/or light exposure.

382. Accordingly, at all relevant times, Defendants knew or, in the exercise of reasonable care, should have known that use of ranitidine-containing products could cause or be associated with Plaintiffs' injuries, and thus create a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

383. Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of ranitidine-containing products were unaware of the risks and the magnitude of the risks associated with use of ranitidine-containing products.

384. As such, Defendants breached their duty of reasonable care and failed to exercise

ordinary care in the design, manufacture, testing, marketing, labeling, packaging, handling, distribution, storage, and/or sale of ranitidine-containing products, in that Defendants manufactured and produced defective ranitidine-containing products, which carries the potential to transform into the carcinogenic compound NDMA; knew or had reason to know of the defects inherent in their products; knew or had reason to know that a user's or consumer's use of the products created a significant risk of harm and unreasonably dangerous side effects; and failed to prevent or adequately warn of these risks and injuries. Indeed, Defendants deliberately refused to test ranitidine-containing products for NDMA levels because they knew that the chemical posed serious health risks to humans.

385.     Defendants further failed to conduct stability and light sensitivity studies at all levels of the distribution and storage chain to enable them to set accurate expiration dates for their ranitidine-containing products. As such, Defendants failed to provide physicians and patients, such as Plaintiffs, with accurate warnings related to their products.

386.     Defendants were negligent in their marketing of ranitidine-containing products, outside of the labeling context, by failing to disclose material-risk information as part of their marketing of ranitidine-containing products, including the internet, television, and print advertisements. Nothing prevented Defendants from being honest in their promotional activities to doctors, as well as to co-Defendants further down the distribution chain, including generic manufacturers and retailers, among others, and, in fact, Defendants had a duty to disclose the truth about the risks associated with ranitidine in their promotional efforts, outside of the context of labeling.

387.     Defendants—who designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine—were in a superior position to understand the

risk of NDMA being present in and/or forming in ranitidine-containing products and had a duty to warn of these dangers.

388. Despite their ability and means to investigate, study, and test the products and to provide adequate warnings, Defendants failed to do so. Indeed, Defendants wrongfully concealed information and further made false and/or misleading statements concerning the safety and use of ranitidine-containing products.

389. Defendants' negligence included

a. Designing, manufacturing, testing, marketing, labeling, packaging, handling, distributing, storing, and/or selling ranitidine-containing products without thorough and adequate pre- and post-market testing;

b. Designing, manufacturing, testing, marketing, labeling, packaging, handling, distributing, storing, and/or selling ranitidine-containing products while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of ranitidine and the carcinogenic potential of NDMA as a result of ingesting ranitidine, and, consequently, the risk of serious harm associated with human use of ranitidine-containing products;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not ranitidine-containing products were safe for their intended consumer use;

d. Failing to use reasonable and prudent care in the design, manufacture, testing, marketing, labeling, packaging, handling, distribution, storage, and/or sale of ranitidine-containing products so as to avoid the risk of serious harm associated with the prevalent use of ranitidine-containing products;

e. Failing to design, manufacture, test, market, label, package, handle, distribute, store, and/or sell ranitidine-containing products so as to ensure they were at least as safe and effective as other medications on the market intended to treat the same symptoms;

f. Failing to undertake to provide adequate instructions, guidelines, and safety precautions regarding identity, strength, quality and purity at the time of use of their products to those persons Defendants could reasonably foresee would use ranitidine-containing products;

g. Failing to conduct proper studies at every level of the distribution chain regarding stability, as well as proper packaging and storage conditions, particularly relating to heat and light;

h. Failing to comply with CGMPs or conduct testing and due diligence in sourcing ingredients and solvents used to manufacture ranitidine-containing products;

i. Failing to comply with CGMPs or conduct testing and due diligence before designing, manufacturing, testing, marketing, labeling, packaging, handling, distributing, storing, and/or selling ranitidine-containing products, specifically as it relates to proper storage and transport of the drugs, and subsequently failing to provide proper warnings to patients and physicians concerning the same;

j. Failing to conduct proper post-market surveillance relating to the presence of NDMA in Defendants' ranitidine-containing products;

k. Failing to conduct proper post-market surveillance relating to the stability (or lack thereof) of Defendants' ranitidine-containing products;

l. Failing to report adverse events, specifically cases of cancer in patients who took ranitidine-containing products to the FDA, despite being aware of these adverse events;

m. Failing to undertake to disclose to Plaintiffs, users/consumers, and the general public that use of ranitidine-containing products presented severe risks of cancer;

n. Failing to warn Plaintiffs, consumers, and the general public that ranitidine-containing products' risk of harm was unreasonable and that there were safer and effective alternative medications available to Plaintiffs and other consumers;

o. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of ranitidine-containing products;

p. Representing that their ranitidine-containing products were safe for their intended use when, in fact, Defendants knew or should have known the products were not safe for their intended purpose;

q. Declining to make or propose any changes to ranitidine-containing products' labeling or other promotional materials that would alert consumers and the general public of the risks of ranitidine-containing products;

r. Advertising, marketing, and recommending the use of ranitidine-containing products, while concealing and failing to disclose or warn of the dangers known (by Defendants) to be associated with or caused by the use of or exposure to ranitidine-containing products;

s.  Continuing to disseminate information to consumers, including Plaintiffs, that indicate or imply that Defendants' ranitidine-containing products are not unsafe for regular consumer use; and

t.  Continuing to design, manufacture, test, market, label, package, handle, distribute, store, and/or sell ranitidine-containing products with the knowledge that the products were unreasonably unsafe and dangerous.

390.  Defendants knew or should have known that it was foreseeable that consumers such as Plaintiffs would suffer injuries as a result of Defendants' failure to exercise ordinary care in the design, manufacture, testing, marketing, labeling, packaging, handling, distribution, storage, and/or sale of ranitidine-containing products.

391.  Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to ranitidine-containing products.

392.  Defendants' negligence was a substantial factor in causing Plaintiffs' injuries.

393.  Defendants' conduct, as described above, was reckless.  Defendants regularly risked the lives of consumers and users of their products, including Plaintiffs, with full knowledge of the dangers of their products.  Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs, about those dangers. Defendants' reckless conduct therefore warrants an award of punitive damages.

394.  As a direct and proximate result of Defendants' failure to undertake to provide an adequate warning of the risks of ranitidine-containing products, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

395.  WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein

incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT VI: NEGLIGENT MISREPRESENTATION
### (Against Manufacturer Defendants)

396.     Plaintiffs incorporate paragraphs 1 through 302 as if fully stated herein.

397.     At all relevant times, Manufacturer Defendants designed, manufactured, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, stored, handled, warehoused, distributed, sold and/or otherwise placed ranitidine-containing products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to consumers of ranitidine-containing products, including Plaintiffs.

398.     Manufacturer Defendants were negligent, reckless, and careless and owed a duty to Plaintiffs to make accurate and truthful representations regarding ranitidine-containing products, and Manufacturer Defendants breached their duty, thereby causing Plaintiffs to suffer harm.

399.     Manufacturer Defendants represented to Plaintiffs via the media, advertising, website, social media, packaging, and promotions, among other misrepresentations described herein that

    a.   ranitidine-containing products were both safe and effective for the lifetime of the product, when in fact, the drug contains unsafe levels of NDMA far in excess of the 96ng limit that increases at various points during the shipping, handling, storage, and consumption phases and as the product ages;

    b.   consumption of ranitidine-containing products would not result in excessive amounts of NDMA being formed in their bodies; and

    c.   the levels of NDMA in ranitidine-containing products have no practical clinical significance; and

    d.   ranitidine-containing products were safe for their intended use when, in fact, Defendants knew or should have known the products were not safe for their intended purpose.

400.     These representations were false.  Because of the unsafe levels of NDMA in

ranitidine-containing products, the drug presented an unacceptable risk of causing cancer. Ranitidine-containing products are so unsafe that the FDA was compelled to order the immediate withdrawal of all ranitidine-containing products on April 1, 2020.

401. Manufacturer Defendants knew or should have known these representations were false and negligently made them without regard for their truth.

402. Manufacturer Defendants had a duty to accurately provide this information to Plaintiffs. In concealing this information from Plaintiffs, Manufacturer Defendants breached their duty. Manufacturer Defendants also gained financially from, and as a result of their breach.

403. Manufacturer Defendants intended for Plaintiffs and/or their physicians to rely on these representations.

404. Each of these misrepresentations were material at the time they were made. In particular, each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiffs as to whether to purchase or consume ranitidine-containing products.

405. Plaintiffs reasonably relied on these representations and were harmed as described herein. Plaintiffs' reliance on Manufacturer Defendants' representations was a substantial factor in causing Plaintiffs' harms. Had Manufacturer Defendants told Plaintiffs the truth about the safety and composition of ranitidine-containing products, Plaintiffs would not have consumed or purchased them.

406. Manufacturer Defendants' acts and omissions as described herein were committed in reckless disregard of Plaintiffs' rights, interests, and well-being to enrich Defendants.

407. As a direct and proximate result of the Manufacturer Defendants' negligent misrepresentations concerning their ranitidine-containing products, Plaintiffs have been injured,

sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

408. WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT VII: BREACH OF EXPRESS WARRANTIES
### (Against Manufacturer Defendants)

409. Plaintiffs incorporate paragraphs 1 through 302 as if fully stated herein.

410. At all relevant times, Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine-containing products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing ranitidine-containing products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

411. Defendants had a duty to exercise reasonable care in the design, manufacture, testing, marketing, labeling, packaging, handling, distribution, storage, and/or sale of ranitidine-containing products, including a duty to:

    a. ensure that their products did not cause the user unreasonably dangerous side effects;

    b. warn of dangerous and potentially fatal side effects; and

    c. disclose adverse material facts, such as the true risks associated with the use of and exposure to ranitidine-containing products, when making representations to consumers and the general public, including Plaintiffs.

412. As alleged throughout this pleading, the ability of Defendants to properly disclose those risks associated with ranitidine-containing products is not limited to representations made

on the labeling.

413. At all relevant times, Defendants expressly represented and warranted to the purchasers of their products, by and through statements made by Defendants in labels, publications, package inserts, and other written materials intended for consumers and the general public, that ranitidine-containing products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendants advertised, labeled, marketed, and promoted ranitidine-containing products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that ranitidine-containing products would conform to the representations.

414. These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to ranitidine-containing products. Defendants knew and/or should have known that the risks expressly included in ranitidine-containing products warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendants expressly represented that ranitidine-containing products were safe and effective, that they were safe and effective for use by individuals such as Plaintiffs, and/or that they were safe and effective as consumer medication.

415. The representations about ranitidine-containing products, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

416. Defendants placed ranitidine-containing products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the

true risks of developing the injuries associated with the use of ranitidine-containing products.

417. Defendants breached these warranties because, among other things, ranitidine-containing products were defective, dangerous, and unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendants breached the warranties in the following ways:

     a. Defendants represented through their labeling, advertising, and marketing materials that ranitidine-containing products were safe, and intentionally withheld and concealed information about the risks of serious injury associated with use of ranitidine-containing products and by expressly limiting the risks associated with use within their warnings and labels;

     b. Defendants represented that the expiry dates on their products were accurate and that their ranitidine-containing products were safe for consumption throughout the end of the expiry period;

     c. Defendants represented that their ranitidine-containing products were safe for human consumption without disclosing the risks of NDMA in the pills, the risk that NDMA might form over time and/or increase dramatically as a result of exposure to heat and/or light, and the risk that NDMA might form during the digestion process; and

     d. Defendants represented that ranitidine-containing products were safe for use and intentionally concealed information that demonstrated that they had carcinogenic properties, and that ranitidine-containing products, therefore, were not safer than alternatives available on the market.

418. Plaintiffs detrimentally relied on the express warranties and representations of Defendants concerning the safety and/or risk profile of ranitidine-containing products in deciding to purchase the product. Plaintiffs reasonably relied upon Defendants to disclose known defects, risks, dangers, and side effects of ranitidine. Physicians would not have prescribed, and Plaintiffs would not have purchased or used ranitidine-containing products had Defendants properly disclosed the risks associated with ranitidine, either through advertising, labeling, or any other form of disclosure.

419.     Defendants had sole access to material facts concerning the nature of the risks associated with their ranitidine-containing products, as expressly stated within their warnings and labels, and knew that consumers and users such as Plaintiffs could not have reasonably discovered that the risks expressly included in ranitidine-containing products' warnings and labels were inadequate and inaccurate.

420.     Plaintiffs had no knowledge of the falsity or incompleteness of Defendants' statements and representations concerning ranitidine-containing products.

421.     Plaintiffs used and/or were exposed to ranitidine-containing products as designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, sold, or otherwise released into the stream of commerce by Defendants.

422.     Had the warnings, labels, advertisements, or promotional material for ranitidine-containing products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiffs' injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiffs could have avoided the injuries complained of herein.

423.     Defendants' breach of these express warranties was a substantial factor in causing Plaintiffs' harm.

424.     As a direct and proximate result of Defendants' breach of these warranties, as alleged herein, Plaintiffs sustained an economic loss and other injuries.

425.     WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

**COUNT VIII:  BREACH OF IMPLIED WARRANTIES**
**(Against Manufacturer Defendants)**

426. Plaintiffs incorporate paragraphs 1 through 302 as if fully stated herein .

427. At all relevant times, Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine-containing products, which were and are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing ranitidine-containing products into the stream of commerce.

428. Before the time Plaintiffs used ranitidine-containing products, Defendants impliedly warranted to their consumers, including Plaintiffs, that ranitidine-containing products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as consumer medication.

429. But Defendants failed to disclose that ranitidine-containing products had dangerous propensities when used as intended and that use of ranitidine-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

430. Plaintiffs were an intended beneficiary of the implied warranties made by Defendants to purchasers of their ranitidine-containing products.

431. At all relevant times, Defendants were aware that consumers and users of their products, including Plaintiffs, would use ranitidine-containing products as marketed by Defendants, which is to say that Plaintiffs were a foreseeable user of ranitidine-containing products.

432. Defendants intended that ranitidine-containing products be used in the manner in which Plaintiffs, in fact, used them and which Defendants impliedly warranted to be of merchantable quality, safe, and fit for this use, even though ranitidine-containing products were not adequately tested or researched.

433. In reliance upon Defendants' implied warranty, Plaintiffs used ranitidine-

containing products as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendants.

434. Plaintiffs could not have reasonably discovered or known of the risks of serious injury associated with ranitidine-containing products.

435. Defendants breached their implied warranty to Plaintiffs in that ranitidine-containing products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Ranitidine-containing products have dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

436. The harm caused by Defendants' ranitidine-containing products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

437. Defendants' breach of these implied warranties was a substantial factor is causing Plaintiffs' harm.

438. As a direct and proximate result of Defendants' breach of implied warranties, as alleged herein, Plaintiffs sustained a loss an economic loss and other injuries.

439. WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT IX: UNJUST ENRICHMENT
### (Against Manufacturer Defendants)

440. Plaintiffs incorporate paragraphs 1 through 302 as if fully stated herein.

441. At all relevant times, Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold, or otherwise released ranitidine-containing products into the stream of commerce, and therefore owed a duty of reasonable care to

avoid causing harm to those that consumed it, including Plaintiff.

442. Defendants knew that ranitidine-containing products posed a grave risk of harm but failed to warn of the dangerous risks associated with use and exposure to the products. The dangerous propensities of their products and the carcinogenic characteristics of NDMA were well known to Defendants.

443. Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading marketing, promotions, and advertisements that omitted disclosure that the products presented an unreasonable risk of substantial bodily injury resulting from their use.

444. Defendants requested and received a measurable benefit at the expense of Plaintiffs in the form of payment for their ranitidine-containing products.

445. Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Defendants at Plaintiffs' detriment. These benefits were the expected result of Defendants acting in their pecuniary interests at the expense of Plaintiffs.

446. There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

447. Defendants wrongfully obfuscated the harm caused by their ranitidine-containing products. Thus, Plaintiffs, who mistakenly enriched Defendants by relying on Defendants' misrepresentations of product safety, could not and did not know the effect that using ranitidine-containing products would have on Plaintiffs' health.

448. Plaintiffs are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs to the position he occupied prior to dealing with

Defendants. Due to their wrongful conduct and the FDA action recalling ranitidine-containing products in the form of a market withdrawal, Defendants are reasonably notified that Plaintiffs would expect compensation from Defendants' unjust enrichment stemming from their wrongful actions.

**WHEREFORE**, Plaintiffs respectfully request this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT X: LOSS OF CONSORTIUM
### (Against All Defendants)

449. Plaintiffs incorporate paragraphs 1 through 302 as if fully stated herein.

450. As a direct and proximate result of Defendants' conduct as detailed above, Plaintiffs' spouses have suffered and will continue to suffer the loss of their loved one's support, companionship, services, society, love, and affection.

451. Plaintiffs' spouses have necessarily paid and have become liable to pay for medical aid, treatment and for medications, and will necessarily incur further expenses of a similar nature in the future as a proximate result of Defendants' misconduct.

452. Plaintiffs' spouses allege that their marital relationship has been impaired and depreciated, and the marital association has been altered.

453. Plaintiffs' spouses suffered great emotional pain and mental anguish.

454. Plaintiffs' spouses sustained and will continue to sustain several physical injuries, severe emotional distress, economic losses, and other damages for which they are entitled to compensatory damages.

455. Defendants' actions and omissions as identified in this Complaint show that Defendants acted maliciously and/or intentionally disregarded Plaintiffs' rights so as to warrant

the imposition of punitive damages.

456.     Under Illinois law, Plaintiffs are entitled to damages for loss of consortium under the facts herein alleged based on their injuries, expenditures, and suffering.

**WHEREFORE**, Plaintiffs respectfully request this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

457.     Pursuant to 735 ILCS 5/2-1105 Plaintiffs hereby demands a trial by jury on all the triable issues within this pleading.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request the Court to enter judgment in Plaintiffs' favor and against Defendants for:

a.     actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

b.     exemplary and punitive damages sufficient to punish and deter Defendants and others from future wrongful practices;

c.     pre-judgment and post-judgment interest;

d.     reasonable attorneys' fees as provided by law;

e.     costs and expenses of these actions;

f.     statutory damages, treble damages and other relief permitted by the laws of the states that will govern these actions; and

g.     any other relief the Court may deem just and proper.

DATED: August 2, 2021.

Respectfully submitted,

HOLLAND LAW FIRM, LLC

*/s/ R. Seth Crompton*
R. SETH CROMPTON (#6288095)
ERIC D. HOLLAND (#6207110)
GREG JONES (#6325696)
211 North Broadway, Suite 2625
St. Louis, MO 63102
(314) 241-8111 Telephone
(314) 241-5554 Facsimile
scrompton@hollandtriallawyers.com
eholland@hollandtriallawyers.com
gjones@hollandtriallawyers.com

ANN E. CALLIS (#6203933)
ERIKA STASSI (#6327641)
HOLLAND LAW FIRM, LLC
1324 Niedringhaus Avenue
Granite City, Illinois 62040
(618) 452-1323 Telephone
(618) 452-8024 Facsimile
acallis@hollandtriallawyers.com
estassi@hollandtriallawyers.com

and

KELLER LENKNER LLC
ASHLEY KELLER (#6300171)
NICOLE BERG (#06207110)
150 N. Riverside Plaza, Suite 4270
Chicago, Illinois 60606
(312) 741-5220 Telephone
ack@kellerlenkner.com
ncb@kellerlenkner.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 2, 2021 , I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that the foregoing document is being served on all counsel of record or parties registered to receive CM/ECF Electronic Filings.

HOLLAND LAW FIRM, LLC

*/s/ R. Seth Crompton*
R. SETH CROMPTON (#6288095)
211 North Broadway, Suite 2625
St. Louis, MO 63102
(314) 241-8111 Telephone
(314) 241-5554 Facsimile
scrompton@hollandtriallawyers.com

***EFILED***
Case Number 2021L 000915
Date: 8/2/2021 11:32 AM
Thomas McRae
Clerk of Circuit Court
Third Judicial Circuit, Madison County Illinois

**IN THE CIRCUIT COURT
OF THE THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS**

JOSEPH BAYER and ) 
GWENDOLYN CULVERSON, ) 
　 ) 
　　Plaintiffs, ) 　　Cause No.:   2021L 000915
　 ) 
vs. ) 
　 ) 
BEOHRINGER INGELHEIM, et al., ) 
　 ) 
　　Defendants. ) 

**JURY DEMAND**

    Plaintiff hereby requests trial by jury on all counts.

Dated: August 2, 2021.

                HOLLAND LAW FIRM, LLC

                */s/ Seth Crompton*
                R. SETH CROMPTON (#6288095)
                211 N. Broadway, Suite 2625
                St. Louis, MO 63102
                314-241-8111 Telephone
                314-241-5554 Facsimile
                scrompton@hollandtriallawyers.com

                *Attorneys for Plaintiff*

***EFILED***
Case Number 2021L 000915
Date: 8/2/2021 11:32 AM
Thomas McRae
Clerk of Circuit Court
Third Judicial Circuit, Madison County Illinois

## IN THE CIRCUIT COURT
## OF THE THIRD JUDICIAL CIRCUIT
## MADISON COUNTY, ILLINOIS

JOSEPH BAYER and         )
GWENDOLYN CULVERSON,     )
                            )
       Plaintiffs,           )      Cause No.:     **2021L 000915**
                            )
vs.                         )
                            )
BOEHRINGER INGELHEIM, et al.,    )
                            )
       Defendants.         )

### AFFIDAVIT

Comes now Affiant, Seth Crompton, and, pursuant to Supreme Court Rule 222(b), states,

under the penalties of perjury as provided by Section 1-109 of the Code of Civil Procedure, that

the money damages sought by plaintiff in the above-entitled cause of action do exceed $50,000.

Further, affiant sayeth not.

Dated this 18th day of August 2020.



                       Seth Crompton

Subscribed and sworn to me before this 2nd day of August 2021.

NOTARY PUBLIC                  My commission expires 04/12/2024.

TRACEY L BLASA
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
April 12, 2024